# United States Court of Appeals

*for the*

# Federal Circuit

REPROS THERAPEUTICS INC.,

*Plaintiff-Appellee,*

– v. –

HARRY FISCH,

*Defendant-Appellant,*

JOSEPH S. PODOLSKI, RONALD WIEHLE,

*Defendants.*

ON APPEAL FROM A FINAL JUDGMENT ENTERED IN THE UNITED STATES
DISTRICT COURT FOR THE SOUTHERN DISTRICT OF TEXAS IN CASE NO.
4:13-CV-02266, BEFORE THE HONORABLE JUDGE VANESSA D. GILMORE

## BRIEF ON BEHALF OF DEFENDANT-APPELLANT

MICHAEL A. NICODEMA
BARRY J. SCHINDLER
GREENBERG TRAURIG, LLP
200 Park Avenue
P.O. Box 677
Florham Park, New Jersey 07932
(973) 360-7900

ELLIOT H. SCHERKER
JOSE PENA
STEPHANIE L. VARELA
GREENBERG TRAURIG, P.A.
Wells Fargo Center
333 Southeast Second Avenue, Suite 4400
Miami, Florida 33131
(305) 579-0500

JULIE P. BOOKBINDER
GREENBERG TRAURIG, LLP
MetLife Building
200 Park Avenue
New York, New York 10166
(212) 801-9200

MICHAEL J. SCHAENGOLD
GREENBERG TRAURIG, LLP
2101 L Street, NW
Washington, D.C. 20037
(202) 331-3100

*Attorneys for Defendant-Appellant*

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

REPROS THERAPEUTICS INC. v. HARRY FISCH,
JOSEPH S. PODOLSKI, RONALD WIEHLE
No. 15-1328

**CERTIFICATE OF INTEREST**

Counsel for the Defendant-Appellant Harry Fisch certifies the following:

1. The full name of every party or amicus represented by me is:

Harry Fisch

2. The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

N/A

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

N/A

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Greenberg Traurig, LLP, Greenberg Traurig, P.A., Mary-Olga Lovett, Julie P. Bookbinder, Dwayne L. Mason, Ira R. Hatton, Michael A. Nicodema, Elliot H. Scherker, Barry J. Schindler, Pamela A. Ferguson, Jose Pena, Stephanie L. Varela, Michael J. Schaengold

Dated:  May 20, 2015                          /s/ Elliot H. Scherker
                                              Elliot H. Scherker

cc:    Counsel of Record

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST ................................................................C-1

TABLE OF AUTHORITIES ......................................................................iv

STATEMENT OF RELATED CASES ........................................................1

JURISDICTIONAL STATEMENT ...........................................................1

STATEMENT OF THE ISSUES................................................................1

STATEMENT OF THE CASE....................................................................1

    I.     PROCEDURAL HISTORY ...............................................1

    II.    THE PATENTS...................................................................2

        A.    The Fisch Provisional ............................................2

        B.    The Repros Provisional..........................................4

            1.    Disclosure of the Fisch Provisional to Repros ................4

            2.    The Repros Provisional ................................5

        C.    The '920 Patent ......................................................7

            1.    The patent ......................................................7

            2.    Repros's discovery of the '920 Patent............8

            3.    The reexaminations.......................................8

        D.    The '185 and '360 Patents ....................................10

            1.    Repros's application for the '360 Patent .......10

            2.    The '185 Patent............................................12

            3.    The '360 Patent............................................12

        E.    The Agreed Claim Constructions..........................13

    III.   THE SUMMARY JUDGMENT ......................................14

        A.    Joint Inventorship..................................................14

i

1.    Dr. Fisch's motion for summary judgment on his counterclaim for co-inventorship ...................................14

2.    Repros's summary judgment motion on Dr. Fisch's counterclaim and response to Dr. Fisch's motion ........................................................................17

3.    Dr. Fisch's rebuttal ......................................18

4.    The ruling....................................................19

B.    Equitable Estoppel ................................................21

1.    The parties' positions..................................21

2.    The court's ruling .......................................23

SUMMARY OF ARGUMENT ................................................23

ARGUMENT .........................................................................25

I.    THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT FOR REPROS ON JOINT INVENTORSHIP.................................................................25

A.    Standard of Review................................................25

B.    Joint Inventorship.................................................26

C.    Dr. Fisch Is a Joint Inventor of the '185 Patent........27

1.    Dr. Fisch's conception ...................................27

2.    The district court's ruling erroneously denies Dr. Fisch's valid claim of joint inventorship.......................29

a.    The composition of the treating compound .........29

b.    The novel treatment of the disorder ....................31

c.    Reliance on the '920 Patent...................................32

D.    Dr. Fisch Is a Joint Inventor of the '360 Patent........34

1.    The district court applied the wrong claim construction to claim 7 of the '360 Patent.....................34

2.    Dr. Fisch's joint inventorship of claim 7 of the '360 Patent ...................................................36

        E.      The Summary Judgment Must Be Reversed ............................37

II.     THE DISTRICT COURT ERRED IN GRANTING
        SUMMARY JUDGMENT ON EQUITABLE ESTOPPEL
        TO BAR DR. FISCH'S CLAIM OF JOINT
        INVENTORSHIP OF THE '360 PATENT .......................................38

        A.      Standard of Review ...................................................................38

        B.      Equitable Estoppel and Joint Inventorship Claims ..................39

                1.      The equitable estoppel doctrine ......................................39

                2.      Dr. Fisch's action did not accrue until the '360
                        Patent issued to Repros...................................................41

        C.      The District Court Misapplied Equitable Estoppel in
                Barring Dr. Fisch's Claim to Joint Inventorship of the
                '360 Patent ................................................................................43

                1.      No "misleading conduct"................................................45

                2.      No reliance......................................................................49

                3.      No prejudice....................................................................51

                4.      Failure to weigh all equitable factors ............................53

CONCLUSION............................................................................................54

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*,
    960 F.2d 1020 (Fed. Cir. 1992) ............................................................*passim*

*Advanced Cardiovascular Sys., Inc. v. Scimed Life Sys., Inc.*,
    988 F.2d 1157 (Fed. Cir. 1993) ....................................................................40

*Allergan, Inc. v. Apotex Inc.*,
    754 F.3d 952 (Fed. Cir. 2014), *cert. denied*, 135 S. Ct. 956 (2015) .............32

*Aspex Eyewear, Inc. v. Clariti Eyewear, Inc.*,
    605 F.3d 1305 (Fed. Cir. 2010) ........................................................39, 45, 53

*Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs., Inc.*,
    776 F.3d 837 (Fed. Cir. 2015) ......................................................... 25-26, 27

*Burroughs Wellcome Co. v. Barr Labs., Inc.*,
    40 F.3d 1223 (Fed. Cir. 1994) ............................................................*passim*

*Checkpoint Sys., Inc. v. All-Tag Sec. S.A.*,
    412 F.3d 1331 (Fed. Cir. 2005) ....................................................................37

*Cook Biotech Inc. v. Acell, Inc.*,
    460 F.3d 1365 (Fed. Cir. 2006) ....................................................................26

*Dawson v. Dawson*,
    710 F.3d 1347 (Fed. Cir. 2013) .............................................................. 28-29

*Dey, L.P. v. Sunovion Pharm., Inc.*,
    715 F.3d 1351 (Fed. Cir. 2013) ....................................................................37

*Ecolab Inc. v. Envirochem, Inc.*,
    264 F.3d 1358 (Fed. Cir. 2001) .............................................................50, 51

*Eli Lilly & Co. v. Aradigm Corp.*,
    376 F.3d 1352 (Fed. Cir. 2004) .................................................. 26, 29-30, 32

*Ethicon, Inc. v. U.S. Surgical Corp.*,
    135 F.3d 1456 (Fed. Cir. 1998) .............................................................27, 37

*Falana v. Kent State Univ.*,
    669 F.3d 1349 (Fed. Cir. 2012) .............................................................27, 30

iv

*Fina Oil & Chem. Co. v. Ewen*,
  123 F.3d 1466 (Fed. Cir. 1997) .......................................................25, 26, 36

*Gasser Chair Co., Inc. v. Infanti Chair Mfg. Corp.*,
  60 F.3d 770 (Fed. Cir. 1995) ...........................................................50, 52, 54

*Gemstar-TV Guide, Int'l. v. Int'l Trade Comm'n*,
  383 F.3d 1352 (Fed. Cir. 2004) ....................................................................32

*Gen. Elec. Co. v. Wilkins*,
  750 F.3d 1324 (Fed. Cir.), *cert. denied*, 135 S. Ct. 286 (2014) ...................31

*Hall v. Aqua Queen Mfg., Inc.*,
  93 F.3d 1548 (Fed. Cir. 1996) ................................................................50, 52

*Hess v. Advanced Cardiovascular Sys., Inc.*,
  106 F.3d 976 (Fed. Cir. 1997) ......................................................................27

*HIF Bio, Inc. v. Yung Shin Pharm. Indus. Co., Ltd.*,
  600 F.3d 1347 (Fed. Cir. 2010) ....................................................................41

*Kopykake Enters., Inc. v. Lucks Co.*,
  264 F.3d 1377 (Fed. Cir. 2001) ....................................................................32

*Mahurkar v. C.R. Bard, Inc.*,
  79 F.3d 1572 (Fed. Cir. 1996) ......................................................................32

*MCV, Inc. v. King-Seeley Thermos Co.*,
  870 F.2d 1568 (Fed. Cir. 1989) ...................................................43, 44, 47, 48

*Memorylink Corp. v. Motorola Solutions, Inc.*,
  773 F.3d 1266 (Fed. Cir. 2014) ....................................................................25

*Meyers v. Asics Corp.*,
  974 F.2d 1304 (Fed. Cir. 1992) ...............................................................45, 50

*Meyers v. Brooks Shoe Inc.*,
  912 F.2d 1459 (Fed. Cir. 1990) ....................................................................46

*Pannu v. Iolab Corp.*,
  155 F.3d 1344 (Fed. Cir. 1998) ...............................................................27, 37

*Pei-herng Hor v. Ching-Wu Chu*,
  699 F.3d 1331 (Fed. Cir. 2012) ...............................................................41, 42, 43

*PPG Indus. v. Guardian Indus. Corp.*,
  156 F.3d 1351 (Fed. Cir. 1998) ....................................................................36

*Raytheon Co. v. Indigo Sys. Corp.*,
688 F.3d 1311 (Fed. Cir. 2012) ...................................................25

*Robinson v. Aetna Life Ins. Co.*,
443 F.3d 389 (5th Cir. 2006) ......................................................37

*Sandt Tech., Ltd. v. Resco Metal & Plastics Corp.*,
264 F.3d 1344 (Fed. Cir. 2001) ..................................................31

*Stark v. Advanced Magnetics, Inc.*,
119 F.3d 1551 (Fed. Cir. 1997) ..................................................41

*Stark v. Advanced Magnetics, Inc.*,
29 F.3d 1570 (Fed. Cir. 1994) ........................................40, 44, 52

*State Contracting & Eng'g Corp. v. Condotte Am., Inc.*,
346 F.3d 1057 (Fed. Cir. 2003) ..................................................52

*Stewart & Stevenson Servs. Inc. v. Serv-Tech, Inc.*,
794 F. Supp. 202 (S.D. Tex. 1992), *aff'd*,
996 F.2d 318 (Fed. Cir. 1993) ....................................................48

*Trovan, Ltd. v. Sokymat SA, Irori*,
299 F.3d 1292 (Fed. Cir. 2002) ............................................32, 34

*Vaupel Textilmaschinen KG v. Messanica Euro Italia S.P.A.*,
944 F.2d 870 (Fed. Cir. 1991) ....................................................53

**Statutes & Other Authorities:**

28 U.S.C. § 1295(a)(1) ................................................................1

28 U.S.C. § 1338(a) .....................................................................1

28 U.S.C. § 2107(a) .....................................................................1

35 U.S.C. § 116 .............................................................22, 23, 41

35 U.S.C. § 116(a) .....................................................................26

35 U.S.C. § 116(b) .....................................................................41

35 U.S.C. § 116(c) .....................................................................41

35 U.S.C. § 256 ................................................................*passim*

37 C.F.R. § 1.324 .......................................................................41

37 C.F.R. § 1.48(b) ............................................................................41

37 C.F.R. § 1.63(a)............................................................................41

Fed. R. App. P. 4(a) ............................................................................1

THE BLUE BOOK:  A UNIFORM SYSTEM OF CITATION R. 1.2(c) (Columbia
    Law Review Ass'n *et al*. eds. 19th ed. 2010).................................43

## STATEMENT OF RELATED CASES

There are no appeals in or from this action in the district court that are pending before this Court or any other appellate court. There are no other cases pending in this or any other court that will directly affect, or be directly affected by, this Court's decision in the pending appeal.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over the parties' claims to inventorship of the patents in suit under 35 U.S.C. § 256 and 28 U.S.C. § 1338(a). The district court entered its final judgment on December 23, 2014, and notice of appeal was timely filed on January 9, 2015. 28 U.S.C. § 2107(a); Fed. R. App. P. 4(a). This Court has jurisdiction under 28 U.S.C. § 1295(a)(1).

## STATEMENT OF THE ISSUES

1.     Whether the district court erred in ruling, on summary judgment, that Dr. Fisch is not a joint inventor of the '185 Patent or the '360 Patent, where the undisputed material facts establish that Dr. Fisch made a fundamental inventive contribution to the claims in dispute.

2.     Whether the district court erred in ruling on summary judgment that Dr. Fisch is equitably estopped from asserting joint inventorship of the '360 Patent.

## STATEMENT OF THE CASE

### I.     PROCEDURAL HISTORY.

On August 2, 2013, Repros Therapeutics Inc. (Repros) filed a complaint against Harry Fisch (Dr. Fisch) in the Southern District of Texas, seeking a declaratory judgment that Joseph S. Podolski (Mr. Podolski) and Ronald Wiehle

1

(Dr. Wiehle) are the only inventors of U.S. Patent Nos. 7,737,185 (the '185 Patent) and 7,759,360 (the '360 Patent).  (A113-26).  Dr. Fisch filed his answer on October 2, 2013, asserting a counterclaim for joint inventorship of the patents against Repros (and adding two counterclaim defendants, Mr. Podolski and Dr. Wiehle).  (A205-24; A524-49).[1]

On October 6, 2014, the parties filed summary judgment motions:  (i) Repros's motion for a judgment on the merits, as to both patents; (ii) Dr. Fisch's motion for a determination of joint inventorship, also as to both patents; and (iii) Repros's motion to bar Dr. Fisch's joint inventorship of claim 7 of the '360 Patent based on equitable estoppel.  (A877, A1135-36, A1479-80).  On December 23, 2014, the district court entered an order granting Repros's summary judgment motions and also entered a final judgment for Repros.  (A11-45).  Dr. Fisch filed his notice of appeal on January 9, 2015.  (A2815).

## II.  THE PATENTS.

### A.    The Fisch Provisional.

Dr. Fisch submitted his Provisional Application for Patent (the Fisch Provisional) to the United States Patent and Trademark Office (the PTO) on May 26, 2000.  (A554-63).  The invention's object "is to treat a relative androgen deficiency in older men and/or the specific disorders related to male menopause by the use of antiestrogens."  (A557).  Dr. Fisch identified several disorders that are caused by relative androgen deficiency:  (i) "[r]eduction of muscle mass"; (ii)

---

[1] The counterclaim defendants will be collectively referred to as Repros, except as necessary for clarity.

2

"reduction of bone density"; (iii) reduction of libido and potency"; and (iv) "psycho-vegetative disorders such as depression."  (A556).

The Fisch Provisional identifies two antiestrogens – tamoxifen citrate and clomiphene citrate (sold under the trademark Clomid) – but notes that "all such compounds are suitable."  (A558).  "A pharmaceutically effective dosage," *i.e.*, "10-1000 mg, preferably 20 to 100 mg . . . is used daily."  (A558-59).  Clomiphene citrate is a mixture of two geometric isomers:  the cis-isomer of clomiphene citrate, which is between 30% and 50% of the mixture; and the trans-isomer of clomiphene citrate, which is between 50-70%.  (A560).

Claim 1 of the Fisch Provisional recites "[a] method of treating androgen deficiency in men comprising administering" the antiestrogen.  (A561).  It has two dependent claims:  using tamoxifen or clomiphene (claim 2) and using tamoxifen citrate or clomiphene citrate (claim 3).  (A561).

Claim 4 recites "[a] method of treating disorders related to male menopause in men comprising administering an antiestrogen."  (A561).  Claim 4 has four dependent claims, each to a specific disorder: "reduction of muscle mass;" "limitation of body performance capacity;" "reduction of bone density;" and "reduction of libido and potency."  (A561-62).

B.    **The Repros Provisional.**

1.    **Disclosure of the Fisch Provisional to Repros.**

Dr. Fisch called Mr. Podolski, the Repros CEO, in March 2001 to discuss "commercializ[ing] my invention." (A1170, A1258-59, A1831).[2] Mr. Podolski told Dr. Fisch that the invention, an oral treatment for androgen deficiency and related disorders, was new and "pretty interesting." (A1259). Repros had not previously pursued the development of an oral treatment for androgen deficiency. (A1259-60, A1485, 1502).

Mr. Podolski sent Dr. Fisch an executed confidentiality agreement on March 27, 2001. (A1171-72, 1259).[3] On March 28, 2001, Dr. Fisch sent Mr. Podolski an article titled "The Aging Male." (A1123-24). Dr. Fisch also sent Mr. Podolski a copy of the Fisch Provisional, which Mr. Podolski gave to Dr. Wiehle, Repros's endocrinologist, whom he directed to "perform a little background survey." (A1284, A1734).

Dr. Wiehle performed a "short inspection of the literature," which he deemed "not encouraging" and prepared a report on April 2, 2001. (A1284, A1734, A1736-37, A1817-18, A1983-84). Mr. Podolski forwarded an "overview of Fisch's technology," together with Dr. Wiehle's report, to Tim McInerney, a Repros board member. (A1734).

---

[2] Repros was then known as Zonagen, Inc. (A1253, A1255-56, A1258, A1831). The entity will be referred to as Repros, unless otherwise warranted.

[3] Mr. Podolski maintained the Fisch Provisional as confidential. (A1175).

On April 4, 2001, Mr. Podolski traveled from Texas to New York City for dinner with Dr. Fisch, at which they were joined by Mr. McInerney. (A1180-81, A1262, A1268). At dinner, Mr. Podolski "[t]ook a quick look" at the Fisch Provisional. (A1181-82, A1269). He then told Dr. Fisch "[t]here's nothing here" and that Repros was "not interested in working" with him. (A14, A1184-85, A1260, A1268-69, A1326).

But Mr. Podolski kept his copy of the Fisch Provisional, which he shared with Dr. David Clough, Repros's intellectual property counsel, to determine whether the invention was patentable, and with the Repros board. (A1260). On April 18, 2001, Repros placed its first order for clomiphene citrate. (A1271, A1807).

### 2.    The Repros Provisional.

On July 9, 2001, three months after Mr. Podolski met with Dr. Fisch, he filed a Provisional Patent Application, titled "Methods and Materials for the Treatment of Testosterone Deficiency in Men" (the Repros Provisional). (A1517). The application was prepared by Repros's counsel, Dr. Clough. (A1517).

The invention "is directed to compositions useful for increasing testosterone levels . . . and for ameliorating or preventing the sequelae of low testosterone levels." (A1523).[4] "In one of its aspects the invention is directed to compositions having active ingredients comprising 0% to 29 % weight/weight of . . . '*cis*-clomiphene' . . . and 100% to 71% [weight/weight] '*trans*-clomiphene.'" *Id.*

---

[4] Among the "sequelae" are "loss of libido" and "progressive decrease in muscle mass." (A1522).

"Among the preferred compositions . . . which contain both *cis*-clomiphene and *trans*-clomiphene . . . are compositions wherein the ratio of *trans*-clomiphene and *cis*-clomiphene is greater than 1," and "[a] more preferred composition . . . comprises about 100% . . . *trans*-clomiphene." (A1523). The Repros Provisional includes four claims:

> 1.    A method for increasing serum levels of testosterone . . . , the method comprising administering . . . an effective amount of a compound comprising *cis*-clomiphene and *trans*-clomiphene . . . wherein the ratio of *trans*-clomiphene and *cis*-clomiphene is greater than 1 [weight/weight].

> 2.    The method of claim 1 wherein the composition consists essentially of an effective amount of *trans*-clomiphene . . . .

> 3.    A composition comprising 0% to about 29% [weight/weight] of *cis*-clomiphene at about 100% to about 71% *trans*-clomiphene . . . .

> 4.    A composition comprising *cis*-clomiphene and *trans*-clomiphene or analogs thereof . . . wherein the ratio of *trans*-clomiphene and *cis*-clomiphene is greater than 1.

(A1531).

Mr. Podolski "rel[ied] on [his] IP counsel to craft . . . claims in a broad net." (A1274). At deposition, Mr. Podolski was asked about compositions described in the Repros Provisional as "comprising zero percent to 29 percent *cis*-clomiphene and 100 percent to 71 percent *trans*-clomiphene" (A1275, A1531), and responded: "That's the way it was lawyered." (A1275). He could not recall any "experiments

6

with a clomiphene composition where the trans component was between 71 and 100 percent." (A1276-77).[5]

### C.    The '920 Patent.

#### 1.    The patent.

On May 21, 2002, Dr. Fisch was awarded U.S. Patent No. 6,391,920 (the '920 Patent) for his invention relating to: "the new use of antiestrogens for the production of a pharmaceutical agent for treating a relative androgen deficiency in men," the object of which "is to treat a relative androgen deficiency in older men and/or the specific disorder related to male menopause by the use of antiestrogens."    (A1843-44).    The '920 Patent discloses using "[a] pharmaceutically effective dosage of the antiestrogen," *i.e.*, "[a] dose of 10-25 mg of clomid daily or every other day . . . up to 100 mg." (A1844).  The '920 Patent notes that clomiphene citrate is a "mixture" of the cis-isomer and the trans-isomer, "containing between 30% and 50% of the cis-isomer." (A1845).

There are two independent claims in the '920 Patent as originally issued:  (i) "[a] method of treating androgen deficiency" with an antiestrogen (claim 1); and (ii) "[a] method of treating disorders related to" androgen deficiency with an antiestrogen (claim 4).    *Id.*    Claim 1 has dependent claims for different antiestrogens. *Id.*  Claim 4 has six dependent claims, all for disorders, including:

---

[5] When asked whether "52/49 or 51/48 [percent] would be an effective amount," Mr. Podolski responded:  "At this point in a prophetic patent application, yes." (A1275).    Repros's expert witness, Dr. Glenn Cunningham, acknowledged on deposition that, if a product that "was 70% trans raised testosterone," he would expect a product with "90 percent trans to raise it."  (A1824).

"reduction of muscle mass"; "reduction of bone density"; "reduction of libido"; and "reduction of potency." *Id.*

## 2.    Repros's discovery of the '920 Patent.

On May 12, 2003, Repros issued a press release that announced its "efficacy and safety study" of Androxal™, an oral treatment for androgen deficiency. (A1116-17). Dr. Fisch thereafter called Mr. Podolski and told him that the '920 Patent had issued; Mr. Podolski responded: "I never thought that you'd get that issued." (A1263). He professed to have been "surprised" and "flabbergasted." (A1263-64). Mr. Podolski told Dr. Fisch that "[y]our patent will not stand a . . . challenge." (A1263).

On September 1, 2003, Dr. Fisch sent Mr. Podolski an e-mail "[t]o summarize our recent phone conversations" about the '920 Patent.[6] He also suggested that Repros's studies, "if successful would be promising." (A1133). In an October 1, 2003 e-mail, Dr. Fisch referenced a conversation on the previous day and stated that he had been "giving your comments about my patent some more thought." (A1134).

## 3.    The reexaminations.

In an effort to build a "picket fence" around Dr. Fisch's '920 Patent, to "narrow[]" or "restrict the claims," Repros initiated a PTO reexamination of the '920 Patent in January 2004. (A1263-64, A1331). The examiner initially rejected

---

[6] In response to an interrogatory in this litigation, Dr. Fisch stated that he had "first identified that his inventive contributions had been incorporated into patent filings" by Repros "in or about August-September 2003." (A983).

claims 1-3 and 11-14 as having been anticipated by prior art, and/or as obvious. (A1343-44, A1352).

Dr. Fisch submitted an amendment in October 2004:

Claim 1. . . . A method of treating *disorders related to* androgen deficiency in men comprising administering a selective antiestrogen *to men in need of such treating*.

Claim 4. . . . A method of treating disorders related to [androgen deficiency] in men comprising administering an antiestrogen *to men in need of such treating*.

(A1331-32). The amendment also added claim 21, "[a] method of treating androgen deficiency in men comprising administering an antiestrogen to men in need of such treating . . . to treat a disorder related to" androgen deficiency, and seven additional dependent claims. (A1332-33, A1339) (emphasis omitted).[7]

On April 11, 2006, the PTO issued its Reexamination Certificate, ruling that claims 1 and 4, as well as dependent claims 2-3 and 5-14, "are determined to be patentable as amended." (A1847). Repros instituted a second reexamination proceeding less than three weeks later. (A1263-64, A1400).

On January 29, 2007, the PTO rejected claims 1-2, 4-9, 11, 15, and 19-20, as having been anticipated. (A1402). Dr. Fisch submitted a request for

---

[7] The amendment also addressed Dr. Fisch's reliance on later published references to support his position that his invention is novel and unobvious. (A1339). One such referral was a submission by Repros to the PTO on May 20, 2004, in the prosecution of its patent. (A1339-40). Dr. Fisch cited Mr. Podolski's discussion of published references on clomiphene and androgen deficiency to assert that the prior art did not address treatment of disorders related to androgen deficiency. (A1346-51).

reconsideration on March 15, 2007. (A1400-12).[8] On April 29, 2013, the PTO issued its Second Reexamination Certificate, confirming the '920 Patent's claims 2-3 and 11-20. (A1849).

### D.    The '185 and '360 Patents.

#### 1.    Repros's application for the '360 Patent.

In January 2004 – while the first reexamination of Dr. Fisch's '920 Patent was pending – Repros filed a patent application claiming the benefit of the Repros Provisional. (A1568). The claims in that application all contemplate, either expressly or implicitly, treating androgen deficiency with "[a] composition comprising *cis*-clomiphene and *trans*-clomiphene . . . wherein the ratio of *trans*-clomiphene and *cis*-clomiphene is greater than 1," or "[a] composition comprising 0% to about 29% . . . of *cis*-clomiphene and about 100% to about 71% *trans*-clomiphene." (A1583).[9] On July 20, 2009, the PTO rejected 11 of Mr. Podolski's claims. (A2041, A2045).[10]

---

[8] Dr. Fisch's supporting declaration refers to Mr. Podolski as the inventor of a second application (which ultimately led to the '185 Patent). (A2537-38).

[9] In a declaration submitted in the '920 Patent reexamination, Dr. Fisch noted Repros's statements in the application, which reflect that the prior art "does not reveal that a trial of clomiphene citrate . . . to treat a disorder associated with androgen deficiency . . . would reasonably have been expected to be successful." (A1101). The declaration cites the Repros application as "invented by" Mr. Podolski. (A1100-01).

[10] Among other publications relied on by the PTO to reject those claims was Dr. Fisch's application, which taught "a use of antiestrogen agent such as clomiphene or its isomers . . . for the treatment of androgen deficiency." (A2046).

On December 16, 2009, Repros submitted an amendment that canceled or withdrew numerous claims. (A2041-44). Claim 1, as amended (deletions marked by strike-through and additions by underlining) read:

> A method for increasing serum levels of testosterone in a human male with secondary hypogonadism, the method comprising administering to said male an effective amount of a composition ~~comprising 0% to 29% of cis clomiphene and 100% to 71%~~ consisting essentially of trans-clomiphene . . . .

(A2042). Claim 15 was similarly amended:

> A method for treating secondary hypogonadism in a human male, the method comprising administering to a human male in need thereof, an effective amount of a composition ~~comprising about 100% w/w of active ingredients~~ consisting essentially of trans-clomiphene . . . .

(A2043).

Repros's amendment argues that its "application is the first to disclose the ability of purified trans-clomiphene to elevate testosterone levels . . . and the first to disclose that purified cis-clomiphene *depresses* testosterone levels." (A2050). That "invention provides a composition that is surprisingly *more effective* than prior art . . . in raising testosterone while reducing side effects associated with the prior art compositions." *Id.*[11]

---

[11] Repros conceded, however, that prior art includes "[c]lomiphene and its isomers . . . among a laundry list of antiestrogens that may be administered" and that it was not the first to teach or suggest purification of the trans-isomer, or a composition consisting "essentially of" the trans-isomer, although Repros claimed to be the first to disclose the ability of purified trans-clomiphene to elevate testosterone levels. (A2048).

### 2. The '185 Patent.

On June 15, 2010, the PTO issued the '185 Patent to Repros. (A1546). The invention "relates to compositions and methods for treating wasting," and, "[m]ore specifically, . . . to treatments for increasing muscle mass in individuals." (A1555).

The patent states that the invention "is directed to compositions comprising clomiphene with increased amounts of trans-clomiphene" so that "the anti-estrogenic properties of the trans-isomer may be taken advantage of while lowering or eliminating potential side effects caused by the estrogenic cis-isomer." (A1557). Three "aspects of the present invention" are identified, in which: (i) "the composition comprises 0% to about 29% [weight/weight] of cis-clomiphene and about 100% to about 71% trans-clomiphene"; (ii) "the composition comprises cis-clomiphene and trans-clomiphene . . . , wherein the ratio of trans-clomiphene to cis-clomiphene is greater than 71/29"; and (iii) "the composition consists essentially of trans-clomiphene." *Id.* Claim 1 recites "[a] method for treating wasting in a hypogonadal male, comprising administering . . . a composition consisting essentially of trans-clomiphene . . . in an effective amount to treat said wasting." (A1563).

### 3. The '360 Patent.

On July 20, 2010, the PTO issued the '360 Patent to Repros. (A1534). The '360 patent relates to "a composition comprising clomiphene enriched for trans-clomiphene," to be used for "increasing testosterone levels" and "for ameliorating or preventing the sequelae of low testosterone levels." (A1541). The invention

includes "compositions having active ingredients comprising 0% to 29% . . . 'cis-clomiphene' . . . and 100% to 71% . . . 'trans-clomiphene,'" and to "methods for increasing serum testosterone levels . . . (and for ameliorating or preventing the sequelae of low testosterone levels)." *Id.*

Claim 1 recites "[a] method for increasing serum levels of testosterone . . . , comprising administering . . . an effective amount of a composition consisting essentially of trans-clomiphene." (A1545). Claim 7 recites "[a] method for treating secondary hypogonadism . . . , comprising administering to a human male in need thereof, an effective amount of a composition consisting essentially of trans-clomiphene." (A1545).

### E. The Agreed Claim Constructions.

The parties submitted agreed joint claim constructions:

- The term "a human male with secondary hypogonadism" in claim 1 of the '360 Patent is construed as: "[a] human male with low testosterone levels . . . being with or without at least one related symptom." (A875).

- The term "treating secondary hypogonadism in a human male" in claim 7 of the '360 Patent is construed as: "[t]herapeutic or prophylactic management of a human male with low testosterone levels . . . being with or without at least one related symptom." *Id.*

- The term "treating wasting in a hypogonadal male" in claim 1 of the '185 Patent is construed as: "[t]herapeutic and prophylactic or preventive measures to prevent or slow (lessen) progressive loss of weight or muscle

13

mass and/or progressive weakening and degeneration of muscle mass in a male having low testosterone levels." *Id.*

## III.  THE SUMMARY JUDGMENT.

### A.    Joint Inventorship.

#### 1.    Dr. Fisch's motion for summary judgment on his counterclaim for co-inventorship.

Dr. Fisch moved for summary judgment on his joint inventorship counterclaim, asserting – based on the facts set forth in Part II, *supra* – that the Repros Provisional "appropriated the inventive concepts disclosed in the Fisch Provisional for treating symptoms relating to testosterone deficiency." (A1479, A1501). Dr. Fisch submitted the expert declaration of Dr. Ridwan Shabsigh, a professor of clinical urology at Cornell University, who compared the Fisch Provisional with claim 7 of the '360 Patent and claim 1 of the '185 Patent. (A1850-51, A1855, A1869-71, A1879).

The Fisch Provisional discloses that androgen deficiency can cause "a number of age-related disorders," including "[r]eduction of muscle mass . . . reduction of bone density . . . reduction of libido and potency, and psycho-vegetative disorders such as depression." (A1871).  The '360 Patent discloses that "[s]ome of the sequelae of adult testosterone deficiency include a wide variety of symptoms," including "loss of libido, . . .  progressive decrease in muscle mass, fatigue, depressed mood and increased risk of osteoporosis." (A1869).

The Fisch Provisional "disclosed a treatment using 50-70% trans-clomiphene." (A1870). Both the '360 Patent and the '185 Patent disclose "using 71-100% trans-clomiphene." (A1870-71).

Dr. Shabsigh's declaration includes an exhibit comparing the Fisch Provisional's disclosure and Repros's claims. First, he compared the Fisch Provisional and claim 7 of the '360 Patent:

|  | **Fisch Provisional** | **'360 Patent Claim 7** |
|---|---|---|
| **Disease** | • "The object of the present invention is to treat a relative androgen deficiency in older men and/or the specific disorders related to male menopause by the use of antiestrogens." | secondary hypogonadism in a human male |
| **Disorders or Symptoms Related to Hypogonadism** | • "The object of the present invention is to treat a relative androgen deficiency in older men and/or the specific disorders related to male menopause by the use of antiestrogens."<br>• Examples of specific disorders: reduction of muscle mass, limitation of body performance capacity, reduction of bone density, reduction of libido and potency[.] | treating secondary hypogonadism – including at least one symptom |
| **Method** | • "A daily dose of 25 mg of clomid and up to 100 mg is administered to obtain the mid-normal levels."<br>• "Clomiphene citrate tablets is a mixture of two geometric isomers [cis (zuclomiphene) and trans (enclomiphene)] containing between 30% and 50% of the cis-isomer." | administering an effective amount of a composition consisting essentially of trans-clomiphene<br><br>. . . . |

(A1914) (page references omitted).

Second, he compared the Fisch Provisional and claim 1 of the '185 Patent:

|  | **Fisch Provisional** | **'185 Patent Claim 1** |
|---|---|---|
| **Disease** | • "The object of the present invention is to treat a relative androgen deficiency in older men and/or the specific disorders related to male menopause by the use of antiestrogens." | wasting in a hypogonadal male |
| **Disorders or Symptoms Related to Hypogonadism** | • "The object of the present invention is to treat a relative androgen deficiency in older men and/or the specific disorders related to male menopause by the use of antiestrogens."<br>• Example of specific disorder: reduction of muscle mass[.] | wasting – progressive weakening and degeneration of muscle mass |
| **Method** | • "A daily dose of 25 mg of clomid and up to 100 mg is administered to obtain the mid-normal levels."<br>• "Clomiphene citrate tablets is a mixture of two geometric isomers [cis (zuclomiphene) and trans (enclomiphene)] containing between 30% and 50% of the cis-isomer." | administering a composition consisting essentially of trans-clomiphene<br><br>. . . . |

(A1915) (page references omitted).

Dr. Shabsigh concluded that "Dr. Fisch made a foundational inventive contribution" to claim 7 of the '360 Patent and claims 1-7 of the '185 Patent:

> Dr. Fisch's inventive contribution to all of these Repros patent claims is the new use of Clomiphene citrate in a pharmaceutically effective amount to treat the disorders related to or symptoms of secondary hypogonadism in men. . . . Dr. Fisch's contributions in this regard are embodied in the Fisch Provisional, a copy of which he gave in confidence to Repros 3 months before Repros filed its own provisional patent application on the use of Clomiphene citrate to treat secondary hypogonadism and the symptoms thereof. . . . In my opinion, Dr. Fisch's foundational inventive contributions to the Repros '360 and '185 patent claims were novel, and were not disclosed, taught, or suggested in the prior art. . . .

(A1871).

16

### 2. Repros's summary judgment motion on Dr. Fisch's counterclaim and response to Dr. Fisch's motion.

Both Repros's response to Dr. Fisch's summary judgment motion and its cross-motion assert that Dr. Fisch is not a joint inventor of either patent. (A1156-63, A2282-86). First, Repros asserted that, as to claim 7 of the '360 Patent, "the use of clomiphene citrate to treat secondary hypogonadism was known in the state of the art," and that the Fisch Provisional "does not describe a composition consisting essentially of trans-clomiphene (or its use)." (A2282-83).[12]

Second, Repros asserted that claim 7 of the '360 Patent "neither refers to nor requires the treatment of a disorder." (A2283) (emphasis omitted). That is, "all that is required by claim 7 is that testosterone levels in the human male are raised to a normal level," and the claim "requires only the treatment (therapeutic or prophylactic management) of secondary hypogonadism itself in a human male who may or may not have a related symptom." *Id.* With respect to the '185 Patent – which Repros conceded discloses treatment of a disorder caused by androgen deficiency – Repros relied on its use of "a composition 'consisting essentially of the trans-isomer.'" (A2285-86).

Repros sought to support its arguments with Dr. Cunningham's opinion that the Fisch Provisional does not "suggest the use of the trans-clomiphene isomer separate from a composition in which between 30% and 50% of the cis-isomer is also present to treat androgen deficiency or any disorder related to" androgen deficiency. (A2573). Dr. Cunningham concluded that the Fisch Provisional "did

---

[12] The district court gave short shrift to Repros's assertion that Dr. Fisch's contributions are prior art. (A40, A1156-61).

not contribute" to "the conception of the inventions described" in the '360 Patent or the '185 Patent.  (A2579-80).

"[T]he conception of the inventions claimed in the '360 and '185 patents," according to Repros, "occurred in the mind of Mr. Podolski after discussing the potential of the isomers within his own research group."  (A2741).  Repros also sought to narrow claim 7 of the '360 patent to the treatment of androgen deficiency with "trans-clomiphene, essentially free of cis-clomiphene," which Repros describes as "[a] novel property of the inventions."  (A2742-44).

### 3.    Dr. Fisch's rebuttal.

Dr. Shabsigh's rebuttal declaration reviewed the prior art, which "did not disclose, teach, or suggest that symptoms of disorders related to hypogonadism could be effectively treated with clomiphene citrate" and, "[i]f anything, . . . showed that attempts at proving the clinical efficacy of clomiphene citrate to treat symptoms or disorders related to hypogonadism failed."  (A1924).  Dr. Shabsigh also addressed Repros's argument that the '360 Patent "is directed to the use of the isolated trans-isomer of clomiphene":

> [T]he '360 patent describes treatment with *enriched* trans-clomiphene, which is presented as (71-100%).  The Fisch [P]rovisional clearly teaches that Clomiphene citrate contains trans-clomiphene as a majority of its content (50-70%).  These . . . formulations are similar in that they both contain a majority of trans-clomiphene and could logically be both described as "trans-clomiphene-enriched."  The only difference is the degree of enrichment.  Clearly the difference between 70% and 71% would not be significant or meaningful to a person of ordinary skill in the art. . . .

(A1925).

18

4.    **The ruling.**

Addressing claim 7 of the '360 Patent, the court professed to "compar[e] the purported contribution by Fisch to the claims of the [Repros] patents based on the agreed constructions by the parties." (A39-40).[13]   The court first ruled that the PTO's reexamination of the '920 Patent had revealed that "treatment of androgen deficiency in men with clomiphene citrate was not novel to Fisch's patent and that this invention was limited strictly to *disorders related to* androgen deficiency." (A40-41).  But the court also declined to give any weight to Repros's "prior art" arguments, labeling as "inexplicabl[e]" Repros's "attempts to disprove co-inventorship by proving the invalidity of the '920 patent based on its similarity to prior art," because the court was "not tasked with determining the validity of the '920 patent." (A40).

The court nonetheless rejected Dr. Fisch's contention that his invention had "contributed to the conception . . . of the '360 patent," because Dr. Fisch's '920 Patent "bears very little resemblance" to the Fisch Provisional, in that Dr. Fisch's invention "was deemed only patentable" when its method was modified to

---

[13] The court conflated the agreed construction of claim 1 of the '360 Patent with the construction of claim 7 (A875), applying the construction of "a human male with secondary hypogonadism" as "a human male with low testosterone levels . . . the human male being with or without at least one related symptom" to claim 7. (A39).  But the parties' agreed construction of the term "treating secondary hypogonadism in a human male" in claim 7 is "[t]herapeutic or prophylactic management of a human male with low testosterone levels . . . , the human male being with or without at least one related symptom." (A875).  The court's application of the claim 1 construction to claim 7 – the only claim in the '360 Patent as to which Dr. Fisch asserted joint inventorship – skewed the court's analysis of that claim. (A39, A41-42).  See Argument, Point I.D, *infra*.

"treating 'disorders related to androgen deficiency,'" while "[t]he '360 patent is a purported improvement on existing treatments for low testosterone itself, not merely the related disorders." (A39, A41-42). The court ruled that "the treatment of disorders *related to* androgen [deficiency] bears little relation" to the '360 Patent. (A42). Although the Fisch Provisional contemplates treating with clomiphene citrate, with up to 70% trans-clomiphene, and both the Repros Provisional and the ultimately issued '360 Patent use between 71-100% trans-clomiphene, the court ruled that Dr. Fisch "contributed nothing to the actual invention of the '360 patent, which was the use of trans-clomiphene as opposed to clomiphene citrate to treat secondary hypogonadism." (A43).[14]

Addressing claim 1 of the '185 Patent, the court noted that the Fisch Provisional "claim[ed] the use of clomiphene citrate to treat 'reduction of muscle mass,'" but that, following the second PTO reexamination, "that claim was cancelled." (A44-45). Because "the invention of the '185 patent is the emphasis on trans-clomiphene rather than clomiphene citrate with higher proportions of cis-clomiphene," the court ruled that Dr. Fisch's joint inventorship claim "suffer[s] from many of the same deficiencies as his prior argument as to the '360 Patent." *Id.*

---

[14] The court also relied on Repros's post-filing "studies on the varying impacts on testosterone levels and other issues between Clomid, cis-clomiphene, and trans-clomiphene," and its determination that "Clomid . . . was less effective and posed greater health risks than pure trans-clomiphene." (A43).

## B.    Equitable Estoppel.

### 1.    The parties' positions.

Repros sought summary judgment on an equitable estoppel theory, to bar Dr. Fisch from asserting joint inventorship of the '360 Patent, based on: (i) Dr. Fisch's admission that he realized in August-September 2003 that "his inventive contributions had been incorporated into [Repros's] patent filings"; (ii) a telephone call and e-mail between Dr. Fisch and Mr. Podolski following Repros's May 12, 2003 press release; and (iii) a September 30, 2003 telephone conversation and October 1, 2003 e-mail exchange between Dr. Fisch and Mr. Podolski, discussing the '920 Patent. (A894-96). Repros also relied on Dr. Fisch's statement, during the two reexamination proceedings instigated by Repros on Dr. Fisch's '920 Patent, that Mr. Podolski is identified as the "inventor" in the application that ultimately led to the '360 Patent. (A896-98).

According to Repros, "[r]elying on the sole inventorship of the '360 patent, Repros completed prosecution of the '360 patent and made increasingly substantial investments in developing the technology covered by the patent." (A900). Repros also asserted that it would suffer "evidentiary prejudice," based on Dr. Fisch's inability to recall with specificity conversations during his dinner with Mr. Podolski in April 2001. (A901-02).

In response, Dr. Fisch noted that he had never communicated his post-August-September 2003 state of mind to Repros, that he had never engaged in misleading conduct, and that the reexamination proceedings had no bearing on

"who should be listed as the inventors of '360 patent." (A2108-10).[15]   And Dr.
Fisch could not have asserted joint inventorship of the '360 Patent in 2003,
because his claim did not accrue until the patent issued in 2010. (A2108-09).[16]

On Repros's purported reliance, "Repros has submitted no documentary
evidence to support its assertion that it relied upon anything more than its own
business decision" to go forward with its invention. (A2114) (internal quotation
marks and citation omitted). Nor did Repros "establish that it relied upon any of
the alleged 'misleading conduct' of Dr. Fisch in pursuing commercialization of
Androxal™.[17]   (A2114, A2116-17) (emphasis omitted). Finally, Repros cannot
demonstrate evidentiary prejudice because Dr. Fisch's claim is based solely on the
Fisch Provisional, such that his "memory lapses . . . on minor, incidental points
concerning his interactions with Repros are . . . irrelevant." (A2118).[18]

---

[15] Dr. Fisch had cited Repros's statements in its patent prosecution, which
"disparage[ed] the same prior art Repros submitted in the reexamination
proceeding against Dr. Fisch's '920 patent." (A2110).   If anything, the
reexamination proceedings, which Repros instituted to weaken Dr. Fisch's '920
patent, and which led to almost 10 years of PTO proceedings, should weigh against
equitable estoppel. (A2112-13). See Argument, Point II, *infra*.

[16] In reply, Repros asserted that Dr. Fisch could have invoked 35 U.S.C. § 116 to
invoke his joint inventorship rights before the '360 Patent issued. (A2760). See
Argument, Point II.B.2., *infra*.

[17] As Dr. Fisch noted, "it is just as likely that Repros' decisions and actions have
been driven by the market opportunity that Dr. Fisch first introduced to Mr.
Podolski (*i.e.*, the oral treatment of symptoms relating to testosterone deficiency
using clomiphene citrate), and not a reliance upon alleged misleading conduct by
Dr. Fisch." (A2117-18).

[18] Dr. Fisch also invoked Repros's egregious conduct after having learned from Dr.
Fisch that androgen deficiency and related disorders could be treated with
clomiphene citrate. (A2119). See Argument, Point II.C.4., *infra*.

### 2.     The court's ruling.

The district court recognized that, "[t]ypically, misleading silence arises when a party 'threaten[s] immediate or vigorous enforcement of its patent rights but then [does] nothing for an unreasonably long time.'"  (A30) (alterations in original).  Although there were no such threats by Dr. Fisch, the court nonetheless found "unreasonable delay," because Dr. Fisch "knew or should have known" of Mr. Podolski's "research and pending application in 2003," and that his "communications with Podolski, his representations during the reexamination of his patent, and his failure to assert co-inventorship for years, induced Podolski and Repros to believe that he would not pursue" a joint inventorship claim.  (A30-32).[19]

The district court also found "a risk of economic and evidentiary prejudice."  (A33-34).  The evidentiary prejudice "is not as clear" as Repros's investment of "significant time and money" – because "the parties agree that the nature of his purported contribution to the '360 [Patent] is largely contained" in the Fisch Provisional – but that the passage of time and Repros's investment "demonstrate that Repros will be materially prejudiced."  (A32, 34).

### SUMMARY OF ARGUMENT

1.     On the undisputed facts before the district court, Dr. Fisch is a joint inventor of both the '185 Patent and the '360 Patent.  His fundamental inventive contribution, which is disclosed in the Fisch Provisional, was the treatment of

---

[19] The court also accepted Repros's assertion that Dr. Fisch could have invoked 35 U.S.C. § 116 during the pendency of the Repros application.  See n.16, *supra*.

disorders related to androgen deficiency with a pharmaceutically effective dosage of clomiphene citrate, comprised of between 50-70% trans-clomiphene. Repros took that fundamental inventive contribution – and the Fisch Provisional itself – and, in less than three months, submitted the Repros Provisional. The Repros Provisional discloses, in Repros's own words, a "more effective" clomiphene composition, with a higher concentration of trans-clomiphene, to treat disorders related to androgen deficiency. When the Repros Provisional matured into the '185 Patent and the '360 Patent, Repros was statutorily required to include Dr. Fisch as a joint inventor. Its failure to do so entitles Dr. Fisch to invoke 35 U.S.C. § 256 and secure a judgment directing the PTO to add him to the patents as an inventor.

The district court's summary judgment for Repros is unsustainable. The court focused on Repros's contribution to the invention, as if Dr. Fisch were seeking a *sole* inventorship ruling. This Court's precedent establishes that an inventive contribution warrants joint inventorship status where, as here, a subsequent inventor builds upon the foundation erected by the first joint inventor. That is precisely what Repros did. And the court's attempt to convert the '360 Patent to merely a method for treating androgen deficiency, rather than disorders related to the deficiency, fails on the face of the pertinent claim.

2.    The district court's alternative ruling, on the '360 Patent only, that Dr. Fisch is barred by equitable estoppel from pursuing a declaration of joint inventorship, misapplies the equitable estoppel doctrine, assuming that doctrine can or should be applied to Section 256 claims, which do not accrue until a patent

24

actually issues.  Neither Repros nor the district court could point to any misleading conduct by Dr. Fisch, and his mere silence – which is all that Repros established – cannot constitute misleading conduct.

Nor did Repros present any evidence of reliance on any conduct by Dr. Fisch; the district court essentially presumed reliance simply because Repros went forward with its application.  That is not the law in this Circuit.  Finally, although essentially conceding that Repros could not establish evidentiary prejudice, the district court found economic prejudice, in a ruling that is as flawed as the court's reliance ruling, *i.e.,* from the mere fact that Repros prosecuted its patents.  That is also not the law in this Circuit.

## ARGUMENT

## I.     THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT FOR REPROS ON JOINT INVENTORSHIP.

### A.     Standard of Review.

The regional circuit's law governs on review of a summary judgment.  *E.g.,* *Memorylink Corp. v. Motorola Solutions, Inc.*, 773 F.3d 1266, 1270 (Fed. Cir. 2014).   Applying Fifth Circuit law, this Court reviews summary judgment by "view[ing] all evidence in the light most favorable" to Dr. Fisch and "draw[ing] all reasonable inferences in [his] favor."  *Raytheon Co. v. Indigo Sys. Corp.*, 688 F.3d 1311, 1314-15 (Fed. Cir. 2012).

"The determination of whether a person is a joint inventor is fact specific, and no bright-line standard will suffice in every case.  *Fina Oil & Chem. Co. v. Ewen*, 123 F.3d 1466, 1473 (Fed. Cir. 1997); *accord Bard Peripheral Vascular,*

25

*Inc. v. W.L. Gore & Assocs., Inc.*, 776 F.3d 837, 845 (Fed. Cir. 2015). "Inventorship is a mixed question of law and fact." *Eli Lilly & Co. v. Aradigm Corp.*, 376 F.3d 1352, 1362 (Fed. Cir. 2004).

Summary judgment in a declaratory action on joint inventorship is reviewed under the *de novo* standard. *Fina Oil*, 123 F.3d at 1472-73. The "clearly erroneous" standard is inapplicable on summary judgment. *Cook Biotech Inc. v. Acell, Inc.*, 460 F.3d 1365, 1373 (Fed. Cir. 2006).

### B. Joint Inventorship.

 "A joint invention is the product of a collaboration between two or more persons working together." *Burroughs Wellcome Co. v. Barr Labs., Inc.*, 40 F.3d 1223, 1227 (Fed. Cir. 1994). Joint inventorship is proper even if inventors: (i) "did not physically work together or at the same time; (ii) "did not make the same type or amount of contribution"; or (iii) "did not make a contribution to the subject matter of every claim of the patent." 35 U.S.C. § 116(a). "[W]hile joint inventors need not physically work together . . . , the statutory word 'jointly' is not mere surplusage." *Bard Peripheral*, 776 F.3d at 846 (citations and internal quotation marks omitted). "[W]hen collaboration or concerted effort occurs – that is, when the inventors have some open line of communication during or in temporal proximity to their inventive efforts," there is joint inventorship. *Eli Lilly*, 376 F.3d at 1359.

Section 116 "does not set forth the minimum quality or quantity of contribution required for joint inventorship," *Burroughs*, 40 F.3d at 1227, but "[e]ach joint inventor . . . must contribute in some significant manner to the

conception of the invention." *Falana v. Kent State Univ.*, 669 F.3d 1349, 1357 (Fed. Cir. 2012) (internal quotation marks omitted). "All that is required of a joint inventor is that he or she (1) contribute in some significant manner to the conception or reduction to practice of the invention, (2) make a contribution to the claimed invention that is not insignificant in quality, when that contribution is measured against the dimension of the full invention, and (3) do more than merely explain to the real inventors well-known concepts and/or the current state of the art." *Pannu v. Iolab Corp.*, 155 F.3d 1344, 1351 (Fed. Cir. 1998).

"Issued patents are presumed to correctly name the inventors; therefore, '[t]he burden of showing misjoinder or nonjoinder of inventors is a heavy one and must be proved by clear and convincing evidence.'" *Bard Peripheral*, 776 F.3d at 845 (quoting *Hess v. Advanced Cardiovascular Sys., Inc.*, 106 F.3d 976, 980 (Fed. Cir. 1997)). "A contribution to one claim is enough." *Ethicon, Inc. v. U.S. Surgical Corp.*, 135 F.3d 1456, 1460 (Fed. Cir. 1998); *accord Falana*, 669 F.3d at 1357. If a putative inventor "in fact contributed to the invention defined by [the] claim . . . , he is a joint inventor of that claim." *Ethicon*, 135 F.3d at 1461. Nonjoinder of an inventor may be redressed under 35 U.S.C. § 256, "[u]pon . . . a finding of incorrect inventorship." *Pannu*, 155 F.3d at 1350.

## C.   Dr. Fisch Is a Joint Inventor of the '185 Patent.

### 1.   Dr. Fisch's conception.

Claim 1 of the '185 Patent recites: "[a] method for treating wasting in a hypogonadal male, comprising administering . . . a composition consisting essentially of trans-clomiphene . . . in an effective amount to treat said wasting."

27

(A1563).  The parties' agreed construction of the term "treating wasting in a hypogonadal male" is:  "[t]herapeutic and prophylactic or preventive measures to prevent or slow (lessen) progressive loss of weight or muscle mass and/or progressive weakening and degeneration of muscle mass in a male having low testosterone levels."  (A876).  Dr. Fisch's conception – the use of clomiphene citrate to treat "wasting" or muscle loss – is his inventive contribution to the '185 Patent.

The Fisch Provisional disclosed using clomiphene citrate to "treat[] disorders related to" androgen deficiency, which include "reduction of muscle mass."  (A561).  The Fisch Provisional specifically discloses using "[a] pharmaceutically effective dosage" of clomiphene citrate, *i.e.*, "10 to 1000 mg," and preferably "20 to 100 mg," with a compound "containing between 30% and 50% of the cis-isomer," to treat a "reduction of muscle mass."  (A558-61).  The Fisch Provisional thus establishes that Dr. Fisch conceived of treating "reduction of muscle mass" with a clomiphene compound, 50-70% of which is the trans-clomiphene isomer, as a "pharmaceutically effective" treatment.  (A558-61).

That conception requires a finding of joint inventorship determination. "Conception is the touchstone of inventorship, the completion of the mental part of invention."  *Burroughs*, 40 F.3d at 1227-28.  "It is the formation in the mind of the inventor, of a definite and permanent idea of the complete and operative invention, as it is hereafter to be applied in practice," to the point that "all that remains to be accomplished, in order to perfect the art or instrument, belongs to the department of construction, not creation."  *Dawson v. Dawson*, 710 F.3d 1347, 1352 (Fed. Cir.

28

2013) (citations and internal quotation marks omitted). "An idea is definite and permanent when the inventor has a specific, settled idea, a particular solution to the problem at hand, not just a general goal or research plan he hopes to pursue." *Burroughs,* 40 F.3d at 1228. It is beyond question that Dr. Fisch had the idea to treat wasting with clomiphene citrate that includes the trans-clomiphene isomer.

### 2. The district court's ruling erroneously denies Dr. Fisch's valid claim of joint inventorship.

The district court nonetheless rejected Dr. Fisch's claim to joint inventorship of the '185 Patent, for three ostensible reasons: (i) "the invention of the '185 patent is the emphasis on trans-clomiphene rather than clomiphene citrate with higher proportions of cis-clomiphene"; (ii) the Fisch Provisional "did not disclose any novel treatment with regard to 'wasting'"; and (iii) the Fisch Provisional's claim of using clomiphene citrate to treat "reduction of muscle mass" was cancelled after the PTO's second reexamination. (A45). None of those reasons can withstand analysis.

### a. The composition of the treating compound.

The district court's reliance on the '185 Patent's "emphasis on trans-clomiphene" essentially converts Dr. Fisch's *joint* inventorship claim into a *sole* inventorship claim. Dr. Fisch was not required to prove that Repros had *no* inventorship rights, *see*, *e.g.*, *Dawson*, 710 F.3d at 1352-54, but *only* that "his labors were conjoined with the efforts of the named inventors." *Eli Lilly*, 376 F.3d

at 1359. Indeed, in addressing the "element of joint behavior," this Court has cited the example of "one inventor seeing a relevant report and building upon it." *Id.*[20]

That is precisely what happened here: Repros *conceded* in the course of prosecuting its patents that its "invention" is a "composition that is surprisingly *more effective* than prior art clomiphene compositions in raising testosterone while reducing side effects associated with the prior art compositions." (A2050). Repros asserted to the PTO that "a 20 milligram dose of purified trans-isomer . . . is more effective than a 30 milligram dose of clomiphene citrate which is 1/3 cis-isomer and 2/3 trans-isomer," *id.* – that is, the Repros composition is merely *more* effective than the "pharmaceutically effective" combinations in the Fisch Provisional. (A558-61).

But it was Dr. Fisch who conceived a *new use* of clomiphene citrate – with a high concentration of trans-clomiphene – to treat loss of muscle mass related to androgen deficiency. Repros built on that inventive foundation in coming up with a "more effective" compound. The Fisch Provisional sets forth a "definite and permanent" conception, which "involve[d] a specific approach to the particular problem." *Burroughs*, 40 F.3d at 1229-30. Here, as in *Burroughs*, Dr. Fisch's

---

[20] The district court notably – and correctly – did not accept Repros' misconceived assertion that there was *no* collaboration between Dr. Fisch and Mr. Podolski. (A12-45, A1153-56). After reciting the governing law (A37-38), the district court recognized that Dr. Fisch's contribution was set forth in the Fisch Provisional (A42-43), which was provided to Mr. Podolski. (A14). Dr. Fisch's delivery of the Fisch Provisional to Mr. Podolski more than satisfies the collaboration requirement. *Eli Lilly*, 376 F.3d at 1359. There is no requirement that joint inventors "physically work on the invention together or at the same time." *Falana*, 669 F.3d at 1357.

invention "use[d] a compound of known structure" and "the method of making the compound [was] also well known," but the invention was using a pharmaceutically effective dosage of the compound to treat a disorder.  40 F.3d at 1225-26, 1229-30. And, as in *Burroughs*, the Fisch Provisional "corroborates the claim that [he] had formulated a definite and permanent idea of the invention[] by the time it was prepared."  *Id.* at 1230.[21]

### b.     The novel treatment of the disorder.

The second basis for the district court's refusal to recognize Dr. Fisch as a joint inventor of the '185 Patent is that the Fisch Provisional, although "claim[ing] the use of clomiphene citrate to treat 'reduction of muscle mass,'" purportedly did not "disclose any novel treatment with regard to 'wasting.'"  (A45).  That ruling simply disregards the agreed-upon claim construction of "treating wasting in a hypogonadal male" as "[t]herapeutic and prophylactic . . . measures to prevent or slow (lessen) progressive *loss* of weight *or muscle mass* and/or progressive *weakening and degeneration* of muscle mass."  (A876) (emphasis added).

Because "inventorship is determined on the claim-by-claim basis," the analysis "begins as a first step with a construction of each asserted claim to

---

[21] The district court rejected Repros's lack-of-corroboration argument.  (A12-45, A1153-56).  *See, e.g., Gen. Elec. Co. v. Wilkins*, 750 F.3d 1324, 1330 (Fed. Cir.) ("to guard 'against courts being deceived by inventors who may be tempted to mischaracterize the events of the past . . . ,' the law requires corroboration of a putative inventor's credible testimony, the sufficiency of which is measured under a 'rule of reason' standard") (citation omitted), *cert. denied*, 135 S. Ct. 286 (2014). Reducing a conception to an application, contemporaneously with the time of invention, constitutes corroboration.  *Sandt Tech., Ltd. v. Resco Metal & Plastics Corp.*, 264 F.3d 1344, 1351-52 (Fed. Cir. 2001); *Burroughs*, 40 F.3d at 1230.

determine the subject matter encompassed thereby," and turns to a comparison of "the alleged contributions of each asserted co-inventor . . . [to] the properly construed claim." *Trovan, Ltd. v. Sokymat SA, Irori*, 299 F.3d 1292, 1302 (Fed. Cir. 2002); *accord Gemstar-TV Guide, Int'l. v. Int'l Trade Comm'n*, 383 F.3d 1352, 1381-82 (Fed. Cir. 2004); *Eli Lilly*, 376 F.3d at 1360. The Fisch Provisional indeed disclosed a "novel treatment with regard to 'wasting.'" (A45).

### c.      Reliance on the '920 Patent.

Finally, the district court inappropriately looked to the PTO's second reexamination of Dr. Fisch's '920 Patent, noting that the claim of using clomiphene citrate to treat "reduction of muscle mass" was "cancelled" after the second reexamination. (A45). That ruling is difficult to square with the court's recognition that the '920 Patent was not before the court. (A40).

More fundamentally, the ruling shows that the court failed to determine Dr. Fisch's contribution to the '185 Patent as of that patent's invention date – which was July 9, 2001, the date of the Repros Provisional. (A1517). *See Kopykake Enters., Inc. v. Lucks Co.*, 264 F.3d 1377, 1383 (Fed. Cir. 2001); *Mahurkar v. C.R. Bard, Inc.*, 79 F.3d 1572, 1576-77 (Fed. Cir. 1996). And "[t]he invention date is the date of conception." *Allergan, Inc. v. Apotex Inc.*, 754 F.3d 952, 967 (Fed. Cir. 2014), *cert. denied*, 135 S. Ct. 956 (2015). The *dispositive* question thus turns on the Fisch Provisional's teaching and Repros's incorporation of that teaching into the Repros Provisional (and ultimately, into the '185 Patent).

As Dr. Shabsigh, Dr. Fisch's expert witness, determined: "Dr. Fisch made a foundational inventive contribution to the invention recited in . . . claims 1-7 of the

'185 patent," – "the new use of Clomiphene citrate in a pharmaceutically effective amount to treat the disorders related to . . . the symptom of muscle wasting recited in the claims of the '185 patent." (A1871). This is so, of course, because it was undisputed that Repros had never undertaken the research or development of oral treatments for androgen deficiency or related disorders until Dr. Fisch gave the Fisch Provisional to Mr. Podolski in March/April 2001. (A1259-60, A1817-18).

Mr. Podolski took the copy of the Fisch Provisional provided to him by Dr. Fisch, purported to disclaim any interest, shared it with his patent lawyer, and then – only three months later – filed the Repros Provisional (A1517), which ultimately matured into the '185 Patent (and the '360 Patent as well). (A1566-83, A2041-51). The question of whether using clomiphene citrate to treat muscle wasting is patentable has been conclusively resolved by the '185 Patent itself.

\* \* \* \*

Dr. Fisch's inventive contribution to the '185 Patent was the novel conception of using clomiphene citrate to treat "wasting" in men suffering from androgen deficiency. Repros took that inventive contribution, used it to develop its own provisional application, and ultimately obtained a patent for using clomiphene citrate – albeit a "more effective" compound thereof – to treat "wasting." On the undisputed facts, Dr. Fisch is a joint inventor of the '185 Patent.

**D.    Dr. Fisch Is a Joint Inventor of the '360 Patent.**

**1.    The district court applied the wrong claim construction to claim 7 of the '360 Patent.**

The district court's foundational error in addressing joint inventorship of the '360 Patent is apparent on the face of the summary judgment.  Claim 7 of the '360 Patent recites "[a] method for treating secondary hypogonadism . . . comprising administering to a human male in need thereof, an effective amount of a composition consisting essentially of trans-clomiphene."  (A1545).  Dr. Fisch sought joint inventorship as to claim 7.  (A1508-10).

The parties' agreed construction of "treating secondary hypogonadism in a human male" in claim 7 is "[t]herapeutic or prophylactic management of a human male with low testosterone levels . . . , the human male being with or without at least one related symptom."  (A875).  The district court was bound by that construction in analyzing inventorship.  *Trovan*, 299 F.3d at 1302.  But the court instead looked to the agreed construction of "a human male with secondary hypogonadism" in *claim 1* of the '360 Patent, which is "[a] human male with low testosterone levels . . . , the human male being with or without at least one related symptom."  (A39, A875).  The court thereby conflated the construction agreed upon by the parties as to claim 1 – as to which Dr. Fisch asserted *no claim* of joint inventorship – with the parties' agreed construction of the critical term in *claim 7*, *i.e.*, "[t]herapeutic or prophylactic management" of a male who is "with or without at least one related symptom."  (A875, A1508-10).  The district court thus went astray at the outset.

The agreed claim construction is clear:  if a patient has a symptom, the treatment is "therapeutic," in that it *ameliorates* that symptom (or sequela); on the other hand, if the patient is asymptomatic, the treatment is "prophylactic," in that it *prevents* that symptom (or sequela) from occurring.  And the Fisch Provisional plainly states that its purpose is "to treat a relative androgen deficiency in older men and/or the specific disorders related to" that deficiency, including "reduction of muscle mass," "limitation of body performance capacity," "reduction of bone density" and "reduction of libido and potency."  (A557, 561-62).  Having gotten off on the wrong foot, however, the district court distinguished between merely "treating 'androgen deficiency'" – as the district court believed was the Fisch Provisional's scope – and "treating '*disorders related to* androgen deficiency.'" (A41) (emphasis added).[22]

Based on that misguided analysis, the district court ruled that "[t]he '360 patent is a purported improvement on existing treatments for low testosterone itself, not merely the related disorders," such that "the treatment of disorders *related to* androgen [deficiency] bears little relation to the invention of the '360 patent."  (A42).  But claim 7 contemplates "*therapeutic or prophylactic management*," that is, treatment or prevention of a symptom or disorder.  (A875) (emphasis added).

_____

[22] As in its rulings on the '185 Patent, the district court continued to look to the '920 Patent claims to determine whether Dr. Fisch made an inventive contribution to Repros's '360 Patent, when the question before the court was whether the Fisch Provisional provided that inventive contribution.

## 2.    Dr. Fisch's joint inventorship of claim 7 of the '360 Patent.

When properly analyzed, Dr. Fisch's inventive contribution to the '360 Patent is as clear as his contribution to the '185 Patent. That inventive contribution to claim 7 is a new use of clomiphene citrate in a "pharmaceutically effective" amount to treat disorders related to androgen deficiency. (A558, A1914). It is undisputed that Mr. Podolski provided the Fisch Provisional to his counsel, who "lawyered" the Repros Provisional to jigger the percentages of trans-clomiphene. (A1260, A1275, A1523-27, A1531). But Dr. Fisch's fundamental inventive contribution to claim 7, under the proper claim construction, is one that was "not disclosed, taught, or suggested" by prior art – as is established by the '360 Patent's issuance. (A1871).

Repros thus built on Dr. Fisch's foundational "inventive contribution," *Fina Oil*, 123 F.3d at 1473, by developing – in Repros's own words – a "more effective" combination of trans-clomiphene and cis-clomiphene, which has "reduc[ed] side effects" to treat disorders and symptoms related to androgen deficiency. (A2050).[23] It was Dr. Fisch who first conceived "a definite and permanent idea of the complete and operative invention," *i.e.,* using clomiphene citrate in a

_____

[23] The district court's suggestion that the '360 Patent placed "emphasis on isolating trans-clomiphene" (A43), misreads claim 7, which recites treating with "an effective amount of a composition consisting essentially of trans-clomiphene." (A2447). The phrase "consisting essentially of," when used in patent claims, "is a transition phrase commonly used to signal a partially open claim in a patent," *i.e.,* by using that term, "the drafter signals that the invention necessarily includes the listed ingredients and is open to unlisted ingredients that do not materially affect the basic and novel properties of the invention." *PPG Indus. v. Guardian Indus. Corp.*, 156 F.3d 1351, 1354 (Fed. Cir. 1998). Repros's use of "consisting essentially of" cannot be converted into "isolating" trans-clomiphene.

pharmaceutically effective amount to treat disorders related to androgen deficiency. *Ethicon*, 135 F.3d at 1460.

### E.    The Summary Judgment Must Be Reversed.

Dr. Fisch established a factual basis for joint inventorship, and the district court's legal errors skewed its application of this Court's precedent. Where evidence is in conflict on joint inventorship, a district court cannot accept the named inventor's version of the facts to grant summary judgment. *See Checkpoint Sys., Inc. v. All-Tag Sec. S.A.*, 412 F.3d 1331, 1338-39 (Fed. Cir. 2005). At a bare minimum, the summary judgment must be reversed for a trial on joint inventorship. *Id.*; *see also Pannu*, 155 F.3d at 1351 (reversing judgment as a matter of law because "a reasonable jury could find" joint inventorship).

But this Court, under governing Fifth Circuit precedent, also "has the power to render summary judgment for a nonmoving party" where: "(1) there is no genuine issue of material fact and (2) the opposing party has had a full opportunity to (a) brief the legal issues and (b) develop a record." *Robinson v. Aetna Life Ins. Co.*, 443 F.3d 389, 396 (5th Cir. 2006); *see also Dey, L.P. v. Sunovion Pharm., Inc.*, 715 F.3d 1351, 1360 n.5 (Fed. Cir. 2013). It is entirely appropriate to do so here.[24]

The undisputed facts, as set forth in the previous section, establish that Dr. Fisch's conception of a method for treating disorders related to androgen

---

[24] This is particularly so because Dr. Fisch also moved for summary judgment, to which Repros responded and the court, in granting summary judgment for Repros, denied Dr. Fisch's motion. (A44-45, A1479, A2268-87).

deficiency was disclosed in the Fisch Provisional, which was provided Repros – and that Repros only three months later, purported to have invented a method for treating symptoms or disorders related to androgen deficiency with the same compound disclosed in the Fisch Provisional. Those undisputed material facts establish Dr. Fisch's entitlement to be named as a joint inventor on both the '185 Patent and the '360 Patent.

## II. THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT ON EQUITABLE ESTOPPEL TO BAR DR. FISCH'S CLAIM OF JOINT INVENTORSHIP OF THE '360 PATENT.

### A.    Standard of Review.

The district court applied equitable estoppel to bar Dr. Fisch's joint inventorship claim as to the '360 Patent, ruling on summary judgment that "Repros was 'lulled into a sense of security' by Fisch's failure to assert co-inventorship and other communications" and that Repros had "relied on Fisch's communications and silence when it pursued prosecuting and monetizing the '360 patent." (A32-33).[25] The court further found that, although Dr. Fisch's purported inability to recall conversations from 2001 in detail was of little weight because "the parties agree that the nature of his purported contribution to the '360 [Patent] is largely contained" in the Fisch Provisional, Repros nonetheless would be prejudiced, based on "the amount of time that has passed since much of the conduct in question" and Repros's expenditures on the '360 Patent. (A34).

---

[25] Repros made no argument on equitable estoppel as to the '185 Patent. (A887-905).

Although a summary judgment on equitable estoppel "is reviewed . . . under the abuse of discretion standard," *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1028 (Fed. Cir. 1992) (en banc), "when there are disputed underlying factual elements, summary judgment is inappropriate unless the movant would prevail even on the non-movant's view of the facts." *Aspex Eyewear, Inc. v. Clariti Eyewear, Inc.*, 605 F.3d 1305, 1310 (Fed. Cir. 2010). The court's ruling cannot be sustained under that standard.

### B.    Equitable Estoppel and Joint Inventorship Claims.

### 1.    The equitable estoppel doctrine.

This Court developed its equitable estoppel doctrine in the context of patent infringement cases. *E.g.*, *Aukerman*, 960 F.2d at 1041-43. The Court took pains to distinguish laches from equitable estoppel, carving out unreasonable delay from the equitable estoppel standard. *Aukerman*, 960 F.2d at 1042 (overruling precedent "intertwin[ing] the elements of laches and equitable estoppel"; even when "delay is present, the concepts of equitable estoppel and laches are distinct from one another"). In the infringement context, there are three elements of equitable estoppel:

> (1) the patentee, through misleading conduct, led the alleged infringer to reasonably believe that the patentee did not intend to enforce its patent against the infringer; (2) the alleged infringer relied on that conduct; and (3) due to its reliance, the alleged infringer would be materially prejudiced if the patentee were permitted to proceed with its charge of infringement.

*Aspex*, 605 F.3d at 1310 (citing *Aukerman*, 960 F.2d at 1028).

That doctrine is a poor fit in a joint inventorship case. In accordance with 35 U.S.C. § 256, "inventorship may be corrected at *any time*." *Advanced Cardiovascular Sys., Inc. v. Scimed Life Sys., Inc.*, 988 F.2d 1157, 1162 (Fed. Cir. 1993) (emphasis added). This is so because "Section 256 does not limit the time during which inventorship can be corrected," and "thus serves the public policy of preserving property rights from avoidable forfeiture." *Stark v. Advanced Magnetics, Inc.*, 29 F.3d 1570, 1573 (Fed. Cir. 1994) (*Stark I*). At the same time, "equity disfavors undue and prejudicial delay by a person who may have an interest in the property of another." *Id.* This Court accordingly has suggested that "there are circumstances wherein diligence is an appropriate requisite to pursuit of a particular legal right, whether or not the defense of laches or estoppel may be invoked," *i.e.*, "when there is an affirmative obligation on the claimant to act promptly and without significant pause in establishing a legal right." *Id.* at 1574. But asserting joint inventorship under Section 256 is *not* one of those circumstances:

> Neither 35 U.S.C. § 256 nor 37 C.F.R. § 1.324 requires that an omitted inventor of an issued patent must diligently bring a lawsuit to correct inventorship or be forever barred from doing so. Absent any statutory or regulatory requirement of diligence in bringing legal action to correct inventorship of an issued patent, it was error to hold that [plaintiff's] action to correct inventorship was barred for lack of diligence as a matter of law. Whether diligent action is required in a particular case must be determined on the facts of that case.

*Id.* at 1575.

## 2.     Dr. Fisch's action did not accrue until the '360 Patent issued to Repros.

Regardless of the theoretical applicability of equitable estoppel to joint inventorship claims, the district court erred as a matter of law in applying equitable estoppel to this inventorship dispute – because Dr. Fisch could not have brought a joint inventorship claim *before* the '360 Patent issued.   The district court inappropriately relied on 35 U.S.C. § 116 to rule that Dr. Fisch had such a remedy (A31), because that statute empowers *only* the PTO to add an inappropriately "omitted inventor."  35 U.S.C. § 116(b), (c).

There is no diligence requirement in either 35 U.S.C. § 256 or the implementing regulation, 37 C.F.R. § 1.324.   Nonjoinder by "fail[ing] to list a person who is an inventor," is governed by 35 U.S.C. § 256, which authorizes a court to "order correction of the patent."  *Stark v. Advanced Magnetics, Inc.*, 119 F.3d 1551, 1553 (Fed. Cir. 1997) (*Stark II*).   Section 116 "does not provide a private right of action to challenge inventorship of a pending patent application," and Section 256 provides that right, "[o]nce a patent issues," but *not* before.  *HIF Bio, Inc. v. Yung Shin Pharm. Indus. Co., Ltd.*, 600 F.3d 1347, 1354 (Fed. Cir. 2010).

While an application may be made to the PTO under Section 116 during the pendency of an application, 35 U.S.C. § 116(b)-(c), an application must be made by each inventor under oath.  37 C.F.R. §§ 1.48(b), 1.63(a).  Thus, "inventorship correction under [Section 116] requires consent of all the parties."  *Pei-herng Hor v. Ching-Wu Chu*, 699 F.3d 1331, 1336 (Fed. Cir. 2012).  Because here, "as in most § 256 cases brought by an omitted inventor," Dr. Fisch's "inventorship is

contested," Section 116 "likely was not an available avenue for [him] . . . to correct . . . omitted inventorship while the [Repros] applications . . . were pending before the PTO." *Pei-herng Hor*, 699 F.3d at 1336.

In *Pei-herng Hor*, starting with that premise, this Court, while "recogniz[ing] that the prompt resolution of inventorship disputes certainly is a desirable goal," also acknowledged that "there may be circumstances in which it would be inefficient to require an omitted inventor to initiate an inventorship dispute while the application is still pending." *Id.* Indeed, speaking directly to the scenario presented by the Repros application – which went through various iterations before '185 Patent and the '360 Patent issued (A1534, A1546, A2041-51) – this Court stated:

> Throughout the back-and-forth negotiation between the patentee and the PTO examiner, the original claims are routinely narrowed or even cancelled. Thus, in many cases, an omitted inventor may not know whether he or she has a cognizable inventorship claim until the examination concludes and the patent finally issues.

699 F.3d at 1336.

The Court accordingly held that "the laches period for a § 256 correction of inventorship claim begins to run when the omitted inventor knew or should have known of *the issuance of the patent*, regardless of whether the omitted inventor knew or should have known of the omitted inventorship while the patent application was pending before the PTO." *Id.* at 1336-37 (emphasis added) (internal quotation marks omitted). Estoppel and laches are both equitable doctrines – and, indeed, laches is less draconian, because it "bars relief on a

patentee's claim only with respect to damages accrued prior to suit." *Aukerman*, 960 F.2d at 1041. Surely, the harsh consequence that results from applying equitable estoppel should not be visited on a co-inventor who brings an action promptly after a patent issues.

To the extent that delay in filing an action may, in the equitable estoppel context "be evidence which influences the assessment of whether the patentee's conduct is misleading," *id.* at 1042, the asymmetrical result of requiring a putative joint inventor to act before a Section 256 cause of action accrues is inconceivable. Under either doctrine, "[a] § 256 claim for correction of inventorship does not accrue until the patent issues." *Pei-herng Hor*, 699 F.3d at 1335. Dr. Fisch cannot be estopped from bringing a claim that accrued only in 2010.

### C.    The District Court Misapplied Equitable Estoppel in Barring Dr. Fisch's Claim to Joint Inventorship of the '360 Patent.

The only reported decision from this Court that addresses the intersection between equitable estoppel and inventorship claims is *MCV, Inc. v. King-Seeley Thermos Co.*, 870 F.2d 1568 (Fed. Cir. 1989). That decision applied the pre-*Aukerman* formulation, under which laches and equitable estoppel were inappropriately intertwined. 870 F.2d at 1571-72; *see Aukerman*, 960 F.2d at 1042.[26] But that case turned on the plaintiff's agent having initially requested his

---

[26] In *Aukerman*, this Court, in the course of discussing the misleading-statement requirement for equitable estoppel, cited *MCV*, in a footnote, with a "*but see*" signal. 960 F.2d at 1042 n.17. That signal "indicate[s] contradiction," *i.e.*, that the "[c]ited authority clearly supports a proposition *contrary* to the main proposition." THE BLUE BOOK:  A UNIFORM SYSTEM OF CITATION R. 1.2(c) (Columbia Law Review Ass'n *et al.* eds. 19th ed. 2010) (emphasis added). The Court has not cited

(continued . . .)

inclusion as a joint inventor on the application and, after the defendant demurred, consenting to his omission to foster the parties' business relationship. 870 F.2d at 1569. Almost five years later (and more than one year after the defendant's patent had been issued), the plaintiff – in a second amended complaint in litigation arising from the termination of the business relationship – added a joint inventorship count. *Id.* at 1569.

This Court upheld a summary judgment on equitable estoppel, finding both "delay and affirmative misleading conduct," and that "the district court did not abuse its discretion in estopping MCV in the face of its misleading nonchalance about its putative right to co-inventorship, a nonchalance on which [defendant] relied." *Id.* at 1572, 1574. The plaintiff's agent knew defendant "was seeking a patent, and knew what was being claimed," and the Court held that it "was incumbent upon him timely, explicitly and tenaciously to apprise [defendant] of his purported inventorship," rather than electing "to lie low for four years and then invoke a claim of erroneous inventorship against the patent." *Id.* at 1573.

*MCV* is an extreme case and, indeed, one that perhaps could have just as easily been resolved against the plaintiff under the "diligent action" test. *Stark*, 29 F.3d at 1575. To the extent that it survives as a guidepost for application of equitable estoppel in inventorship cases, however, *MCV* serves here to show both

---

(. . . continued)

*MCV*'s equitable estoppel holding since *Aukerman*. It is accordingly reasonable to question *MCV*'s continuing vitality as precedent for applying equitable estoppel to joint inventorship claims, but that question need not be reached here – because there is no basis for applying equitable estoppel to Dr. Fisch's claim.

how unfounded Repros's position truly is, and the district court's error in adopting that position.

### 1.    No "misleading conduct."

The district court erred in finding that three factors showed misleading conduct:  (i) Dr. Fisch's realization in August-September 2003 that "his inventive contributions had been incorporated into [Repros's] patent filings"; (ii) a telephone call and e-mail between Dr. Fisch and Mr. Podolski after Repros's May 12, 2003 press release; and (iii) a September 30, 2003 telephone conversation and October 1, 2003 e-mail exchange between Dr. Fisch and Mr. Podolski, in which they discussed the '920 Patent.  (A15-16, A30-31, A894-96).  Both Repros and the court also relied on Dr. Fisch's acknowledgement, during the reexamination proceedings on the '920 Patent, that Mr. Podolski identified himself as the "inventor" in the application that led to the '360 Patent.  (A31-32, A896-98).

This Court has recognized that "intentionally misleading silence arises when a patentee 'threatened immediate or vigorous enforcement of its patent rights but then did nothing for an unreasonably long time.'"  *Aspex*, 605 F.3d at 1310 (quoting *Meyers v. Asics Corp.*, 974 F.2d 1304, 1309 (Fed. Cir. 1992)).  The district court recognized as much.  (A30).  But the court nonetheless ruled that, "even absent an initial threat, an unreasonable delay following the point at which the plaintiff knew or should have known of the infringing actions is itself evidence of misleading conduct."  (A30-31).  The court essentially estopped Dr. Fisch based on mere silence.

This it could not do.  "The first element of equitable estoppel concerns the statements or conduct of the patentee, which must 'communicate something in a misleading way,'" that is, "the accused infringer will not be disturbed by the plaintiff patentee in the activities in which the former is currently engaged." *Aukerman*, 960 F.2d at 1042.  "The patentee's conduct must have supported an inference that the patentee did not intend to press an infringement claim against the alleged infringer." *Id.*  But "[s]ilence alone is not sufficient affirmative conduct to give rise to estoppel," *Meyers v. Brooks Shoe Inc.*, 912 F.2d 1459, 1464 (Fed. Cir. 1990), *overruled on other grounds*, *Aukerman*, 960 F.2d at 1038-39, and alleged "inaction must be combined with other facts respecting the relationship or contacts between the parties to give rise to the necessary inference that the claim against the defendant is abandoned." *Aukerman*, 960 F.2d at 1042.  There is simply nothing in this record that even approaches that level.

None of the three events on which the district court relied show anything more than Dr. Fisch's *silence*.  First, the May 12, 2003 press release states that Repros had initiated a very small "efficacy and safety study" (involving only 50 patients) of Androxal[TM], "which is being developed as an oral treatment for testosterone deficiency in men." (A1116-17).  There was neither a reference to a patent application nor any indication that Repros was seeking a patent. *Id.*  And, indeed, Repros's reliance on the press release is inconsistent with its simultaneous reliance on Dr. Fisch's interrogatory response that he realized only in August– September 2003 – months *after* the press release – that "his inventive contributions

had been incorporated into patent filings that ultimately led to the '360 patent." (A894). His "silence" in May 2003 is thus meaningless.

As to the interrogatory response, Dr. Fisch *never* communicated his belief to Repros and then engaged in misleading conduct, as in *MCV*. 870 F.2d at 1569-70, 1572. That leaves the September 30, 2003 telephone conversation and the e-mail exchange on the next day, both of which addressed the '920 Patent, and not Repros's patent filings. (A896-97).

In their conversation, Mr. Podolski expressed his surprise – indeed, that he was "flabbergasted" – that Dr. Fisch had secured the '920 Patent. (A1263-64). According to Mr. Podolski, Dr. Fisch then said: "I noticed you've applied for a patent for one of the isomers" which is "already in our application," *i.e.*, the "trans isomer." (A1263). There followed a discussion as to whether Dr. Fisch and Mr. Podolski might combine their efforts in some fashion, either through a sale to Dr. Fisch or a combined effort with Repros, but neither was interested in the other's suggestion. (A1263). The conversation concluded with some acrimony, as Mr. Podolski expressed his "personal opinion" that the '920 Patent "will not stand a . . . challenge," with which Dr. Fisch forcefully disagreed. (A1263-64).[27] The October 1, 2003 e-mail does not mention the Repros Provisional. (A1134).

Dr. Fisch made no affirmative statement to Mr. Podolski about the Repros Provisional, either during their telephone call or in the e-mail, which, coupled with later inaction, could amount to misleading conduct. Thus, as of January 2004,

---

[27] Dr. Fisch was, of course, proven correct with the ultimate issuance of the Second Reexamination Certificate on the '920 Patent in April 2013. (A1848-49).

when Repros filed its application claiming the benefit of the Repros Provisional (A1568), Dr. Fisch had said or done nothing that would satisfy the requirement for "misleading *inaction*" which, "combined with other facts respecting the relationship or contacts between the parties . . . give[s] rise to the necessary inference that the claim against the defendant is abandoned." *Aukerman*, 960 F.2d at 1042; *cf. MCV*, 870 F.2d at 1569-70 (alleged joint inventor "knowingly acquiesced in the omission of his name from the application for four years"); *Stewart & Stevenson Servs. Inc. v. Serv-Tech, Inc.*, 794 F. Supp. 202, 204-05 (S.D. Tex. 1992), *aff'd*, 996 F.2d 318 (Fed. Cir. 1993) (alleged joint inventor's "active conduct induced [patentee] to believe that" plaintiff claimed no "interest in the inventions").

Finally, the district court relied on Dr. Fisch's two declarations, submitted in the reexamination proceedings:  (i) the April 2005 declaration in the first reexamination proceeding initiated by Repros, and in which Dr. Fisch noted that Repros as the "[r]equester," was the assignee of the patent application which had been "invented by" Mr. Podolski (A1100-01); and (ii) the August 2007 declaration in the second reexamination instituted by Repros, in which Dr. Fisch noted that Repros had filed a second application, which "appears to be owned by" Repros, "in view of the common inventor," *i.e.*, Mr. Podolski.  (A2538).  The district court erroneously relied on these "representations during the reexamination of [Dr. Fisch's] patent" as having "induced Podolski and Repros to believe" that Dr. Fisch would not assert joint inventorship.  (A31-32).

48

It was factually *correct* to refer to Mr. Podolski as an "inventor" of the two patent applications – because he is so identified on those applications. (A1588-89; A1566-1645). Dr. Fisch certainly made no statement that even suggested his *acquiescence* in Mr. Podolski being the *sole* inventor of the ultimately issued '185 Patent or '360 Patent. (A1100-01, A2538). The entirely correct informational reference cannot have been misleading to Repros.

To the contrary, Dr. Fisch's 2005 declaration cited Repros's application as disparaging the *same prior art* that Repros had submitted in the reexamination proceeding against Dr. Fisch's '920 Patent. (A1100-02). Thus, the only reasonable inference that can be drawn from his reference to the Repros application is that Dr. Fisch was using Repros's own statements to counter Repros's challenge to the '920 Patent. In any event, that is, at the least, an entirely reasonable inference, and summary judgment on equitable estoppel requires that an inference of a misleading communication by omission or acquiescence "must be the *only* possible inference from the evidence." *Aukerman*, 960 F.2d at 1043-44. The district court's ruling that Dr. Fisch's Section 256 challenge to the '360 Patent is barred by his alleged silence and failure to act against Repros's patent application is thus legally untenable.

## 2.    No reliance.

The district court's analysis on the reliance element of equitable estoppel is also flawed. The court purported to "find[] that Repros relied on Fisch's communications and silence when it pursued prosecuting and monetizing the '360 patent" (A33), in the absence of *any* evidence that this was so. Mr. Podolski's

deposition testimony includes *no* statement that Repros went forward with its patent applications in reliance upon a misplaced belief that Dr. Fisch would not assert joint inventorship. (A1251-90, A2146-85). Neither Repros's motion nor the district court's order cites to any *factual* support for Repros's supposed "reliance." (A32-33, A899-900).

To be sure, Repros went forward with its patent application, but "[r]eliance is not the same as prejudice or harm, although frequently confused." *Aukerman*, 960 F.2d at 1043. And even "*post hoc* conclusory statements" that a party relied on an adversary's conduct, "rather than any undisputed contemporaneous evidence demonstrating such reliance," is insufficient to support a summary judgment on equitable estoppel. *Hall v. Aqua Queen Mfg., Inc.*, 93 F.3d 1548, 1558 (Fed. Cir. 1996); *accord Gasser Chair Co., Inc. v. Infanti Chair Mfg. Corp.*, 60 F.3d 770, 776 (Fed. Cir. 1995) (rejecting "conclusory assertions as a basis for summary judgment of equitable estoppel"); *Meyers*, 974 F.2d at 1309 (no summary judgment based on "conclusory assertions" rather than "undisputed facts to show" reliance).

As Dr. Fisch correctly argued to the district court, Repros failed to prove that it relied on anything other than its own "business decisions . . . to capitalize on a market opportunity" that Mr. Podolski acknowledged having discovered after his meeting with Dr. Fisch in 2001. (A2117-18). The district court erred finding the reliance element to have been satisfied. *See Ecolab Inc. v. Envirochem, Inc.*, 264 F.3d 1358, 1371 (Fed. Cir. 2001). At a bare minimum, because Repros's supposed "reliance" on allegedly "misleading conduct" is not the *sole* reasonable reference that can be drawn from the evidence, the court could not decide equitable estoppel

on summary judgment.  *Aukerman*, 960 F.2d at 1044 (court cannot draw unfavorable inferences against non-movant).

### 3.    No prejudice.

The district court, although recognizing that "[t]he severity of the evidentiary prejudice in this case is not . . . clear" because "the parties agree that the nature of [Dr. Fisch's] purported contribution to the '360 [Patent] is largely contained in his own provisional patent application," found sufficient prejudice based on "the amount of time that has passed since much of the conduct in question and the amount of money expended by Repros."  (A34).  The court's ruling is bereft of record support.

"Evidentiary, or 'defense' prejudice" is separate and apart from economic prejudice."  *Aukerman*, 960 F.2d at 1033; *accord Ecolab*, 264 F.3d at 1371-72.  Evidentiary, or defense prejudice, may arise "by reason of a defendant's inability to present a full and fair defense on the merits due to the loss of records, the death of a witness, or the unreliability of memories of long past events, thereby undermining the court's ability to judge the facts."  *Aukerman*, 960 F.2d at 1033.  Because, as the district court itself recognized, the alleged delay did not leave Repros "unable to present a full and fair defense on the merits," *Ecolab*, 264 F.3d at 1372, the district court should have found no such prejudice.[28]

---

[28] Once again demonstrating the poor fit of equitable estoppel and disputes over joint inventorship, the Repros patent prosecution took from July 2001, the date of the Repros Provisional to June and July 2010, when the two patents issued.  Under the district court's view, lengthy PTO proceedings would thus give rise to both "delay" claims and "evidentiary prejudice" assertions in virtually all joint inventorship disputes.  The notion that a Section 256 claim should be "available at

(continued . . .)

Laches and equitable estoppel both apply the same "economic prejudice" standard. *Aukerman*, 960 F.2d at 1033, 1043. It "arises when a defendant suffers the loss of monetary investments or incurs damages that likely would have been prevented by earlier suit." *State Contracting & Eng'g Corp. v. Condotte Am., Inc.*, 346 F.3d 1057, 1066 (Fed. Cir. 2003). There must be an "explicitly proven nexus to the . . . delay in filing suit," and "[t]he change must be because of and as a result of the delay, not simply a business decision to capitalize on a market opportunity." *Gasser Chair*, 60 F.3d at 774; *accord State Contracting*, 346 F.3d at 1066. The district court's error here is identical to its error in applying the reliance requirement – the court *assumed* the relationship between Dr. Fisch's purported delay and Repros's monetary investment in developing technology to effectuate the '360 Patent, in the absence of an "explicitly proven nexus." *Gasser Chair*, 60 F.3d at 774.

This the court could not do, especially on summary judgment. *Aukerman*, 960 F.2d at 1043-44. It was Repros's burden "to establish the defense based on proof," by a preponderance of the evidence. *Aukerman*, 960 F.2d at 1043, 1046. Its failure to establish *any* of the three elements is fatal to the summary judgment on equitable estoppel. *See Hall*, 93 F.3d at 1558.

---

(. . . continued)

any time," and this Court's holding that "Section 256 does not limit the time during which inventorship can be corrected," *Stark I*, 29 F.3d at 1573, would be all but cast aside if a decade of delay in a patent's issuance rendered a patentee immune from a joint inventorship claim.

### 4.     Failure to weigh all equitable factors.

The undisputed facts, as set forth in Point II.C. and I.D., *supra*, show:  (i) Dr. Fisch provided the Fisch Provisional to Mr. Podolski, thereby disclosing his inventive method of treating symptoms relating to androgen deficiency with clomiphene citrate; (ii) Repros had absolutely no prior experience in treating symptoms relating to androgen deficiency in men before Mr. Podolski met with Dr. Fisch; and (iii) within three months, Repros used the Fisch Provisional to confect the Repros Provisional, in which it gave no credit to Dr. Fisch as a joint inventor.  Then, once Dr. Fisch succeeded, against Repros's apparent expectations, in being awarded the '920 Patent, Repros – by its own admission – instituted almost a decade of reexamination proceedings in an attempt to create a "picket fence" around the '920 Patent, in aid of its own patent prosecution.

This Court has recognized that "[p]atentees should be encouraged to avoid litigation when their patents are being reevaluated . . . rather than being forced into premature litigation."  *Vaupel Textilmaschinen KG v. Messanica Euro Italia S.P.A.*, 944 F.2d 870, 878 (Fed. Cir. 1991).  Applying equitable estoppel on a joint inventor whom the named inventor has embroiled in almost 10 years of reexaminations cannot be reconciled with that precedent.

Moreover, "[i]n deciding whether to bar the suit on estoppel grounds, the court must consider *all evidence* relevant to the equities."  *Aspex*, 605 F.3d at 1310 (emphasis added).  The almost decade-long reexamination proceedings instituted by Repros on the '920 Patent should have been weighed against Dr. Fisch's alleged

delay in bringing an action – even if such an action could have been brought before the '185 Patent and '360 Patent ultimately issued.

This Court has recognized that "egregious conduct must be considered as part of the equitable estoppel determination." *Gasser Chair*, 60 F.3d at 776. The district court was obligated to consider Repros's egregious conduct and, as this Court has held in the infringement context, "[i]ntentional copying" should be deemed misconduct on summary judgment. *Id.* at 775. The district court's failure to weigh Repros's conduct against equitable estoppel only further serves to show that the summary judgment cannot be sustained.

## CONCLUSION

Based on the foregoing, Dr. Fisch requests the Court to reverse the summary judgment and the final judgment, and to remand with directions to enter summary judgment in his favor on his counterclaim for joint inventorship, and/or for such other and further proceedings as the Court may deem appropriate.

Respectfully submitted,

Michael A. Nicodema

_____/s/ Elliot H. Scherker_____

Barry J. Schindler

Elliot H. Scherker

GREENBERG TRAURIG, LLP

200 Park Avenue, P.O. Box 677

Florham Park, New Jersey 07932

Elliot H. Scherker

Telephone: 973.360.7900

Jose Pena

Facsimile: 973.301.8410

Stephanie L. Varela

nicodemam@gtlaw.com

GREENBERG TRAURIG, P.A.

schindlerb@gtlaw.com

Wells Fargo Center, Suite 4400

333 Southeast Second Avenue

Miami, Florida 33131

Julie P. Bookbinder

Telephone: 305.579-0500

GREENBERG TRAURIG, LLP

Facsimile: 305.579.0717

MetLife Building

scherkere@gtlaw.com

200 Park Avenue

varelas@gtlaw.com

New York, New York 10166

penaj@gtlaw.com

Telephone: 212.801.9200

miamiappellateservice@gtlaw.com

Facsimile: 212.801.6400

bookbinderj@gtlaw.com

Michael J. Schaengold

GREENBERG TRAURIG, LLP

2101 L Street, NW

Washington, D.C. 20037

Telephone: 202.331.3146

Facsimile: 202.261.0186

schaengoldm@gtlaw.com

*Attorneys for Defendant-Appellant Harry Fisch*

ADDENDUM

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **REPROS THERAPEUTICS, INC.,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **vs.** | § | **CIVIL ACTION NO. H-13-2266** |
| | § | |
| **HARRY FISCH,** | § | |
| | § | |
| **Defendant.** | § | |

## FINAL JUDGMENT

For the reasons stated in the Court's Order, signed on the _____ 23ʳᵈ _____ day of December, 2014, this action is **DISMISSED**.

**THIS IS A FINAL JUDGMENT**.

The Clerk shall enter this Order and provide a copy to all parties.

SIGNED on this the _____ 23ʳᵈ _____ day of December, 2014, at Houston, Texas.

**VANESSA D. GILMORE
UNITED STATES DISTRICT JUDGE**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **REPROS THERAPEUTICS, INC.,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **vs.** | § | **CIVIL ACTION NO. H-13-2266** |
| | § | |
| **HARRY FISCH,** | § | |
| | § | |
| **Defendant.** | § | |

## O R D E R

Pending before the Court are Plaintiff and Counterclaim Defendant Repros Therapeutics Inc.'s ("Plaintiff" or "Repros") and Counterclaim Defendants Joseph S. Podolski's ("Podolski") and Ronald Wiehle's ("Wiehle") Motion for Summary Judgment Based on Equitable Estoppel (**Instrument No. 78**); Repros's, Podolski's, and Wiehle's Motion for Summary Judgment on Defendant and Counterclaimant Harry Fisch's ("Defendant" or "Fisch") Counterclaims (**Instrument No. 80**); and Fisch's Motion for Summary Judgment. (**Instrument No. 82**).

## I.

### A.

This is a case for declaratory judgment or correction of inventorship as to two patents currently owned by Repros and invented by Podolski and Wiehle. The patents relate to the use of trans-clomiphene to treat hypogonadism and related medical problems in men. Fisch claims that he was a co-inventor of these patents, based on his prior confidential disclosure to Repros of his own provisional patent application related to the use of anti-estrogens, including clomiphene citrate, to treat androgen deficiency in men. Repros, Podolski, and Wiehle argue now that Fisch

should be equitably estopped from bringing his claim as to one of these patents. Furthermore, all parties have filed motions for summary judgment on the substantive issue of inventorship.

**B.**

The patents in question in this case deal with the treatment of hypogonadism, low testosterone, or androgen deficiency in men. Fisch is a urologist and fertility specialist in New York, New York. (Instrument Nos. 1, at 3; 37, at 11). Repros is a development stage biopharmaceutical company, founded in 1987, originally as Zonagen. (Instrument No. 81-4 at 4). Its name was changed to Repros in 2006. (Instrument No. 1 at 1). Podolski is president and CEO of Repros and was president of Zonagen at all times relevant to this case. (Instrument No. 1 at 3). Ronald Wiehle is a Vice President of Research and Development at Repros. (Instrument No. 81-4 at 10).

Fisch claims that in 2000, he discovered a new treatment method for androgen deficiency. (Instrument No. 89, at 1). Fisch filed a provisional patent application on May 26, 2000, and his patent, U.S. Patent No. 6,391,920 (the '920 patent) was granted on May 21, 2002. (Instrument Nos. 89 at 2; 89-1; 90). The '920 patent claims to address decreases in androgen in men through the administration of antiestrogens, specifically clomiphene or tamoxifen, which stimulate the body's production of testosterone. (Instrument No. 89-1, at 2).

In March of 2001, Fisch contacted Podolski about the possibility of Zonagen commercializing his treatment methods. (Instrument Nos. 89, at 2; 81-1 at 6, 17; 81-4 at 9). Podolski testified that he was interested in meeting with Fisch to discuss the possibility of an oral treatment, because at the time, the primary treatment method was topical gel. (Instrument No. 81-4 at 10). On March 27, 2001, Fisch asked that Podolski sign a confidentiality agreement.

2

A13

(Instrument Nos. 81-1 at 8; 85-5, 81-4 at 10-11). Following Podolski's signing of the agreement, Fisch faxed him documents and articles related to the subject matter of his provisional patent. (Instrument No. 81-1 at 10-11). Podolski faxed Fisch back an article from 1995 detailing studies on the treatment of secondary hypogonadism with clomiphene citrate, and expressed his interest in hearing how Fisch would "circumnavigate this from a prior art point of view." (Instrument No. 81-3). On April 4, 2001, Fisch met with Podolski, and Timothy McInerney ("McInerney"), also from Zonagen, in New York. (Instrument Nos. 81-1 at 16; 81-4 at 19). At that meeting, Fisch provided Podolski with a copy of his provisional patent application and they discussed its contents. (Instrument No. 81-1 at 17-18). Sometime thereafter, Podolski informed Fisch that Zonagen was not interested in going into business with Fisch. (Instrument No. 81-1 at 20). Podolski testified that they were not interested because of his belief that Fisch's proposed invention was not patentable due to its similarity to prior art. (Instrument No. 81-4 at 11-12).

Podolski testified that Zonagen had begun researching clomiphene following his initial contact with Fisch. (Instrument No. 81-4 at 22). Wiehle wrote a memo on April 2, 2001, detailing the use of clomiphene citrate in this area, and identifying articles and studies on the use of anti-estrogens to combat low testosterone. (Instrument No. 88). Podolski informed others at Repros at the time that clomiphene posed a potential toxicity problem, and furthermore, that he had doubts about the patentability of Fisch's application, based on the amount of prior art. *Id.*

On or about April 18, 2001, Zonagen ordered a quantity of clomiphene citrate from Sigma-Aldrich, a chemical supplier for the research industry. (Instrument Nos. 81-4 at 21-22; 85-4). Starting on April 26, 2001, Zonagen began doing research and development in connection with clomiphene citrate. *Id.* at 22-23. On or about July 9, 2001, Podolski filed a provisional

3

application for what ultimately was issued as United States Patent No. 7,759,360 (the "'360 patent") on July 20, 2010. (Instrument Nos. 81-4, at 87-1). The '360 patent claims as its invention "the use of compositions comprising trans-clomiphene for treating men with hypogonadism." (Instrument No. 87-2, at 2). Podolski's application also led to the issuance of U.S. Patent No. 7,737,185 (the "'185 patent"), on June 25, 2010, for inventors Podolski and Wiehle, and assignee, Repros. (Instrument No. 87-3). The '185 patent claims as its invention "the use of compositions comprising trans-clomiphene for treating wasting, especially a loss of muscle mass." (Instrument No. 87-3 at 2).

On May 12, 2003, Zonagen released a statement regarding its quarterly financial results. (Instrument No. 78-7). The statement included information regarding a Phase I/II efficacy and safety study with Androxal, initiated on April 26, 2003. *Id*. at 3. Androxal is marketed as an oral treatment for testosterone deficiency based on the '360 patent, and at the time, Zonagen was studying its effectiveness as compared to topical testosterone therapy. *Id*.

In September and October 2003, Podolski and Fisch had numerous conversations and exchanged e-mails about the issuance of Fisch's patent, and Podolski's pending patent application and research. (Instrument No. 78-8; 78-9). In an e-mail dated September 1, 2003, Fisch informed Podolski that the '920 patent had issued and noted that Zonagen's "current studies regarding en-Clomiphene are underway and if successful would be promising." (Instrument No. 78-8 at 2). Podolski testified that he was surprised to hear that the '920 patent had been issued, specifically because it failed to distinguish prior art and did not include any supporting data. (Instrument No. 81-4 at 14-16). According to Podolski, Fisch informed him at that time that his patent included the same trans-isomer included in Podolski's provisional patent

application. (Instrument No. 81-4 at 14). Furthermore, Podolski testified that both parties suggested that the other join them in their business venture. *Id*. On October 1, 2003, Fisch sent Podolski an e-mail asserting that his patent describes the use of "isomers" to treat hypogonadism, and inquiring as to whether any published papers address that treatment method. (Instrument No. 78-9 at 2).

Podolski testified that after this he provided literature on the use of antiestrogens to treat hypogonadism to the U.S. Patent Office and it initiated two reexaminations of the '920 patent. (Instrument No. 81-4 at 14-16). The '920 patent was reexamined beginning on January 26, 2004, and after modifications by Fisch the U.S. Patent Office issued a reexamination certificate on April 11, 2006. (Instrument No. 86-2 at 5). The '920 patent was again reexamined beginning on May 1, 2006, and after additional modifications by Fisch, the U.S. Patent Office issued a reexamination certificate on April 29, 2013. *Id*. at 7.

On August 27, 2012, an article was published in the Financial Times, stating that Repros would "need to resolve potential patent conflcits around Androxal" and that they would "likely have to negotiate a deal with the original patent owner, rather than proceed to district court litigation." (Instrument Nos. 1 at 7-8; 37 at 5). On May 2, 2013, BioPharm Insight published an article noting that Fisch and Repros had met and signed a confidentiality agreement in 2001, and that it could pose legal problems for the development of Androxal. (Instrument Nos. 1 at 8; 6 at 6). Repros claims that these articles, and others, were the result of statements made by Fisch to the media and to Repros's investors. (Instrument No. 1 at 7-8).

On July 19, 2013, counsel for Fisch sent a letter to Michael G. Wyllie ("Wyllie"), Director of Repros, informing Repros of Fisch's intent to file a complaint addressing the

A16

inventorship of U.S. Patents assigned to Repros, including the '360 and '185 patents. (Instrument No. 1-6). The letter asserts that Fisch had reached out to Repros on numerous occasions to resolve the contested inventorship issue. *Id*.

**C.**

On August 2, 2013, Plaintiff Repros filed suit against Defendant Fisch in the United States District Court for the Southern District of Texas, seeking declaratory judgment of ownership and inventorship of the '360 patent and the '185 patent.[1] (Instrument No. 1). Plaintiff asserts that Podolski is correctly named as the sole inventor of the '360 patent, and that Podolski and Ronald Wiehle ("Wiehle") are correctly named as the co-inventors of the '185 patent. *Id*. at 9-12. On October 2, 2013, Fisch filed an answer and counterclaims against Repros as well as Podolski and Wiehle, seeking correction of inventorship of these patents pursuant to 35 U.S.C. § 256. (Instrument No. 16). Fisch alleges that he contributed to the conception of the '360 patent and the '185 patent. *Id*.

On December 3, 2013, Repros filed a motion to dismiss Fisch's counterclaims. (Instrument No. 31). Repros argued that Fisch's counterclaims failed to assert any collaboration in the conception of the Repros patents, and that he merely compared his own patent to those of Repros. *Id*. On December 24, 2013, Fisch filed a response. (Instrument No. 34). On December 30, 2013, Repros filed a reply. (Instrument No. 35). On December 31, 2013, Fish filed a sur-reply as well as an amended answer and counterclaims. (Instrument Nos. 36; 37). Despite the intervening pleading, the Court reasoned that Fisch's amended counterclaims were substantially

---

[1] The original complaint sought declaratory judgment of inventorship of additional patents as well, but the parties have since confirmed that only the '360 patent and the '185 patent remain in dispute. *See* (Instrument Nos. 81-1 at 5; 96 at 6).

6

A17

similar to his original counterclaims for the purpose of considering Repros's motion to dismiss. (Instrument No. 57). On March 28, 2014, the Court denied Repros's motion to dismiss. *Id.*

The Court was scheduled to hold a hearing to construe disputed claim terms, pursuant to *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 ( Fed. Cir. 1995), aff'd 517 U.S. 370 (1996), on May 13, 2014. However, on May 9, 2014, the parties filed a joint claim construction chart, wherein they agreed on the constructions of all previously disputed claim terms. (Instrument No. 64).

On October 6, 2014, Repros filed a motion for summary judgment on the basis of equitable estoppel as to Fisch's counterclaim for co-inventorship of the '360 patent. (Instrument No. 78). On October 27, 2014, Fisch filed a response. (Instrument No. 96). On November 3, 2014, Repros filed a reply. (Instrument No. 106).

On October 6, 2014, Repros filed a motion for summary on all of Fisch's co-inventorship counterclaims. (Instrument No. 80). On October 27, 2014, Fisch filed a response. (Instrument No. 93). On November 3, 2014, Repros filed a reply. (Instrument No. 104).

October 6, 2014, Fisch filed a motion for summary on all of his co-inventorship counterclaims. (Instrument No. 82).  On October 27, 2014, Repros filed a response. (Instrument No. 99). On November 3, 2014, Fisch filed a reply. (Instrument No. 101).

**D.**

The patents in this case address treatment for hypogonadism and related health concerns through the administration of clomiphene.

Testosterone is the primary androgen, or male sex hormone, and plays a vital role in male reproductive health, muscle strength, and bone formation. (Instrument No. 87-2 at 9).

A18

Testosterone production in men is regulated by the interactions between the hypothalamus, the pituitary gland, and the gonads. (Instrument Nos. 81-6 at 14; 85-2 at 13-14). The process begins in the hypothalamus section of the brain, which releases gonadotropin-releasing hormone (GnRH), which then travels to the pituitary gland, stimulating the production of luteinizing hormone (LH) and follicle stimulating hormone (FSH). *Id.* The testes or gonads, the male reproductive organs, receive LH and FSH from the pituitary and produce testosterone which is then sent through the body. *Id.* The amount of testosterone produced is controlled by a negative feedback loop. *Id.* In this loop, the enzyme aromatase converts testosterone into estradiol, which inhibits the production GnRH, LH, and FSH, and thus limits the production of further testosterone. *Id.*

Hypogonadism is a general term that refers to a state characterized by low testosterone levels. (Instrument Nos. 81-6 at 14; 85-2 at 14). Over the years, the term has been used interchangeably with terms such as androgen deficiency, low testosterone, and low T. *Id.* Hypogonadism can be classified as either primary or secondary. Primary hypogonadism refers to the failure of the testes to respond to FSH or LH. *Id.* Secondary hypogonadism refers to a defect in the hypothalamus or pituitary gland which results in insufficient production of LH to stimulate production by the testes. (Instrument Nos. 81-6 at 15; 852- at 14). As men age, they experience a gradual reduction in testosterone levels, sometimes referred to as andropause or male menopause. (Instrument No. 81-6 at 15). Hypogonadism in elderly men has been linked to numerous health concerns including: sexual dysfunctions, wasting or decreased muscle mass, osteoporosis, and changes in mood or cognitive function. (Instrument Nos. 81-6 at 15; 85-2 at 15).

Traditionally, hypogonadism has been treated through testosterone therapy. (Instrument Nos. 87-2 at 9; 87-3 at 11). This includes topical gels or scrotal patches, while oral testosterone therapy was noted for posing certain health risks. *Id*. Instead of testosterone therapy, the two patents at issue in this case, as well as the '920 patent owned by Fisch, utilize antiestrogens, specifically clomiphene, to stimulate the production of testosterone by blocking the negative feedback loop involving estradiol. (Instrument Nos. 86-1; 87-2; 87-3).

Clomiphene citrate is the citrate salt of clomiphene, a mixture of two isomers referred to as cis-clomiphene, also known as zuclomiphene, and trans-clomiphene, also known as enclomiphene. (Instrument No. 81-6 at 16). Clomiphene citrate has been used since 1960s for fertility enhancement in women, with trans-clomiphene comprising 50-70% of the composition. (Instrument No. 87-2 at 10). Clomiphene citrate has also been administered to men to treat low testosterone and infertility since the 1960s, and numerous studies about its efficacy in that regard were conducted in the 1980s and 1990s. (Instrument Nos. 81-6 at 17; 85-2 at 16).

<u>1.</u>

The '920 patent is not directly at issue in this case, but is at the heart of Fisch's purported disclosure and contribution to Podolski's and Wiehle's inventions.

On May 25, 2000, Fisch, through his attorney, filed a provisional application for a patent entitled "Methods for Treating Androgen Deficiency in Men Using Selective Antiestrogens." (Instrument No. 85-1). The application describes the relative decrease in testosterone in older men by 30-50% when compared to younger men, and the numerous disorders that accompany this decrease. *Id*. at 5. The application noted that antiestrogens had been used in younger men to increase testosterone values and treat male infertility. *Id*. at 6. However, the application asserts

that antiestrogens had been thought to be ill suited to the treatment of relative androgen deficiency in older men. *Id*. Fisch posited that "[b]y gradually stimulating the body to produce testosterone, the antiestrogens result in an endogenic rebalancing of the testosterone/estrogen ratio in men. As a result, the relative androgen deficiency is compensated for." *Id*. at 6-7. Fisch offered as examples of suitable antiestrogens, tamoxifen citrate and clomiphene citrate, sold under the trademark Clomid. *Id*. at 7. Specifically, the application describes clomiphene citrate containing 50-70% trans-clomiphene. *Id*. at 9. The application provides that the antiestrogens can be administered "orally, parenterally or trasndermally." *Id*. at 8. This application is the document that Fisch provided to Podolski at their meeting in April 2001. (Instrument No. 81-1 at 17-18).

On May 21, 2002, the United States Patent Office issued the '920 patent to Fisch. (Instrument No. 86-1 at 2). The '920 patent includes largely the same substance as the provisional application, and includes 14 claims, two of which are independent. (Instrument No. 86-1 at 4). Claim 1 is: "A method of treating androgen deficiency in men comprising administering a selective antiestrogen." *Id*. Claims 2, 3, 11, 12, 13, and 14 describe methods according to claim 1, and provide different potential antiestrogens, including: clomiphene; clomiphene citrate, comprising either the cis-isomer or the trans-isomr; tamoxifen; and tamoxifen citrate. *Id*. Claim 4 is: "A method of treating disorders related to male menopause in men comprising administering an antiestrogen." *Id*. Claims 5 through 10 provide various disorders including: reduction in muscle mass, limitation of body performance capacity, reduction of bone density, reduction of libido, reduction of potency, and reduction of benign prostatic hyperplasia. *Id*. The claims listed in the provisional application did not include clomiphene citrate comprising the cis-isomer or the trans-isomer.

On January 26, 2004, the U.S. Patent Office began to reexamine the '920 patent, based on information sent by Podolski. (Instrument Nos. 80-4; 81-4 at 14-16). The U.S. Patent Office Examiner rejected claims 1 to 3 as anticipated by prior art under 35 U.S.C. § 102(b) and claims 1 to 3 and 11 to 14 were rejected as being obvious under 35 U.S.C. § 103(a). (Instrument No. 80-4 at 14, 23). The Examiner noted in particular a report written by Andre T. Guay M.D. entitled "Possible Hypothalamic Impotence—Male Counterpart to Hypothalamic Amenorrhea?" published in Volume XXXVIII of *Urology* in October of 1991. (Instrument Nos. 80-4 at 14; 80-6). The Guay article posited that reduced testosterone was caused by inadequate stimulation by the hypothalamus and pituitary. (Instrument No. 80-6 at 6-7). Guay then administered clomiphene to patients, and found that it resulted in an elevation of LH, FSH, and testosterone levels. *Id*.

Fisch filed an Amendment to the '920 patent under 37 C.F.R. § 1.530 on October 29, 2004, and a Declaration under 37 C.F.R. § 1.132, on April 25, 2005. (Instrument Nos. 80-4; 70-6). Fisch argued to the Examiner that the Guay article, and a subsequent study in 1995 by Guay, were inconclusive as to the connection between hypogonadism and sexual dysfunction, and specifically concluded that androgens should not be given indiscriminately to men of a certain age. (Instrument No. 80-4 at 15-16).

Accordingly, to distinguish his patent from the prior art, Fisch amended claim 1 of the '920 patent to read "a method of treating *disorders related to* androgen deficiency in men comprising administering a selective antiestrogen *to men in need of such treating*," rather than simply "a method of treating androgen deficiency in men comprising administering a selective antiestrogen." (Instrument No. 86-1 at 6). Similarly, claim 4 was amended to read: "a method of

11

A22

treating disorders related to male menopause in men comprising administering an antiestrogen *to men in need of such treating*." (Instrument No. 86-1 at 6). Fisch also added additional claims numbered 15-20, which were dependent claims under claim 4, detailing specific antiestrogens. *Id*. The U.S. Patent Office issued a reexamination certificate including the amended claim language on April 11, 2006. *Id*.

On May 1, 2006, the U.S. Patent Office began to again reexamine the '920 patent, based on information sent by Podolski. (Instrument Nos. 80-5; 81-4 at 14-16). The U.S. Patent Office Examiners rejected claims 1, 2, 4-9, 11, 15, 19, and 20 as anticipated by U.S. Patent No. 6,017,964 ("the MacLean patent"). (Instrument No. 80-5 at 4). The MacLean patent claimed as its invention the use of the antiestrogen droloxifene to raise serum testosterone levels. (Instrument No. 80-5 at 6).

Fisch filed a Request for Consideration under 37 C.F.R. § 1.530 on March 15, 2007, and a Declaration under 37 C.F.R. § 1.132, on August 22, 2007. (Instrument Nos. 80-5; 99-12). Fisch argued that the MacLean patent simply addressed increasing testosterone levels, but did not make the connection between increased testosterone levels and treating related disorders. (Instrument No. 80-5 at 7-10).

The U.S. Patent Office issued a reexamination certificate for the '920 patent on April 29, 2013. (Instrument No. 86-1 at 7). The certificate cancelled claims 1 and 4-9 of the '920 patent. *Id*. at 8. The Patent Office confirmed claims 2-3 and 11-20, and confirmed claim 10 as amended to read "the method according to claim 3, wherein the disorder is [reduction of] benign hyperplasia." *Id*. Accordingly, the patentable claims remaining after the patent reexaminations include methods for treating *disorders related to* androgen deficiency or male menopause in men

comprising administering the antiestrogens clomiphene, clomiphene citrate comprising the cis-isomer or the trans-isomer, tamoxifen, and tamoxifen citrate. *Id*.

2.

On July 9, 2001, Podolski filed a provisional patent application, No. 60/304313, entitled "Methods and Materials for the Treatment of Testosterone Deficiency in Men." (Instrument No. 87-1). The application claimed as its invention the use of clomiphene comprising 0 to 29% cis-clomiphene and 71 to 100% trans-clomiphene, to increase testosterone levels in male mammals and ameliorate or prevent the sequelae of low testosterone. *Id*. at 8. The application describes how clomiphene comprising 30-50% cis-clomiphene was used, initially to enhance female fertility, but had also been used for therapeutic intervention in men with low testosterone. *Id*. at 10-11. The application states that by administering only the trans-clomiphene isomer, or clomiphene comprising 71 to 100% trans-clomiphene, certain side effects on male patients can be avoided. *Id*. at 12.

On July 20, 2010, the U.S. Patent Office issued the '360 patent to Inventor Podolski and Assignee Repros. (Instrument No. 87-2). The '360 patent described a study Repros performed on male baboons, wherein they were administered either Clomid, Enclomid (trans-clomiphene), or Zuclomid (cis-clomiphene). (Instrument No. 87-2 at 11). The study indicated that trans-clomiphene was more effective than Clomid at increasing total serum testosterone, and that cis-clomiphene was largely ineffective. *Id*. Furthermore, the study found that cis-clomiphene had numerous negative side effects related to cholesterol, red blood cell counts, and liver enzymes, while trans-clomiphene appeared to have the opposite or no such effect. *Id*. at 12-13. The study

13

A24

also suggested that trans-clomiphene could be useful in treatment of the male population with AIDS. *Id.*

The '360 patent includes the following independent claims:

1. a method for increasing serum levels of testosterone in a human male with secondary hypogonadism, the method comprising administering to said male an effective amount of a composition consisting essentially of trans-clomiphene or pharmaceutically acceptable salts thereof and optionally one or more pharmaceutically acceptable diluents, adjuvants, carriers or excipients.

. . .

7. A method for treating secondary hypogonadism in a human male, the method comprising administering to a human male in need thereof, an effective amount of a composition consisting essentially of trans-clomiphene or pharmaceutically acceptable salts thereof and optionally one of more pharmaceutically acceptable diluents, adjuvants, carriers or excipients.

(Instrument No. 87-2 at 13). Claims 2 through 6 detail methods of claim 1 with varying dosages of trans-clomiphene. *Id.*

<u>3.</u>

On June 15, 2010, the U.S. Patent Office issued the '185 patent to Inventors Podolski and Wiehle, and Assignee Repros. (Instrument No. 87-3). The '185 patent is a continuation in part of provisional patent application No. 60/304313, filed on July 9, 2001, which resulted in the '360 patent. *Id.* at 2. The '185 patent relates to the use of trans-clomiphene to treat wasting, especially loss of muscle mass, and for treating hypogonadism and wasting in males with chronic obstructive pulmonary disorder ("COPD"). *Id.*

The '185 patent notes that muscle wasting, or progressive loss of muscle mass, and hypogonadism have been associated with COPD. *Id.* at 11. The patent proposes that trans-clomiphene can be used in place of testosterone therapy for COPD patients, and notes, like in the '360 patent, that trans-clomiphene may have certain health benefits over testosterone or other

14

antiestrogen therapies. *Id*. at 13. Although the patent notes a preference for trans-clomiphene, it does claim that any antiestrogen is within the scope of the invention, so long as it elevates serum testosterone levels. *Id*.

The '185 patent includes the following independent claim:

> 1. A method for treating wasting in a hypogonadal male, comprising administering to the male a composition consisting essentially of trans-clomiphene or pharmaceutically acceptable salts thereof and optionally one or more pharmaceutically acceptable diluents, adjuvants, carriers or excipients in an effective amount to treat said wasting in the hypogonadal male.

*Id*. at 19. Claims 1 through 6 detail methods of claim 1 with varying dosages of trans-clomiphene. *Id*.

## II.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Warfield v. Byron,* 436 F.3d 551, 557 (5th Cir. 2006).

The "movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc*., 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-25(1986)). "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Tex*., 560 F.3d 316, 326 (5th Cir. 2009). An issue is "genuine" if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

A26

If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden by "showing — that is, pointing out to the district court — that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. While the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (citation omitted). "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response." *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).

After the moving party has met its burden, in order to "avoid a summary judgment, the nonmoving party must adduce admissible evidence which creates a fact issue concerning the existence of every essential component of that party's case." *Thomas v. Price*, 975 F.2d 231, 235 (5th Cir. 1992). The party opposing summary judgment cannot merely rely on the contentions contained in the pleadings. *Little*, 37 F.3d at 1075. Rather, the "party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his or her claim," *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 457, 458 (5th Cir. 1998); *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007). Although the court draws all reasonable inferences in the light most favorable to the nonmoving party, *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008), the nonmovant's "burden will not be satisfied by some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence." *Boudreaux*, 402 F.3d at 540 (*quoting Little*, 37 F.3d at 1075). Similarly, "unsupported allegations or affidavit or deposition

16

A27

testimony setting forth ultimate or conclusory facts and conclusions of law are insufficient to defeat a motion for summary judgment." *Clark v. Am's Favorite Chicken*, 110 F.3d 295, 297 (5th Cir. 1997).

In deciding a summary judgment motion, the district court does not make credibility determinations or weigh evidence. *Chevron Phillips*, 570 F.3d 606, 612 n.3 (5th Cir. 2009). Nor does the court "sift through the record in search of evidence to support a party's opposition to summary judgment." *Jackson v. Cal-Western Packaging Corp.*, 602 F.3d 374, 379-80 (5th Cir. 2010); *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003); *Ragas,* 136 F.3d at 458; *Nissho-Iwai American Corp. v. Kline*, 845 F.2d 1300, 1307 (5th Cir.1988) (it is not necessary "that the entire record in the case ... be searched and found bereft of a genuine issue of material fact before summary judgment may be properly entered"). Therefore, "[w]hen evidence exists in the summary judgment record but the nonmovant fails even to refer to it in the response to the motion for summary judgment, that evidence is not properly before the district court." *Malacara*, 353 F.3d at 405.

The Federal Circuit has made clear that "summary judgment is as appropriate in a patent case as in any other." *Barmag Barmer Maschinenfabrik AG v. Murata Machinery, Ltd.*, 731 F.2d 831, 835 (Fed. Cir. 1984), *cited by WesternGeco L.L.C. v. ION Geophysical Corp.*, 876 F. Supp. 2d 857, 865 (S.D. Tex. 2012). Therefore, "[w]here no issue of material fact remains and the movant is entitled to judgment as a matter of law," the Court should grant summary judgment in order "to avoid unnecessary expense to the parties and wasteful utilization of the jury process and judicial resources." *Barmag*, 731 F.2d at 835.

17

A28

## III.

Repros first argues that Fisch's claim of co-inventorship of the '360 patent should be barred by equitable estoppel.

Equitable estoppel is a complete defense to patent inventorship claims. *See MCV, Inc. v. King-Seeley Thermos Co.*, 870 F.2d 1568, 1572 (Fed. Cir. 1989) (holding that equitable estoppel can be applied infringement and inventorship cases). "Whether equitable estoppel has been established is committed to the sound discretion of the trial judge." *SCA Hygiene Products Aktiebolag v. First Quality Baby Products, LLC*, 767 F.3d 1339, 1344 (Fed. Cir. 2014) (citations omitted). An equitable estoppel defense has three elements: 1) the party making the claim has communicated that it does not intend to enforce its claim, either through conduct or silence; 2) the other party relies on that communication; and 3) the other party would be materially prejudiced if the claim is allowed to proceed. *A.C. Aukerman Co. v. R.L. Chaides Const. Co.*, 960 F.2d 1020, 1041 (Fed. Cir. 1992) (citations omitted). "In deciding whether to bar the suit on estoppel grounds, the court must consider all evidence relevant to the equities." *Aspex Eyewear Inc. v. Clariti Eyewear, Inc.*, 605 F.3d 1305, 1310 (Fed. Cir. 2010).

Repros asserts that Fisch should be equitably estopped from bringing his counterclaim of co-inventorship of the '360 patent, because he had communicated with Repros about the invention for over ten years before asserting co-inventorship in 2013. (Instrument No. 79 at 7).

### A.

The first element of equitable estoppel requires that the party bringing the claim communicated to the other party that it would "not be disturbed by the plaintiff . . . in the activities in which the [defendant] is currently engaged." *A.C. Aukerman*, 960 F.2d at 1042.

18

A29

"[S]ilence alone will not create an estoppel unless there was a clear duty to speak or somehow the patentee's continued silence reenforces the defendant's inference from the plaintiff's known acquiescence that the defendant will be unmolested." *Id*. at 1043-44. "Although the most common example of equitable estoppel is a patentee who objects to allegedly infringing activities and then remains silent for a number of years, that silence must be 'coupled with *other* factors, [such that the] patentee's 'misleading conduct' is essentially misleading inaction.'" *SCA Hygeine Products Aktiebolag*, 767 F.3d at 1349 (quoting *A.C. Aukerman*, 960 F.2d at 1042).

Fisch's alleged contribution to the '360 patent occurred on April 4, 2001, when he met with Podolski and shared his own provisional patent application. (Instrument Nos. 81-1 at 16; 81-4 at 19). Podolski filed a provisional patent application on July 9, 2001 and the '360 patent was issued on July 20, 2010. (Instrument Nos. 81-4, 87-2). In the Fall of 2003, Podolski and Fisch had numerous conversations about Fisch's patent and Podolski's research and pending patent application. (Instrument Nos. 78-8; 78-9). Fisch also referred to Podolski's pending patent in the reexamination of his own patent in 2004 and 2007. *See* (Instrument Nos. 80-4; 80-5; 78-6; 99-12). Fisch's reference to the pending patent indicates his awareness of the substance of the invention. Furthermore, Fisch noted on multiple occasions during this reexamination that the patent application for the '360 patent was invented by Podolski. *See e.g.* (Instrument No. 79 at 16).

Typically, misleading silence arises when a party "threaten[s] immediate or vigorous enforcement of its patent rights but then [does] nothing for an unreasonably long time." *Aspex*, 605 F.3d at 1312. However, even absent an initial threat, an unreasonable delay following the point at which the plaintiff knew or should have known of the infringing actions is itself

19

A30

evidence of misleading conduct. *See Stewart & Stevenson Servs., Inc. v. Serv-Tech, Inc.*, 794 F. Supp. 202, 206 (S.D. Tex. 1992) *aff'd*, 996 F.2d 318 (Fed. Cir. 1993). In Stewart, the court found that the plaintiff's failure to pursue a claim for 5 to 6 years, when considered with representations made by the plaintiff that the defendant owned the patent in question, induced the defendant to believe the plaintiff was not bringing a claim. *Id*. Similarly, here, Fisch was aware of Podolski's research and pending patent application in 2003, and was aware of the precise technology in question by, at latest, 2004 while reexamining his own '920 patent. Furthermore, his numerous references during this reexamination to Podolski as the inventor of the then pending '360 patent, further communicated that he did not intend to assert co-inventorship over the '360 patent. Fisch argues that his inventorship claim did not accrue until the patent was issued in 2010, and therefore, he was under no obligation to assert inventorship during the years prior. (Instrument No. 96 at 13). Insofar as Fisch is asserting that he had no remedy prior to the issuance of the '360 patent, he is incorrect. 35 U.S.C. § 116 provides for correction of inventorship prior to the issuance of a patent. Furthermore, when an actual legal claim accrued does not change the nature of his previous communications and silence. Fisch also argues that his delay in asserting this claim was caused by Repros's multiple requests for reexamination of the '920 patent. (Instrument No. 96 at 17-18). Fisch, however, does not explain how this would prevent him from communicating his intention to assert co-inventorship. More tellingly, Fisch does not explain why he referred to Podolski as the inventor of the '360 patent during his reexaminations. The Court finds that Fisch's communications with Podolski, his representations during the reexamination of his patent, and his failure to assert co-inventorship for years, induced

Podolski and Repros to believe that he would not pursue such a claim. *See A.C. Aukerman*, 960 F.2d at 1042.

## B.

The second element of an equitable estoppel defense requires that the defendant actually rely on the misleading conduct of the plaintiff, in connection with taking some action. *A.C. Aukerman*, 960 F.2d at 1042-43. "Reliance is not the same as prejudice or harm, although frequently confused." *Id.* "To show reliance, the [defendant] must have had a relationship or communication with the plaintiff which lulls the [defendant] into a sense of security in going ahead with [its investments]." *Gasser Chair Co. v. Infanti Chair Mfg. Corp.*, 60 F.3d 770, 776 (Fed. Cir. 1995) (citations omitted). The defendant need not "prove precisely what alternative paths it would have taken or that every . . . decision was based on reliance" on the plaintiff's silence. *Aspex*, 605 F.3d at 1312. Rather, the defendant must show that it "took into account" the failure to pursue the patent claim, or other misleading conduct. *Id.* "The requirement that the [plaintiff's] conduct . . . induce a belief that he has abandoned his claim does not require the [defendant] to prove that he was convinced that the [plaintiff] abandoned his claim." *Adelberg Labs., Inc. v. Miles, Inc.*, 921 F.2d 1267, 1274 (Fed. Cir. 1990).

Repros was "lulled into a sense of security" by Fisch's failure to assert co-inventorship and other communications. *See Gasser*, 60 F.3d at 776. It is not disputed that Repros proceeded to prosecute the '360 patent, engaged in numerous studies and trials, and invested significant time and money during the time after Fisch became aware of the contents of the '360 patent. In *Stewart and Stevenson*, 794 F. Supp. at 206, the court found that the plaintiff's failure to assert claims and the defendant's investments in its patent constituted sufficient evidence to show

21

reliance. Fisch argues that Repros "would have proceeded along the same path whether or not Dr. Fisch had objected." (Instrument No. 96 at 20). This is pure speculation, and, furthermore, Repros need not prove "precisely what alternative paths it would have taken or that . . . every decision was based on reliance[.]" *See Aspex*, 605 F.3d at 1312. The Court finds that Repros relied on Fisch's communications and silence when it pursued prosecuting and monetizing the '360 patent. *See A.C. Aukerman*, 960 F.2d at 1042-43.

## C.

Finally, the defendant must establish that it would be "materially prejudiced" if the plaintiff is permitted to proceed. *A.C. Aukerman*, 960 F.2d at 1043. This "prejudice may be a change of economic position or loss of evidence." *A.C. Aukerman*, 960 F.2d at 1043. Economic prejudice means "a change in the [defendant's] economic position . . . during the period of delay that would not have occurred had [the plaintiff] sued earlier." *Ecolab, Inc. v. Envirochem, Inc.*, 264 F.3d 1358, 1371 (Fed. Cir. 2001). Damages normally associated with a finding of infringement, such as hiring new staff or modifying equipment, do not constitute economic prejudice. *Id.* at 1371-72. "Evidentiary prejudice may arise because of a 'defendant's inability to present a full and fair defense on the merits due to the loss of records, the death of a witness, or the unreliability of memories of long past events, thereby undermining the court's ability to judge the facts.'" *Stewart & Stevenson*, 794 F. Supp. at 206.

Repros argues that there is a risk of economic and evidentiary prejudice if Fisch's counterclaim is allowed to proceed. Specifically, it notes that Fisch repeatedly stated an inability to recall details related to his communications with Podolski in 2001. (Instrument No. 79 at 20). Fisch also repeatedly testified to an inability to recall whether or not certain phone calls took

22

A33

place, or many other circumstances surrounding the parties' interactions. *See generally* (Instrument No. 81-1). Repros also asserts that it has invested $53.3 million dollars into researching and developing Androxal, the product covered by the '360 patent, and that this suit could result in conflicts related to the licensing of the patent. (Instrument No. 79 at 22-23). The Court agrees with Repros's assessment. If Fisch is named as a coinventor on the '360 patent, he could interfere with Repros's licensing arrangements, and its strategy surrounding Androxal. While Fisch questions the precise amount of money spent by Repros, it is undisputed that Repros has invested significant time and money into the development of Androxal. The severity of the evidentiary prejudice in this case is not as clear. While Fisch stated an inability to recall certain details countless times throughout his deposition, the parties agree that the nature of his purported contribution to the '360 is largely contained in his own provisional patent application. Nevertheless, the Court finds that the amount of time that has passed since much of the conduct in question and the amount of money expended by Repros, demonstrate that Repros will be materially prejudiced if this claim is allowed to proceed. *See A.C. Aukerman*, 960 F.2d at 1043.

Accordingly, Repros's, Podolski's, and Wiehle's motion for summary judgment (Instrument No. 78) is GRANTED and Fisch is equitably estopped from claiming co-inventorship of the '360 patent.

## IV.

The Court next turns to the substance of the parties' inventorship dispute. Despite having already ruled that Fisch is equitably estopped from bringing a co-inventorship claim as to the '360 patent, the Court, out of an abundance of caution, considers the substantive arguments related to inventorship of the '360 patent as well as the '185 patent.

23

A34

## A.

"Whenever through error . . . an inventor is not named in an issued patent, the Director may, on application of all the parties and assignees, with proof of the facts and such other requirements as may be imposed, issue a certificate correcting such error." 35 U.S.C. § 256. The determination of whether an inventor has been incorrectly omitted from an issued patent is, like an infringement analysis, a two-step process. *Trovan, Ltd. v. Sokymat SA, Irori*, 299 F.3d 1292, 1302 (Fed. Cir. 2002). "Because co-inventors need not make a contribution to the subject matter of every claim of the patent . . . inventorship is determined on a claim-by-claim basis." *Id.* (citations omitted). First, the Court must determine the meaning and scope of the patent claims for which the claimed inventor asserts contribution. *See id.*; *Markman*, 52 F.3d at 976.  This step is commonly known as claim construction or interpretation. Claim construction, including the construction of terms of art within a claim, is a matter of law "exclusively within the province of the court." *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996). Second, the court must compare the alleged contributions of the asserted co-inventor with the subject matter of the construed claim to determine whether the correct inventors have been named in the patent. *Ethicon, Inc. v. U.S. Surgical Corp.*, 135 F.3d 1456, 1460 (Fed. Cir. 1998). "Inventorship is a mixed question of law and fact: The overall inventorship determination is a question of law, but it is premised on underlying questions of fact." *Eli Lilly & Co. v. Aradigm Corp.*, 376 F.3d 1352, 1362 (Fed. Cir. 2004).

"Patent issuance creates a presumption that the named inventors are the true and only inventors." *Caterpillar Inc. v. Sturman Industries, Inc.*, 387 F.3d 1358, 1377 (Fed.Cir.2004). To overcome this presumption, alleged co-inventors must establish their co-inventorship by facts

A35

supported by clear and convincing evidence. *Ethicon*, 135 F.3d at 1461. To meet the burden of clear and convincing evidence, the alleged co-inventors must prove their contribution to the conception of the invention with more than their own testimony concerning the relevant facts. *Trovan*, 299 F.3d at 1302 (citing *Price v. Symsek*, 988 F.2d 1187, 1194 (Fed.Cir.1993)). Whether the co-inventor's testimony has been sufficiently corroborated is evaluated under a "rule of reason analysis," which requires that an "evaluation of all pertinent evidence must be made so that a sound determination of the credibility of the inventor's story may be reached." *Price*, 988 F.2d at 1195. Corroborating evidence may take many forms. "Reliable corroboration preferably comes in the form of records made contemporaneously with the inventive process." *Trovan*, 299 F.3d at 1302 (citing *Sandt Tech., Ltd. v. Resco Metal & Plastics Corp.*, 264 F.3d 1344, 1350–51 (Fed.Cir.2001)). However, circumstantial evidence about the inventive process or oral testimony of someone other than the alleged co-inventor may also corroborate. *Trovan*, 299 F.3d at 1303.

"Section 116 of Title 35 is the statutory locus of joint inventorship doctrine." *Eli Lilly*, 376 F.3d at 1358. Section 116 provides that:

> Inventors may apply for a patent jointly even though (1) they did not physically work together or at the same time, (2) each did not make the same type or amount of contribution, or (3) each did not make a contribution to the subject matter of every claim of the patent.

35 U.S.C. § 116(a). "This provision sets no explicit lower limit on the quantum or quality of inventive contribution required for a person to qualify as a joint inventor." *Fina Oil& Chem. Co. v. Ewen*, 123 F.3d 1466, 1473 (Fed.Cir.1997). Nevertheless, the Federal Circuit has clarified that "to be a joint inventor, an individual must make a contribution to the conception of the claimed invention that is not insignificant in quality, when that contribution is measured against the dimension of the full invention." *Id.*

25

A36

"Conception is the touchstone of inventorship, the completion of the mental part of invention." *Burroughs Wellcome Co. v. Barr Labs., Inc*., 40 F.3d 1223, 1227-28 (Fed.Cir.1994). "The definition of conception in patent law has remained essentially unchanged for more than a century. It is the 'formation in the mind of the inventor, of a definite and permanent idea of the complete and operative invention, as it is hereafter to be applied in practice.'" *Dawson v. Dawson*, 710 F.3d 1347, 1352 (Fed. Cir. 2013) (quoting *Hybritech Inc. v. Monoclonal Antibodies, Inc.,* 802 F.2d 1367, 1376 (Fed.Cir.1986)). "Conception is complete only when the idea is so clearly defined in the inventor's mind that only ordinary skill would be necessary to reduce the invention to practice, without research or experimentation. *Burroughs Wellcome*, 40 F.3d at 1228. "[T]he test for conception is whether the inventor had an idea that was definite and permanent enough that one skilled in the art could understand the conception; the inventor must prove his conception by corroborating evidence, preferably by showing a contemporaneous disclosure." *Id*. "[A]n inventor need not know that his invention will work for conception to be complete," but rather "need only show that he had the idea; the discovery that an invention works is part of its reduction to practice." *Id.* "One who simply provides the inventor with well-known principles or explains the state of the art without ever having a firm and definite idea of the claimed combination as a whole does not qualify as a joint inventor." *Ethicon*, 135 F.3d at 1460 (citations omitted).

In order to establish joint inventorship, there must also be "some element of joint behavior, such as collaboration or working under common direction[.]" *Kimberly-Clark Corp. v. Procter & Gamble Distributing Co., Inc.*, 973 F.2d 911, 917 (Fed.Cir.1992). Two parties cannot be joint inventors "if they have had no contact whatsoever and are completely unaware of each

other's work." *Id.* at 916. While joint inventors are not required to work together physically, there must be "some open line of communication during or in temporal proximity to their inventive efforts[.]" *Eli Lilly*, 376 F.3d at 1359. "The fact that each of the inventors plays a different role and that the contribution of one may not be as great as that of another does not detract from the fact that the invention is joint if each makes some original contribution, though partial, to the final solution of the problem." *Kimberly-Clark Corp.*, 973 F.2d at 917.

"Summary judgment is properly granted [to a defendant] if the evidence, when viewed in a light most favorable to the non-moving party, fails to establish the inventorship of an omitted inventor by clear and convincing evidence." *Linear Tech. Corp. v. Impala Linear Corp.*, 379 F.3d 1311, 1327 (Fed. Cir. 2004). "However, resolving summary judgment motions concerning claims of inventorship tends to be a more complex process than many other such motions, as the inquiry is necessarily very fact-intensive." *Institut Pasteur v. Simon*, 384 F.Supp.2d 802, 804 (E.D. Pa. 2005). "The determination of whether a person is a joint inventor is fact specific, and no bright-line standard will suffice in every case." *Fina Oil*, 123 F.3d at 1473. "Dueling experts and competing characterizations of alleged inventive contributions often tend to present situations inappropriate for resolution by summary judgment." *Institut Pasteur*, 384 F.Supp.2d at 804 (citing *Checkpoint Sys. v. All-Tag. S.A.*, 412 F.3d 1331, 1337-39 (Fed. Cir. 2005).

**B.**

All parties have moved for summary judgment on Fisch's counterclaims of co-inventorship of the '360 and '185 patents.

<u>1.</u>

Fisch first claims to have contributed to the conception of claim 7 of the '360 patent which reads:

> 7. A method for treating secondary hypogonadism in a human male, the method comprising administering to a human male in need thereof, an effective amount of a composition consisting essentially of trans-clomiphene or pharmaceutically acceptable salts thereof and optionally one of more pharmaceutically acceptable diluents, adjuvants, carriers or excipients.

(Instrument No. 87-2 at 13). The parties agreed that "a human male with secondary hypogonadism" should be construed as:

> a human male with low testosterone levels due to inadequate secretion of pituitary gonadotropins and correspondingly low or low normal LH and FSH levels, the human male being with or without at least one related symptom.

(Instrument No. 64-1 at 2).

Fisch's purported contribution to the conception of the '360 patent, as well as the '185 patent, was the disclosure of his provisional patent application. Fisch asserts that "the '360 and '185 patents provide no indication that Repros had carried out any research independent of the Fisch Provisional to determine whether the disclosed clomiphene citrate compositions would be clinically effective in treating symptoms relating to testosterone deficiency in men." (Instrument No. 83 at 13). In fact, the '360 patent includes references to countless publications and studies in this area, including those that Repros supplied to the U.S. Patent Office when requesting a reexamination of the '920 patent. *See e.g.* (Instrument No. 87-2 at 10) (referencing the results of Guay's research on the use of clomiphene in treating male sexual dysfunction). Furthermore, in the '360 and '185 patents, Repros described in great detail its own studies of the varying effects of clomiphene citrate, cis-clomiphene, and trans-clomiphene on serum testosterone levels. *Id.* at 11. Fisch's concerns might be better directed at his own provisional patent application, which

28

A39

included a citation to only one prior study, and no evidence of any actual research of his own. *See* (Instrument No. 85-1). In fact Fisch's patent application and communications with Repros suggest either a conscious effort to avoid or an abject ignorance of the wealth of existing research in this area.

Furthermore, arguments by either party regarding the success or failure of the prosecution of the '920 patent are unavailing on the issue of inventorship. Fisch argues that the issuance of the '920 patent supports his proposition that his provisional application contained inventive language coopted by Repros for its own patents. (Instrument No. 83 at 17). However, the final version of the '920 patent bears little resemblance to the provisional application, and the language that was removed upon reexamination is precisely that which Fisch asserts as his contribution to the Repros patents. Repros also, inexplicably, attempts to disprove co-inventorship by proving the invalidity of the '920 patent based on its similarity to prior art. Ultimately, the U.S. Patent Office determined that the '920 patent contained patentable claims. This Court is not tasked with determining the validity of the '920 patent, nor with whether the '360 or '185 patents infringe on the '920 patent. Rather, this Court must determine whether Fisch significantly contributed to the conception of the Repros patents, by comparing the purported contribution by Fisch to the claims of the patents based on the agreed constructions by the parties. *See Ethicon*, 135 F.3d at 1460.

Fisch's expert, Ridwan Shabsigh, M.D. ("Dr. Shabsigh"), suggests throughout his expert report that "Fisch discovered that administering certain antiestrogens . . . can remedy the relative androgen deficiency in men by stimulating the body's production of testosterone." (Instrument No. 85-2 at 18). This is simply not true. The reexaminations of the '920 patent exposed that

29

A40

treatment of androgen deficiency in men with clomiphene citrate was not novel to Fisch's patent, and that his invention was limited strictly to *disorders related to* androgen deficiency. This point is in fact conceded in Dr. Shabsigh's rebuttal expert report. (Instrument No. 85-3 at 5) ("Dr. Cunningham has improperly conflated the fact that antiestrogens were known to raise testosterone as of May 2000 . . . with the invention of Dr. Fisch—i.e., that antiestrogens such as clomiphene citrate can be used for the treatment of symptoms and disorders related to hypogonadism.").

Fisch, however, also argues that his discovery that clomiphene citrate could treat *disorders related to* androgen deficiency contributed to the conception of the '360 patent. Fisch asserts that this is consistent with the parties' agreed construction of "secondary hypogonadism." However, as noted above, the '920 patent bears very little resemblance to the provisional patent application initially filed by Fisch and shared with Podolski. Upon reexamination, it was deemed only patentable when Fisch modified his method from treating "androgen deficiency" to treating "disorders related to androgen deficiency." *See* (Instrument No. 86-1 at 7). This was, as Fisch acknowledged, because prior art had contemplated the use of clomiphene citrate to treat low testosterone, but had not identified its effectiveness in treating specific disorders *related* to low testosterone. *See* (Instrument Nos. 80-4 at 15-16; 80-5 at 7-10). Fisch now argues that, because "secondary hypogonadism" can occur in males "with or without one related symptom," treatment of secondary hypogonadism is similar to his invention regarding "disorders related to androgen deficiency." Therefore, as Fisch posits, his invention contributed to the conception of treatment of secondary hypogonadism generally as it appears in the '360 patent, at least in cases where secondary hypogonadism is accompanied by symptoms. This is strained to the point of

30

A41

absurdity. Treatment of secondary hypogonadism or androgen deficiency more broadly was precisely what had to be removed from the '920 patent to make it patentable. The Patent Office found, and Fisch conceded, that he did not invent the use of clomiphene citrate to treat low testosterone, but only certain disorders related to it. The '360 patent is a purported improvement on existing treatments for low testosterone itself, not merely the related disorders.

To summarize the above, Fisch offers two potential arguments. First, that he co-invented the '360 patent because he conceived of treating androgen deficiency with clomiphene citrate. Secondly, that he co-invented the '360 patent because he conceived of treating disorders *related to* androgen deficiency with clomiphene citrate. The first argument fails, because the treatment of androgen deficiency with clomiphene citrate was not novel at the time. The second argument fails, because the treatment of disorders *related to* androgen bears little relation to the invention of the '360 patent.

Fisch also argues that he contributed to the idea of using trans-clomiphene for this purpose. Fisch asserts that the provisional patent application for his '920 patent disclosed the use of clomiphene citrate, including an enriched clomiphene citrate, predominantly consisting of trans-clomiphene. (Instrument No. 83 at 19). Furthermore, Fisch's expert, Dr. Shabsigh, notes the insignificance between 70% and 71% trans-clomiphene, and argues that the methods described by Fisch and Repros are therefore substantially similar. (Instrument No. 85-3 at 11). Fisch's provisional application, however, asserts only the use of antiestrogens generally for this purpose. (Instrument No. 85-1 at 7). The application describes antiestrogens as "all those compounds that compete with estrogen for estrogen-receptor binding sites and may delay replenishment of intracellular estrogen receptors." *Id*. It offers as examples tamoxifen citrate and

31

A42

clomiphene citrate, sold as Clomid. *Id*. Clomiphene citrate is described as a mixture of trans-clomiphene and cis-clomiphene containing between 50% and 70% of the trans-isomer. *Id*. at 9. Nowhere in this initial application does Fisch refer to "enriched" clomiphene, describe clomiphene citrate containing 71-100% trans-clomiphene, or otherwise place any emphasis on isolating trans-clomiphene to address potential side effects of the cis-isomer. Yet this is precisely the invention claimed by the '360 patent. Repros conducted studies on the varying impacts on testosterone levels and other issues between Clomid, cis-clomiphene, and trans-clomiphene, and determined that Clomid, as used by Fisch and as studied by others, was less effective and posed greater health risks than pure trans-clomiphene. *See* (Instrument No. 87-2 at 11-13).

The overall inventorship determination is a question of law for the Court. *See Eli Lilly*, 376 F.3d at 1362. The Court has assumed all disputed facts in favor of Fisch, compared the purported contribution by Fisch to the claims of the '360 patent, and finds, as a matter of law, that Fisch made no significant contribution to the conception of the claimed invention when measured against the dimension of the full invention. *See Fina Oil*, 123 F.3d at 1473. Fisch contributed nothing to the actual invention of the '360 patent, which was the use of trans-clomiphene as opposed to clomiphene citrate to treat secondary hypogonadism. Furthermore, the purported contribution by Fisch, the use of clomiphene citrate to treat secondary hypogonadism, was well known in the scientific community at the time of the filing of Repros's provision patent application. "One who simply provides the inventor with well-known principles or explains the state of the art without ever having a firm and definite idea of the claimed combination as a whole does not qualify as a joint inventor." *Ethicon*, 135 F.3d at 1460.

Accordingly, the Court finds an absence of material facts to support a finding of co-inventorship of the '360 patent by Fisch. Therefore, Podolski's, Weihle's, and Repros's motion for summary judgment (Instrument No. 80) is GRANTED as to the '360 patent, and Fisch's motion for summary judgment (Instrument No. 82) is DENIED as to the '360 patent.

<u>2.</u>

Fisch also claims to have contributed to the conception of claim 1, and all dependent claims of the '185 patent, which reads:

> 1. A method for treating wasting in a hypogonadal male, comprising administering to the male a composition consisting essentially of trans-clomiphene or pharmaceutically acceptable salts thereof and optionally one or more pharmaceutically acceptable diluents, adjuvants, carriers or excipients in an effective amount to treat said wasting in the hypogonadal male.

(Instrument No. 87-3 at 19). The parties agreed that "treating wasting in a hypogonadal male" should be construed as:

> therapeutic and prophylactic or preventative measures to prevent or slow (lessen) progressive loss of weight or muscle mass and/or progressive weakening and degeneration of muscle mass in a male having low testosterone levels.

 (Instrument No. 64-1 at 3).

Fisch's arguments of co-inventorship of the '185 patent suffer from many of the same deficiencies as his prior argument as to the '360 patent. The '185 patent originated from the same provisional patent application as the '360 patent, and likewise claims as its invention the use of trans-clomiphene, rather than clomiphene citrate to treat a condition found in hypogonadal males. (Instrument No. 87-3 at 2). Fisch relies on *Burroughs Wellcome Co. v. Barr Labs., Inc.*, 40 F.3d at 1230, for the proposition that he contributed to the conception of the '185 patent, even if the Repros patent was directed at a disorder not mentioned in Fisch's provisional application. However, unlike in *Burroughs Wellcome*, the substance used in the '185 patent is not the same as

33

A44

that used by the purported co-inventor. As discussed above, the invention of the '185 patent is the emphasis on trans-clomiphene rather than clomiphene citrate with higher proportions of cis-clomiphene. Furthermore, Fisch's provisional patent application did not disclose any novel treatment with regard to "wasting." Fisch's provisional patent application does claim the use of clomiphene citrate to treat "reduction of muscle mass." (Instrument No. 85-1 at 10). However, after the second reexamination by the U.S. Patent Office, that claim was cancelled. *Id.* at 8.

Accordingly, the Court finds an absence of material facts to support a finding of co-inventorship of the '185 patent by Fisch. Therefore, Podolski's, Weihle's, and Repros's motion for summary judgment (Instrument No. 80) is GRANTED as to the '185 patent, and Fisch's motion for summary judgment (Instrument No. 82) is DENIED as to the '185 patent.

<h3 align="center"><u>V.</u></h3>

Based on the foregoing, IT IS HERBEY ORDERED THAT Podolski's Weihle's, and Repros's motions for summary judgment (**Instrument Nos. 78; 80**) are **GRANTED** and Fisch's motion for summary judgment (**Instrument No. 82**) is **DENIED**.

The Clerk shall enter this Order and provide a copy to all parties.

**SIGNED** on this the 23rd day of December, 2014, at Houston, Texas.

**VANESSA D. GILMORE**
**UNITED STATES DISTRICT JUDGE**

34

A45

US007737185B2

(12) **United States Patent**   (10) **Patent No.:** **US 7,737,185 B2**

Podolski et al.   (45) **Date of Patent:** **Jun. 15, 2010**

(54) **METHODS AND COMPOSITIONS WITH** *TRANS*-**CLOMIPHENE**

(75) Inventors: **Joseph S. Podolski**, The Woodlands, TX (US); **Ronald Wiehle**, Houston, TX (US)

(73) Assignee: **Repros Therapeutics Inc.**, The Woodlands, TX (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 253 days.

(21) Appl. No.: **11/750,190**

(22) Filed: **May 17, 2007**

(65) **Prior Publication Data**

US 2007/0249726 A1    Oct. 25, 2007

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 10/427,768, filed on Apr. 30, 2003, now Pat. No. 7,368,480, which is a continuation-in-part of application No. PCT/US02/21524, filed on Jul. 9, 2002.

(60) Provisional application No. 60/304,313, filed on Jul. 9, 2001.

(51) **Int. Cl.**
*A61K 31/135* (2006.01)
*A61P 11/00* (2006.01)

(52) **U.S. Cl.** ..................................................... **514/651**

(58) **Field of Classification Search** ........................ None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,061,733 | A | 12/1977 | Gunjikar |
| 4,820,736 | A | 4/1989 | Jensen et al. |
| 4,894,373 | A | 1/1990 | Young |
| 5,728,688 | A | 3/1998 | Labrie |
| 5,861,389 | A | 1/1999 | Radlmaier |
| 6,017,964 | A | 1/2000 | MacLean et al. |
| 6,096,338 | A | 8/2000 | Lacy |
| 6,126,969 | A | 10/2000 | Shah |
| 6,129,933 | A | 10/2000 | Oshlack |
| 6,143,353 | A | 11/2000 | Oshlack |
| 6,190,591 | B1 | 2/2001 | Van Lengerich |
| 6,221,399 | B1 | 4/2001 | Rolfes |
| 6,248,363 | B1 | 6/2001 | Patel |
| 6,291,505 | B1 | 9/2001 | Huebner et al. |
| 6,342,250 | B1 | 1/2002 | Masters |
| 6,391,920 | B1 | 5/2002 | Fisch |
| 6,583,129 | B1 | 6/2003 | Mazer et al. |
| 6,600,010 | B2 | 7/2003 | Mao et al. |
| 6,638,528 | B1 | 10/2003 | Kanios |
| 6,645,974 | B2 | 11/2003 | Hutchinson et al. |
| 6,653,297 | B1 | 11/2003 | Hodgen |
| 6,685,957 | B1 | 2/2004 | Bezemer et al. |
| 6,743,448 | B2 | 6/2004 | Kryger |
| 7,105,679 | B2 | 9/2006 | Kanojia et al. |
| 2002/0120012 | A1 | 8/2002 | Fisch |
| 2002/0183296 | A1 | 12/2002 | Dudley et al. |

| | | | |
|---|---|---|---|
| 2004/0097597 | A1 | 5/2004 | Podolski et al. |
| 2004/0171697 | A1 | 9/2004 | Podolski et al. |
| 2004/0220154 | A1 | 11/2004 | Kryger |
| 2004/0241224 | A1 | 12/2004 | Podolski et al. |
| 2006/0269611 | A1 | 11/2006 | Steiner et al. |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| AU | 2001261684 | 12/2001 |
| EP | 0206021 A | 8/1988 |
| EP | 0430388 A2 | 6/1991 |
| EP | 0888775 A2 | 7/1999 |
| EP | 1829534 A1 | 3/2006 |
| JP | 4-312522 | 11/1992 |
| WO | WO 95/35093 | 12/1995 |
| WO | WO 01/34117 A1 | 5/2001 |
| WO | WO 01/91744 A1 | 12/2001 |
| WO | WO 03/005954 A2 | 1/2003 |
| WO | WO 03/005954 A3 | 1/2003 |
| WO | WO 03/026568 A2 | 4/2003 |
| WO | WO 03/072092 | 9/2003 |
| WO | WO 2006/019916 | 2/2006 |
| WO | WO 2006/084153 | 8/2006 |
| WO | WO 2006/102232 | 9/2006 |
| WO | WO 2007/019165 | 2/2007 |
| WO | WO 2009/051908 | 4/2009 |

OTHER PUBLICATIONS

Laghi et al. (Am J Respir Crit Care, Med vol. 171, pp. 598-605, 2005).*

Debigare et al. (Am. J. Respir. Crit. Care Med., vol. 165, No. 9, 2001, pp. 1712-1717).*

Casaburi et al. (Am J Respir Crit Care Med. vol. 170, pp. 870-878, 2004).*

Banner A. S. (Lancet, vol. 354, Aug. 7, 1999, pp. 440-441).*

Vippagunta (Adv. Drug Del. Rev., 2001, vol. 48, 2001, pp. 3-26.*

ACCE Clinical Practice Guidelines for the Evaluation and Treatment of Hypogonadism in Adult Male Patients (1996).

(Continued)

*Primary Examiner*—Brian-Yong S Kwon

(74) *Attorney, Agent, or Firm*—Howrey LLP

(57) **ABSTRACT**

The present invention relates to the use of compositions comprising trans-clomiphene for treating wasting, especially a loss of muscle mass. The invention is also directed to methods for treating wasting in a patient with chronic obstructive pulmonary disorder. The present invention is also directed to methods for treating hypogonadism in males with chronic obstructive pulmonary disorder.

**7 Claims, 6 Drawing Sheets**

US 7,737,185 B2

Page 2

OTHER PUBLICATIONS

Agarwal, et al., "Male Sexual Dysfunction After Stroke," J Assoc. Physicians India, vol. 37, No. 8, pp. 505-507 (1989).

Barg, P., et al., "Male Factor: Clinical Evaluation of the Semen Analysis," Infert. Reprod. Med. Clin. North Amer., vol. 2, pp. 333-340 (1991).

Bartsch, G., "The Effect of Antiestrogen, Antiandrogen, and the Prolactin Inhibitor 2 Bromo-'alpha!-ergocriptine on the Stromal Tissue of Human Benign Prostatic Hyperplasia. Correlation of Sterological Data and Plasma Hormones," Database Embase; Elsevier Science Publishers, Amsterdam, NL, 1981, vol. 18, No. 4, pp. 308-312.

Bhasin, S., et al., J. Clin Endocrin, Metabol., vol. 91, pp. 1995-2010 (2006).

Brody, J., "Sperm Found Especially Vulnerable to Environment," The New York Times, Mar. 10, 1981.

Broulik, P.D., "Tamoxifen Prevents Bone Loss in Castrated Male Mice," Hormone and Metabolic Research, Thieme-Stratton, Stuttgart, DE, vol. 32, No. 5, pp. 181-184 (2000) XP009041862.

Burghardt, et al., "Gap Junction Modulation in Rat Uterus. III. Structure-Activity Relationships of Estrogen Receptor-Binding Ligands on Myometrial and Serosal Cells," Biol. Reprod. vol. 36, No. 3, pp. 741-751 (1977).

Chang, Ching-Fong, et al., Aquaculture, vol. 101, pp. 329-36 (1992).

Drew, A., "Letter: Possible Teratogenic Effect of Clomifene," Developmental Medicine and Child Neurology, vol. 16, No. 2, pp. 276 (1974).

Editions Du Vidal Ed - Editions Du Vidal: Vidal 1997; Dictionnaire Vidal 1997, Paris, FR, p. 1161 XP002150196.

Eil, "Ketoconazole Binds to the Human Androgen Receptor," Harm Metab Res., vol. 24, No. 8, pp. 367-370 (1992).

Elanjian, Sona I., "Clomiphene for Male Infertility," Journal of Pharmacy Technology, vol. 12, No. 3, pp. 102-104 (1996).

EP Supplementary Search Report of EP 02748104 dated Jun. 24, 2005.

EP Supplementary Search Report of EP 06720243 dated Aug. 6, 2008.

EP Supplementary Search Report of EP 06738985 dated Aug. 15, 2008.

EP Supplementary Search Report of EP 06800648 dated Jul. 21, 2008.

Epstein, "Clomiphene Treatment in Oligospermic Infertile Males," Fertility and Sterility, vol. 28, No. 7, pp. 741-745 (1977).

Excerpt on www.medscape.com from Drug Ther. Perspect., vol. 10, pp. 1-5 (1997).

Garg, Abhimanyu, "Medical progress: Acquired and Inherited Lipodystrophies," New England Journal of Medicine, vol. 35, No. 12, pp. 1231-1232 (2004).

Glasier, A., et al., "A Comparison of the Effects on Follicular Development Between Clomiphene Citrate its Two Separate Isomers and Spontaneous Cycles," Human Reproduction, vol. 4, No. 3, pp. 252-256 (1989).

Grinenko, et al., Khimiko-farmatsevticheskii Zhurnal, vol. 23, No. 1, pp. 123-126 (1989).

Guay, A., et al., Internet!. J. Ompot. Res., vol. 15, pp. 156-165 (2003).

Guzick, D., et al., "Sperm Morphology, Motility and Concentration in Fertile and Infertile Men," N. Engl. J. Med., vol. 345, pp. 1388-1393 (2001).

Hanus, M., et al., "Antiestrogens (Tamoxifen) in the Alternative Therapy of Benign Prostatic Hyperplasia!," US National Library of Medicine, Bethesda, MD, Databse Medline, vol. 72, No. 7, pp. 316-318 (1993).

Hayashi, Norio, et al., Hinyokika Kiyo (Acta Urologica Japonica), vol. 34, No. 5, pp. 847-50 (1988) with English translation.

Herzog, A. G., "Reproductive Endocrine Considerations and Hormonal Therapy for Men with Epilepsy," Epilepsia, Raven Press Ltd., New York, US (1991), vol. 32, No. Suppl. 6, pp. S34-S37.

International Preliminary Examination Report of PCT/US02/21524 dated Mar. 3, 2006.

International Preliminary Report on Patentability of PCT/US05/02500 dated Jan. 16, 2007.

International Preliminary Report on Patentability of PCT/US06/003882 dated Aug. 7, 2007.

International Preliminary Report on Patentability of PCT/US06/030053 dated Feb. 5, 2008.

International Preliminary Report on Patentability of PCT/US06/10022 dated Sep. 25, 2007.

International Search Report of PCT/US02/21524 dated Jun. 18, 2003.

International Search Report of PCT/US06/003882 dated Aug. 14, 2006.

International Search Report of PCT/US06/10022 dated Jan. 10, 2007.

International Search Report of PCT/US06/30053 dated Dec. 22, 2006.

International Search Report of PCT/US08/075433 dated Dec. 19, 2008.

International Search Report of PCT/US09/063621 dated Dec. 28, 2009.

Jones, T. Hugh., "Testosterone Associations with Erectile Dysfunction, Diabetes, and the Metabolic Syndrome," European Urology Supplements, vol. 6, pp. 847857 (2007).

Kadioglu, et al., Treatment of Idiopathic and Postvaricocelectomy Oligozoospermia with Oral Tamoxifen Citrate, BJU Int., vol. 83, No. 6, pp. 646-648 (1999).

Ke, H. Zhu, et al., "Lasofoxifene, A Selective Estrogen Receptor Modulator, Prevents Bone Loss Induced by Aging and Orchidectomy in the Adult Rat," Endocrinology, vol. 141, No. 4, pp. 1338-1344 (2000) XP001170303.

Kidd, S., et al., "Effects of male age on semen quality and fertility: a review of the literature," Fertility and Sterility, vol. 75, pp. 237-248 (2001).

Kotoulas, et al., "Tamoxifen Treatment in Male Infertility. I. Effect on spermatozoa," Fertil. Steril., vol. 61, No. 5, pp. 911-914 (1994).

Lewis, B., et al., "Medical Implication of the Biological Clock," JAMA, vol. 296, pp. 2369-2371 (2006).

Lim, V., et al., "Restoration of Plasma Testosterone Levels in Uremic Men with Clomiphene Citrate," Journal of Clinical Endocrinology and Metabolism, New York, US vol. 43, No. 6, pp. 1370-1377 (1976) XP 009041861.

Lund, et al., "Testosterone and Andropause: the Feasibility of Testosterone Replacement Therapy in Elderly Men," Pharmacotherapy, vol. 19, No. 8, pp. 951-956 (1999).

Macleod, J., et al., J. Urology, vol. 66, pp. 436-449 (1951).

McKinlay, et al., "The Questionable Physiologic and Epidemiologic Basis for a Male Climacteric Syndrome: Preliminary Results from the Massachusetts Male Aging Study," Maturitas, vol. 11, No. 2, pp. 103-115 (1989).

PCT Written Opinion of PCT/US05/02500 dated Sep. 14, 2006.

PCT Written Opinion of PCT/US06/003882 dated Aug. 4, 2007.

PCT Written Opinion of PCT/US06/10022 dated Jan. 10, 2007.

PCT Written Opinion of PCT/US06/30053 dated Dec. 22, 2006.

PCT Written Opinion of PCT/US08/075433 dated Dec. 19, 2008.

PCT Written Opinion of PCT/US09/063621 dated Dec. 28, 2009.

Petak, S., et al., American Association of Clinical Endocrinologists Medical Guidelines for Clinical Practice for the Evaulation and Treatment of Hypogonadism in Adult Male Patients, Endocrine Practice, vol. 8, pp. 439-456 (2002).

Ronnberg, "The Effect of Clomiphene Treatment on Different Sperm Parameters in Men with Idiopathic Oligozoospermia," Andrologia, vol. 12, No. 1, pp. 261-265 (1980).

Schultheiss, D., et al., "Testosterone Therapy in the Ageing Male: What About the Prostate?" Andrologia, vol. 36, No. 6, pp. 357-365 (2004).

Schweikert, et al., "Effects of Estrogen Deprivation on Human Benign Prostatic Hyperplasia," Steroid Biochem Mol Biol., vol. 44, No. 4-6, pp. 573-576 (1993).

Shamis, et al., Arch. Androl., vol. 21, pp. 109 (1991).

Shirai, Takashi, et al., Saishin-Igaku (Latest Medical Science), vol. 45, No. 11, pp. 2250-2254 (1990) with English translation.

Sokel, Fertil and Steril, vol. 49, pp. 865 (1988).

Stahl, F., et al., "Effects of Tamoxifen on the Levels of luteinizing Hormone (LH), Follicle Stimulating Hormone FSH), Prolactin (PRL), 17 beta-oestradiol (E2), and free dihydrotestosterone (DHT)

**US 7,737,185 B2**

Page 3

in blood of patients with Benign Prostatic Hyperplasia," US National Library of Medicine, Bethesda, MD, US, vol. 82, No. 1, pp. 21-28 (1983).

Stedman's Medical Dictionary, William and Wilking, pp. 1312, 1439 & 1798-1799 (1995).

Steiner, et al., "Antiestrogens and Selective Estrogen Receptor Modulators Reduce Prostte Cancer Risk," World J Urol., vol. 21, pp. 31-36 (2003).

Sterochemistry of Geometric Isomers of Clomiphene: a Correction of the Literature and a Reexamination of Structure-Activity Relationships, Journal of Pharmaceutical Science, vol. 65, No., pp. 184-150 (176) XP009056304.

Takihara, Hiroshi, Jin to Toseki (Kidney and Dialysis) vol. 41, Special Edition, pp. 759-61 (1996) with English translation.

Tenover, J., et al., J Clin. Endocrine. Metabol., vol. 75, pp. 1092-1098 (1992).

Tenover, J., et al., "Male Hormone Replacement Therapy Including Andropause," Endocrinology and Metabolism Clinics of North America, W.B. Saunders Company, Philadelphia, US, Dec. 1998, vol. 27, No. 4, pp. 969-987 XP008019800.

Weissenberg, R., et al., "The Effect of Clomiphene Citrate and is Zu or En isomers on the Reproductive System of the Immature Male Rate," Andrologia, vol. 24, pp. 161-165 (1992).

Written Opinion of Singapore Patent Applc. 2007-05640-1 dated Jul. 9, 2008.

U.S. Appl. No. 10/427,768 Examiners Interview Summary Record dated Nov. 19, 2007.

U.S. Appl. No. 10/427,768 Final office action dated Apr. 6, 2006.

U.S. Appl. No. 10/427,768 Non-final office action dated May 29, 2007.

U.S. Appl. No. 10/427,768 Non-final office action dated Oct. 12, 2005.

U.S. Appl. No. 10/427,768 Notice of Allowance and Examiner's Amendment dated Dec. 27, 2007.

U.S. Appl. No. 10/427,768 Restriction Requirement dated May 23, 2005.

U.S. Appl. No. 10/483,458 Non-final office action dated Jul. 20, 2009.

U.S. Appl. No. 10/483,458 Advisory Action dated Jan. 16, 2009.

U.S. Appl. No. 10/483,458 Final office action dated Nov. 19, 2008.

U.S. Appl. No. 10/483,458 Non-final office action dated Feb. 13, 2008.

U.S. Appl. No. 10/483,458 Restriction Requirement dated Oct. 25, 2007.

U.S. Appl. No. 10/712,546 Non-final office action dated Mar. 15, 2006.

U.S. Appl. No. 10/712,546 Notice of Allowance dated Sep. 29, 2006.

U.S. Appl. No. 10/712,546 Restriction Requirement dated Nov. 10, 2005.

U.S. Appl. No. 11/571,150 Final office action dated Aug. 31, 2009.

U.S. Appl. No. 11/571,150 Non-final office action dated Oct. 14, 2009.

U.S. Appl. No. 11/997,858 Restriction Requirement dated Aug. 28, 2009.

U.S. Appl. No. 11/815,542 Restriction Requirement dated Aug. 31, 2009.

U.S. Appl. No. 11/815,542 Non-final office action dated Oct. 15, 2009.

U.S. Control No. 90/008,024 Non-final office action dated Nov. 1, 2006.

U.S. Control No. 90/008,024 Examiner Interview Summary Record dated Dec. 13, 2006.

U.S. Control No. 90/008,024 Non-final office action dated Jan. 29, 2007.

U.S. Control No. 90/008,024 Final office action dated Jun. 22, 2007.

U.S. Control No. 90/008,024 Examiner Interview Summary Record dated Jul. 25, 2007.

U.S. Control No. 90/008,024 Final office action dated Nov. 16, 2007.

U.S. Control No. 90/008,024 Advisory Action dated Feb. 1, 2008.

U.S. Control No. 90/008,024 Advisory Action dated Mar. 5, 2008.

U.S. Control No. 90/008,024 Examiners Answer dated Jun. 12, 2008.

U.S. Control No. 90/006,921 Non-final office action dated Sep. 9, 2004.

U.S. Control No. 90/006,921 Examiners Interview Summary dated Oct. 20, 2004.

U.S. Control No. 90/006,921 Final office action dated Feb. 23, 2005.

U.S. Control No. 90/006,921 Petition Decision dated May 25, 2005.

U.S. Control No. 90/006,921 Non-final office action dated Jun. 27, 2005.

* cited by examiner

**FIG. 1**

**Normal Secretory Total Serum Testosterone Profiles in Healthy Young and Older Men**



Case: 15-1328    Document: 35    Page: 105    Filed: 05/20/2015

**FIG. 2**



$(C_2H_5)_2NCH_2CH_2O$ —[benzene ring]— $C$=$C$ with $Cl$ and phenyl groups    $C_6H_8O_7$

A69



FIG. 3

**FIG. 4**



**FIG. 5**



FIG. 6



US 7,737,185 B2

1

# METHODS AND COMPOSITIONS WITH *TRANS*-CLOMIPHENE

This application is a continuation-in-part of U.S. application Ser. No. 10/427,768, filed Apr. 30, 2003, now U.S. Pat. No. 7,368,480 which is a continuation-in-part of International Application No. PCT/US02/021524, filed Jul. 9, 2002, which claims the benefit, under 35 U.S.C. §119(e), of U.S. Provisional Patent Application No. 60/304,313, filed on Jul. 9, 2001. All applications are incorporated herein by reference in their entirety.

## BACKGROUND

### 1. Field of the Invention

The present invention relates to compositions and methods for treating wasting. More specifically, the present invention relates to treatments for increasing muscle mass in individuals with chronic obstructive pulmonary disease. The present invention also relates to the use of a composition comprising clomiphene enriched for trans-clomiphene reagents for treating hypogonadism, preferably secondary hypogonadism, in individuals with chronic obstructive pulmonary disease.

### 2. Description of Related Art

#### a. Testosterone

Testosterone is the primary male androgen, playing a vital role in overall male health. Testosterone is essential to the development and maintenance of specific reproductive tissues (testes, prostate, epididymis, seminal vesicle and penis) and male secondary sex characteristics. It plays a key role in libido and erectile function and is necessary for the initiation and maintenance of spermatogenesis. Testosterone also has important functions not related to reproductive tissues. For example, it positively affects body composition by increasing nitrogen retention, which supports lean body mass, muscle size and strength. It also acts on bone to stimulate bone formation.

Testosterone deficiency can result from disease or genetic disorders and is also frequently a complication of aging. Some of the sequelae of adult testosterone deficiency include a wide variety of symptoms including: loss of libido, erectile dysfunction, oligospermia or azoospermia, absence or regression of secondary sexual characteristics, progressive decrease in muscle mass, fatigue, depressed mood and increased risk of osteoporosis.

Several forms of testosterone therapy exist in the United States today. Recently, transdermal preparations have gained favor in the market. However, a scrotal testosterone patch results in supraphysiological levels of 5α-dihydrotestosterone (DHT) due to the high concentration of 5α-reductase in scrotal skin. Elevated DHT levels may have pernicious effects on the prostate over time. Nonscrotal systems are considered more convenient and most patients achieve average serum concentrations within the normal range and have normal levels of DHT. Oral testosterone therapy is not recommended because doses required for replacement therapy are associated with significant risk of hepatotoxicity.

#### b. Chronic Obstructive Pulmonary Disease

Chronic obstructive pulmonary disease (COPD) is a progressive lung disease characterized by a gradual and irreversible loss of lung function. COPD includes two related lung diseases: chronic bronchitis and emphysema. Chronic bronchitis is an inflammation and eventual scarring of the lining of the bronchial tubes. Emphysema is the loss of elasticity of lung tissue and destruction of alveoli-supporting structures and small feeding capillaries within the lungs. Persons with COPD have difficulty breathing due to smaller air passageways and par-

2

tially destroyed alveoli. Additionally, the air passageways of persons with COPD become clogged with mucus. COPD represents the fourth leading cause of death in the United States, where 14 million people have been diagnosed with the disease. The most important risk factor for COPD is cigarette smoking.

Muscle wasting is prevalent in a large population of patients with COPD, and it is estimated that over 50% of COPD patients experience some loss of fat-free muscle. Loss of muscle mass adversely affects respiratory and peripheral muscle function, exercise capacity and health status and is a demonstrated predictor of mortality in COPD patients. Gain in muscle mass and strength, on the other hand, is associated with increased exercise capacity and survival. Muscle wasting in persons with COPD does not appear to result primarily from inadequate nutritional intake. Similar to cachexia, preferential loss of muscle tissue over fat, unresponsiveness to nutritional intervention and enhanced protein degradation are observed in persons with COPD.

On the basis of the chronicity of COPD and the elevated age of most COPD patients, it has been suggested that men with COPD may be at risk for hypogonadism. Importantly, low testosterone levels have been observed in patients with COPD, especially those undergoing glucocorticosteroid therapy and significant atrophy of Leydig cells has been observed in some COPD patients. However, it is currently unclear to what extent COPD contributes to the observed decreased testosterone levels.

Numerous studies suggest that hormones may play a role in weight loss and wasting. Androgen supplementation therapy, directed at curing dysfunction of the peripheral muscles in COPD patients, has been the subject of several controlled studies. Positive effects on fat-free mass and overall weight gain in COPD patients were reported in these studies. At least one study also reported improvements in muscle function and exercise capacity.

The aforementioned studies indicate the usefulness and efficacy of testosterone therapy in treating symptoms of COPD. However, high amounts of testosterone increase the risk of cardiovascular disease and benign prostate hyperplasia (BPH) and some forms of testosterone administration result in elevated levels of DHT. The association of high levels of serum DHT and BPH and the subsequent development of prostate cancer is a potential drawback to the use of testosterone gels or patches that enhance DHT.

#### c. Clomiphene

Clomiphene, which is an antiestrogen related to tamoxifen, has also been used to treat men with low testosterone levels. Clomiphene blocks the normal estrogen feedback on the hypothalamus and subsequent negative feedback on the pituitary. This leads to increases in luteinizing hormone (LH) and follicle stimulating hormone (FSH). In men, these increased levels of gonadotropins stimulate the Leydig cells of the testes and result in the production of higher testosterone levels.

Tenover et al., J. Clin. Endocrinol. Metab. 64:1103, (1987) and Tenover et al., J. Clin. Endocrinol. Metab. 64:1118 (1987) found increases in FSH, LH in both young and old men after treatment with clomiphene. They also found increases in free and total testosterone in men with young men showing significant increases.

Studies were also conducted to determine whether or not clomiphene could be used to improve fertility in men by improving semen quality. Homonnai et al. Fertil. and Steril 50:801 (1988) saw increases in sperm concentration and count but others have not. (See e.g., Sokel, et al., Fertil. and Steril. 49:865 (1988); Check, et al., Int. J. Fertil. 34:120

US 7,737,185 B2

3

(1989); Purvis, et al., Int. J. Androl 21:109 (1989); and Breznik, Arch. Androl. 21:109 (1993).) One group saw a deterioration in the percentage of normal sperm with long-term treatment. Shamis, et al., Arch. Androl 21:109 (1991). A WHO study showed no changes in semen quality or fertility after 6 months of treatment. (Anonymous Androl. 15:299 (1992).) A meta-analysis seems to confirm that testosterone levels go up in men with poor quality sperm but not fertility. (Vanderckckhove, et al., 2000).

Vandekerckhove, et al. (Cochrane Database Syst Rev 2000; (2):CD000151 (2000)) noted that ten studies involving 738 men have suggested that anti-estrogens appear to have a beneficial effect on endocrinal outcomes, i.e. testosterone, but there is not enough evidence to evaluate fertility effects. Nevertheless should clomiphene administration enhance testosterone levels then one could easily conclude that the drug should positively impact the side effects of testosterone deprivation as long as the testes still retain the ability to respond to gonadotropin stimulation.

Ernst et al., J. Pharmaceut. Sci. 65:148 (1976), have shown that clomiphene is a mixture of two geometric isomers which they refer to as cis, -Z-, clomiphene (cis-clomiphene or zuclomiphene) and trans-, E-, clomiphene, (trans-clomiphene or enclomiphene). According to Ernst, et al. trans-clomiphene HCI has a melting point of 149° C.-150.5° C., while cis-clomiphene HCI has a melting point of 156.5° C.-158° C. Ernst et al. have also noted that (the trans-isomer) is antiestrogenic (AE) while the cis-isomer is the more potent and more estrogenic form and has also been reported to have anti-estrogenic activity. The authors attribute the effect of the drug on ovulatory activity to both forms stating that the mixture is more effective than trans-clomiphene alone. The trans-isomer aids ovulation at the level of the hypothalamus. The estrogenic isomer cis-clomiphene contributes to enhanced ovulation elsewhere in the physiologic pathway leading to ovulation. The isomers are also reported to have different in vivo half-life. Furthermore the cis form has been reported to leave residual blood levels for in excess of one month following a single dose.

Clomiphene is currently approved as a mixture of both cis- and trans-isomers, the cis-isomer being present as about 30% to 50% (Merck Manual) for fertility enhancement in the anovulatory patient. Clomiphene improves ovulation by initiating a series of endocrine events culminating in a preovulatory gonadotropin surge and subsequent follicular rupture. The drug is recommended to be administered for 5 days at a dose of up to 100 mg daily. Clomiphene has also been associated with numerous side effects including: blurred vision, abdominal discomfort, gynecomastia, testicular tumors, vasomotor flushes, nausea, and headaches. Furthermore, other studies suggest that clomiphene possesses both genotoxic and tumor enhancement effects. The net outcome of these observations is that clomiphene in its current format, having between 30% and 50% of the cis isomer, would be unacceptable for chronic therapy.

There continues to be a need for methods of treating wasting and hypogonadism in patients with COPD which avoids the increased risk of cardiovascular disease and benign prostate hyperplasia (BPH) accompanying traditional testosterone supplementation regimens. The present invention addresses this need and provides novel compositions and methods for treating wasting and hypogonadism.

SUMMARY

The present invention relates to a composition comprising 0% to about 29% weight/weight of (cis, -Z-, trans-clomi-

4

phene) (hereinafter "cis-clomiphene") and about 100% to about 71% w/w (trans-, E-, cis-clomiphene) (hereinafter "trans-clomiphene") or analogs thereof (such as those described in Ernst, et al. supra) or pharmaceutically acceptable salts thereof. The composition may further comprise one or more pharmaceutically acceptable diluents, adjuvants, carriers or excipients.

The present invention also relates to a composition comprising cis-clomiphene and trans-clomiphene or analogs thereof or pharmaceutically acceptable salts or solvates thereof, wherein the ratio of trans-clomiphene to cis-clomiphene is greater than 71/29. The composition may further comprise one or more pharmaceutically acceptable diluents, adjuvants, carriers or excipients.

The present invention also relates to a composition consisting essentially of trans-clomiphene or analogs thereof or pharmaceutically acceptable salts or solvates thereof. The composition may further comprise one or more pharmaceutically acceptable diluents, adjuvants, carriers or excipients.

The present invention also relates to a method for treating wasting in a mammal with chronic obstructive pulmonary disease (COPD), comprising administering to the mammal an effective amount of a composition according to the present invention, the compositions having active ingredients comprising 0% to about 29% weight/weight of cis-clomiphene and about 100% to about 71% w/w trans-clomiphene or analogs thereof or pharmaceutically acceptable salts or solvates thereof. The composition may further comprise one or more pharmaceutically acceptable diluents, adjuvants, carriers or excipients. The mammal may be a male or female. The mammal may also be a human.

The present invention also relates to a method for treating wasting in a mammal with COPD, comprising administering to the mammal an effective amount of a composition comprising cis-clomiphene and trans-clomiphene or analogs thereof or pharmaceutically acceptable salts or solvates thereof, wherein the ratio of trans-clomiphene to cis-clomiphene is greater than 71/29. The composition may further comprise one or more pharmaceutically acceptable diluents, adjuvants, carriers or excipients. The mammal may be a male or female. The mammal may also be a human.

The present invention also relates to a method for treating wasting in a mammal with COPD, comprising administering to the mammal an effective amount of a composition consisting essentially of trans-clomiphene or analogs thereof or pharmaceutically acceptable salts or solvates thereof. The composition may further comprise one or more pharmaceutically acceptable diluents, adjuvants, carriers or excipients. The mammal may be a male or female. The mammal may also be a human.

The present invention also relates to a method for treating wasting in a mammal with COPD, comprising administering to the mammal an effective amount of a composition comprising an antiestrogen or an analog thereof or a pharmaceutically acceptable salt or solvate thereof. The composition may further comprise one or more pharmaceutically acceptable diluents, adjuvants, carriers or excipients. The mammal may be a male or female. The mammal may also be a human.

The present invention also relates to a method for treating hypogonadism in a male mammal with COPD, comprising administering to the mammal an effective amount of a composition according to the present invention, the compositions having active ingredients comprising 0% to about 29% weight/weight of cis-clomiphene and about 100% to about 71% w/w or analogs thereof or pharmaceutically acceptable salts or solvates thereof. The hypogonadism preferably is secondary hypogonadism. The compo-

US 7,737,185 B2

5

sition may further comprise one or more pharmaceutically acceptable diluents, adjuvants, carriers or excipients. The mammal may be a human.

The present invention also relates to a method for treating hypogonadism in a male mammal with chronic obstructive pulmonary disease (COPD), comprising administering to the mammal an effective amount of a composition comprising cis-clomiphene and trans-clomiphene or analogs thereof or pharmaceutically acceptable salts or solvates thereof, wherein the ratio of trans-clomiphene to cis-clomiphene is greater than 71/29. The hypogonadism preferably is secondary hypogonadism. The composition may further comprise one or more pharmaceutically acceptable diluents, adjuvants, carriers or excipients. The mammal may be a human.

The present invention also relates to a method for treating hypogonadism in a male mammal with COPD, comprising administering to the mammal an effective amount of a composition consisting essentially of trans-clomiphene or analogs thereof or pharmaceutically acceptable salts or solvates thereof. The hypogonadism preferably is secondary hypogonadism. The composition may further comprise one or more pharmaceutically acceptable diluents, adjuvants, carriers or excipients. The mammal may be a human.

The present invention also relates to a method for treating hypogonadism in a male mammal with COPD, comprising administering to the mammal an effective amount of a composition comprising an antiestrogen or an analog thereof or a pharmaceutically acceptable salt or solvate thereof. The hypogonadism preferably is secondary hypogonadism. The composition may further comprise one or more pharmaceutically acceptable diluents, adjuvants, carriers or excipients. The mammal may be a human.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is a graphic representative of the normal secretory total serum testosterone profiles in healthy men (young and old).

FIG. **2** shows the chemical structure of clomiphene citrate.

FIG. **3** is a graphic demonstration of the time course of serum testosterone levels with Clomid (clomiphene), Enclomid (trans-clomiphene) and Zuclomid (cis-clomiphene).

FIG. **4** demonstrates the effect of Androxal™ or Androgel® on testosterone levels.

FIG. **5** demonstrates the effect of Androxal™ or Androgel® on LH levels

FIG. **6** demonstrates the effect of Androxal™ or Androgel® on FSH levels

DETAILED DESCRIPTION

The present invention is directed to compositions comprising clomiphene with increased amounts of trans-clomiphene. The trans-isomer of clomiphene is an anti-estrogen, whereas the cis-isomer of clomiphene is estrogenic. By increasing the relative amount of the trans-isomer in clomiphene-containing compositions, the anti-estrogenic properties of the trans-isomer may be taken advantage of while lowering or eliminating potential side effects caused by the estrogenic cis-isomer.

In one aspect of the present invention, the composition comprises 0% to about 29% w/w of cis-clomiphene and about 100% to about 71% trans-clomiphene or analogs thereof or pharmaceutically acceptable salts or solvates thereof. In another aspect of the present invention, the composition comprises cis-clomiphene and trans-clomiphene or analogs thereof or pharmaceutically acceptable salts or solvates thereof, wherein the ratio of trans-clomiphene to cis-clomi-

6

phene is greater than 71/29. In yet another aspect of the present invention, the composition consists essentially of trans-clomiphene or analogs thereof or pharmaceutically acceptable salts or solvates thereof. In yet another aspect of the present invention, the composition comprises an antiestrogen or a pharmaceutically acceptable salt or solvate thereof. The compositions of the present invention may further comprise one or more pharmaceutically acceptable diluents, adjuvants, carriers or excipients.

The compositions of the present invention may be administered to a mammal in order to obtain beneficial effects of an antiestrogen including, but not limited to, increased levels of testosterone. Persons with COPD demonstrate low serum total or free testosterone and consequently may manifest symptoms including lack of energy, lack of libido, muscle loss and bone loss. The compositions of the present invention may be administered to a mammal for increasing or modulating muscle mass, bone density, libido, potency, body performance capacity, memory and lymphocyte levels. The compositions of the present invention may also be administered to a mammal for treating a symptom of COPD such as, without limitation, wasting and hypogonadism, preferably secondary hypogonadism.

The compositions of the present invention may be administered to any mammal that would benefit from increased levels of testosterone. The mammal may be a male or female. The mammal may be a human.

The compositions of the present invention may also be administered to a person with COPD in order to treat wasting. Testosterone supplementation has been demonstrated to increase muscle mass in males with COPD. Gain in lean body mass has been associated with decrease in all-cause mortality in patients with COPD. Compositions comprising trans-clomiphene may be used in patients with COPD as an alternative to testosterone therapy. Trans-clomiphene treatment has low liver and kidney toxicity and favorable effects on cholesterol, lipids and lymphocyte levels. Moreover, treatment with trans-clomiphene may have reduced side effects compared to testosterone therapy, such as PSA and cardiovascular risks, and importantly, treatment with trans-clomiphene does not elevate DHT levels and therefore avoids the pernicious effects of DHT levels on the prostate. Although compositions comprising trans-clomiphene are preferred, compositions comprising any antiestrogen are within the scope of the invention, so long as administration of an effective amount of the antiestrogen to a mammal elevates the mammal's serum testosterone level. Preferably, the individual with COPD is a male. More preferably, the individual with COPD is a male with serum testosterone levels below the normal range.

"Wasting" refers to catabolism and/or progressive loss of weight in a subject, or to loss of muscle mass and/or its progressive weakening and degeneration. "Muscle wasting" refers to the progressive loss of muscle mass and/or to the progressive weakening and degeneration of muscles, including the skeletal or voluntary muscles which control movement, cardiac muscles which control the heart, and smooth muscles.

The loss of muscle mass that occurs during muscle wasting can be characterized by muscle protein catabolism. Protein catabolism occurs because of an abnormally high rate of protein degradation, an abnormally low rate of protein synthesis or a combination of both. Protein catabolism or depletion, whether the result of a high degree of protein degradation or of a low degree of protein synthesis, leads to a decrease in muscle mass and to muscle wasting. The term "catabolism" as is known in the art, means an energy burning form of metabolism.

US 7,737,185 B2

7

In one embodiment, compositions of the instant invention are used to treat muscle wasting in patients with COPD. The methods of the instant invention promote increased muscle mass, muscle performance, muscle strength, or any combination thereof. Compositions of the invention may be administered to patients with COPD in combination with a resistance training regimen in order to gain cumulative benefits on muscle mass and/or performance.

In another embodiment, compositions of the instant invention are used to treat wasting in patients with COPD, wherein the wasting is characterized by involuntary loss of total body weight. Testosterone supplementation has been demonstrated to be effective in achieving weight gain in patients with COPD. Compositions comprising an antiestrogen may be administered to patients with COPD as an alternative to testosterone in order to promote weight gain in these patients while reducing side effects of testosterone therapy. Preferably, the antiestrogen is trans-clomiphene.

The compositions of the present invention may also be used to treat hypogonadism in hypogonadal males with COPD. Preferably the hypogonadism is secondary hypogonadism. Testosterone supplementation has been demonstrated to be effective in relieving symptoms associated with hypogonadism. Compositions comprising an antiestrogen may be used in hypogonadal patients with COPD as an alternative to testosterone therapy. Preferably, the antiestrogen is trans-clomiphene. Trans-clomiphene treatment has low liver and kidney toxicity and favorable effects on cholesterol, lipids and lymphocyte levels. Moreover, treatment with trans-clomiphene may have reduced side effects compared to testosterone therapy, such as PSA and cardiovascular risks.

Patients with COPD are often prescribed glucocorticosteriods, in inhalable form, in order to alleviate some of the symptoms of COPD. However, glucocorticosteriods have been demonstrated to reduce serum testosterone, and therefore aggravate hypogonadism in COPD patients. Compositions of the instant invention may be administered in conjunction with glucocorticosteroids in order to alleviate the tendency of glucocorticosteroids to promote hypogonadism in patients with COPD.

The terms "treat" or "treatment" as used in the instant application, refer to both therapeutic treatment and prophylactic or preventative measures, wherein the object is to prevent or slow down (lessen) an undesired physiological or psychological change or disorder, such as symptoms associated with COPD or the treatment thereof. For purposes of the present invention, beneficial or desired clinical results include, but are not limited to, alleviation of symptoms, diminishment of extent of disease, stabilized (i.e., not worsening) state of disease, delay or slowing of disease progression, amelioration or palliation of the disease state and remission (whether partial or total), whether detectable or undetectable. "Treatment" can also mean prolonging survival as compared to expected survival if not receiving treatment. Individuals in need of treatment include those already with the condition or disorder as well as those prone to develop the condition or disorder or those in whom the condition or disorder is to be prevented.

The terms "modulate" or "modulating," as used in the instant application, refer to both therapeutic treatment and prophylactic or preventative measures, wherein the object is to prevent or slow down (lessen) an undesired clinical parameter. For purposes of the present invention, beneficial or desired clinical results include, but are not limited to, correcting of clinical parameter, diminishment of extent of clinical parameter, stabilized (i.e., not worsening) clinical parameter and delay or slowing of extent of clinical parameter.

8

By "antiestrogen" it is meant a compound that prevents estrogens from expressing their effects on estrogen dependent target tissues consequently antagonizing a variety of estrogen-dependent processes. Based on the unexpected finding that the antiestrogenic trans-clomiphene isomer elevates tesostosterone levels to a greater degree than mixtures of trans- and cis-clomiphene, it is expected that compounds with antiestrogenic activity will be useful in treating psychological distress. In all cases, antiestrogens useful in the practice of the instant invention are those capable of elevating testosterone levels in a mammal. Without wishing to be bound by theory, it is believed that administration of antiestrogens will result in elevated testosterone levels by blocking the negative feedback exerted by normal estrogens on the pituitary leading to increases in LH and FSH. In men, these increased levels of gonadotropins stimulate the Leydig cells of the testes and result in the production of higher testosterone levels.

Antiestrogens useful in the practice of the instant invention may be pure antiestrogens or may have partial estrogenic action as in the case of the selective estrogen receptor modulators (SERMs) which exhibit antiestrogenic properties in some tissues and estrogenic tissues in others.

Pure antiestrogens of the invention include, without limitation: RU 58,688, described in Van de Velde et al., Ann. NY Acad. Sci., 761(3):164-175 (1995); 13-methyl-7-[9-(4,4,5,5,5-pentafluoropentylsulfinyl)nonyl]-7,8,9,11,12,13,14,15,16,17-decahydro-6H-cyclopenta[a]-phenanthrene-3,17-diol (ICI 182,780/fulvestrant) and other compounds described in EP 0138504; N-butyl-11-[(7R,8S,9S,13S,14S,17S)-3,17-dihydroxy-13-methyl-6,7,8,9,11,12,14,15,16,17-decahydrocyclopena[a]phenanthren-7-yl]-N-methyl-undecanamide (ICI 164,384), described in Wakeling and Bowler, J. Endocrin., 112:R7-R110 (1987); (#)-7-pivaloyloxy-3-(4'pivaloyloxyphenyl)-4-methyl-2-(4"-(2"piperidinoethoxy)phenyl)-2H-benzopyran (EM-800/SCH 57050) and other compounds described in WO 96/26201; (2S)-3-(4-hydroxyphenyl)-4-methyl-2-[4-[2-(1-piperidyl)ethoxy]phenyl]-2H-chromen-7-ol (EM-652/SCH 57068) and the like.

SERMs of the invention include, without limitation, triphenylalkylenes such as triphenylethylenes, which include: 2-[4-(1,2-diphenylbut-1-enyl)phenoxy]-N,N-dimethyl-ethanamine (tamoxifen) and other compounds described in U.S. Pat. No. 4,536,516, incorporated herein by reference; Trans-4-(1-(4-(2-dimethylamino)ethoxy)phenyl)-2-phenyl-1-butenyl)phenol (4-hydroxytamoxifen) and other compounds described in U.S. Pat. No. 4,623,660, incorporated herein by reference; 1-[4'-dimethylaminoethoxy)phenyl]-1-(3'-hydroxyphenyl)-2-phenylbut-1-ene (droloxifene) and other compounds described in U.S. Pat. No. 5,047,431, incorporated herein by reference; 2-[p-[(Z)-4-chloro-1,2-diphenyl-1-butenyl]phenoxy]-N,N-dimethylethylamine (toremifene) and other compounds described in U.S. Pat. Nos. 4,696,949, 5,491,173 and 4,996,225, each of which is incorporated herein by reference; (E)-1-(2-(4-(1-(4-iodo-phenyl)-2-phenyl-but-1-enyl)-phenoxy)-ethyl)-pyrrolidinone (idoxifene) and other compounds described in U.S. Pat. No. 4,839,155, incorporated herein by reference; clomiphene and both its isomers; and compounds described in U.S. Pat. Nos. 4,696,949 and 5,491,173 and 6,576,645, each of which is incorporated herein by reference.

SERMS of the invention also include, without limitation, benzothiphene derivatives such as: [6-hydroxy-2-(4-hydroxyphenyl)-benzothiophen-3-yl]-[4-[2-(1-piperidinyl)ethoxy]phenyl]-methanone (raloxifene) and other compounds described in U.S. Pat. Nos. 4,418,068 and 5,393,763, both of which are incorporated herein by reference; LY353381; and LY335563 and other compounds described in WO 98/45286,

US 7,737,185 B2

9

WO 98/45287 and WO 98/45288; benzopyran derivatives such as: (#)-7-pivaloyloxy-3-(4'pivaloyloxyphenyl)-4-methyl-2-(4"-(2"piperidinoethoxy)phenyl)-2H-benzopyran (EM 800/SCH 57050) and other compounds described in WO 96/26201; (2S)-3-(4-hydroxyphenyl)-4-methyl-2-[4-[2-(1-piperidyl)ethoxy]phenyl]-2H-chromen-7-ol (EM 652); naphthalene derivatives such as: Cis-6-phenyl-5-[4-(2-pyrrolidin-1-yl-ethoxy)-phenyl]-5,6,7,8-tetrahydronaphthalen-2-ol (lasofoxifene/CP 336,156) and other compounds described in U.S. Pat. No. 5,552,412; 3,4-dihydro-2-(p-methoxyphenyl)-1-naphthyl-p-[2-(1-pyrrolidinyl)ethoxy]phenyl ketone (trioxifene/LY133314) and other compounds described in U.S. Pat. No. 4,230,862, incorporated herein by reference; and 1-(4-Substituted alkoxy)benzyl)naphthalene compounds such as those described in U.S. Pat. No. 6,509,356, incorporated herein by reference; chromans such as 3,4-trans-2,2-dimethyl-3-phenyl-4-[4-(2-(2-(pyrrolidin-1-yl)ethoxy)phenyl]-7-methoxychroman (levormeloxifene) and other compounds described in WO 97/25034, WO 97/25035, WO 97/25037 and WO 97/25038; and 1-(2-((4-(-methoxy-2,2, dimethyl-3-phenyl-chroman-4-yl)-phenoxy)-ethyl)-pyrrolidine (centchroman) and other compounds described in U.S. Pat. No. 3,822,287, incorporated herein by reference.

Other SERMs of the invention include, without limitation, the compounds described in U.S. Pat. Nos. 6,387,920, 6,743, 815, 6,750,213, 6,869,969, 6,927,224, 7,045,540, 7,138,426, 7,151,196, and 7,157,604, each of which is incorporated herein by reference.

Further non-limiting antiestrogens of the invention include: 6α-chloro-16α-methyl-pregn-4-ene-3,20-dione (clometherone); 6-chloro-17-hydroxypregna-1,4,6-triene-3, 20-dione (delmadinone); 1-[2-[4-[1-(4-methoxyphenyl)-2-nitro-2-phenylethenyl]phenoxy]ethyl]-pyrrolidine (nitromifene/CN-55,945-27); and 1-[2-[p-(3,4-Dihydro-6-methoxy-2-phenyl-1-naphthyl)phenoxy]ethyl]pyrrolidine (nafoxidene).

Further non-limiting antiestrogens of the invention include indoles such as those disclosed in J. Med. Chem., 33:2635-2640 (1990), J. Med. Chem., 30:131-136 (1987), WO 93/10741, WO 95/17383, WO 93/23374 and U.S. Pat. Nos. 6,503,938 and 6,069,153, both of which are incorporated herein by reference.

Further non-limiting antiestrogens of the invention include 2-[3-(1-cyano-1-methyl-ethyl)-5-(1H-1,2,4-triazol-1-ylmethyl)phenyl]-2-methyl-propanenitrile (anastrozole) and other compounds described in EP 0296749; 6-Methylenandrosta-1,4-diene-3,17-dione (exemestane) and other compounds described in U.S. Pat. No. 4,808,616, incorporated herein by reference; 4-[(4-cyanophenyl)-(1,2,4-triazol-1-yl) methyl]benzonitrile (letrozole) and other compounds described in U.S. Pat. No. 5,473,078, incorporated herein by reference; 1-[4'-dimethylaminoethoxy]phenyl]-1-(3'-hydroxyphenyl)-2-phenylbut-1-ene (droloxifene) and other compounds described in U.S. Pat. No. 5,047,431, incorporated herein by reference; 2α,3α-Epithio-5α-androstan-17β-ol (epitiostanol); 2α,3α-Epitio-5α-androstane-17β-yl-1-methoxycyclopentyloxy (mepitiostane); 4-[(2Z,4Z)-4-(4-hydroxyphenyl)hexa-2,4-dien-3-yl]phenol (cycladiene) and other compounds described in U.S. Pat. Nos. 2,464,203 and 2,465,505, both of which are incorporated herein by reference; CI-680 described in Unlisted Drugs, 28(10): 169(0) (1976), CI-628 described in Unlisted Drugs, 26(7): 106(1) (1974); 13-ethyl-17α-ethnyl-17β-hydroxygona-4,9,1-trien-3-one (R2323); diphenol hydrochrysene and erythyro-MEA both described in Geynet, et al., Gynecol. Invest. 3(1):2-29 (1972); 1-[1-chloro-2,2-bis(4-methoxyphenyl)ethenyl]-4-methoxy-benzene (chlorotrianisene) described in Merck

10

Index, 10th ed., #2149; 1-[4-(2-Diethylaminoethoxy)phenyl]-1-phenyl-2-(p-anisyl)ethanol (ethamoxytriphetol) described in Merck Index, 10th ed., #3668; and 2-p-Chlorophenyl-1-[p-(2-diethylaminoethoxy)phenyl]-1-p-tolylethanol (triparanol) and other compounds described in U.S. Pat. No. 2,914, 562, incorporated herein by reference.

Still other antiestrogens of the invention include, without limitation: (2e)-3-(4-((1e)-1,2-diphenylbut-1-enyl)phenyl) acrylic acid (GW5638), GW7604 and other compounds described in Wilson et al., Endocrinology, 138(9):3901-3911 (1997) and WO 95/10513; 1-[4-(2-diethylaminoethoxy)phenyl]-2-(4-methoxyphenyl)-1-phenyl-ethanol (MER-25), N,N-diethyl-2-[4-(5-methoxy-2-phenyl-3H-inden-1-yl)phenoxy]ethanamine hydrochloride (U-11,555A), 1-[2-[4-(6-methoxy-2-phenyl-3,4-dihydronaphthalen-1-yl)phenoxy] ethyl]pyrrolidine hydrochloride (U-11,100A), ICI-46,669, 2-[4-[(Z)-1,2-diphenylbut-1-enyl]phenoxy]-N,N-dimethyl-ethanamine; 2-hydroxypropane-1,2,3-tricarboxylic acid (ICI-46,474) and other compounds described in Terenius et al., Gynec. Invest., 3:96-107 (1972); 2-Hydroxy-6-naphthalenepropionic acid (allenolic acid); [4-[(4-acetyloxyphenyl)-cyclohexylidene-methyl]phenyl]acetate (cyclofenyl/ICI-48213); [6-hydroxy-2-(4-hydroxyphenyl)benzothiophen-3-yl]-[4-[2-(1-piperidyl)ethoxy]phenyl]methanone (keoxifene); 4-[(Z)-1-[4-(2-dimethylaminoethoxy)phenyl]-2-(4-propan-2-ylphenyl)but-1-enyl]phenol (DP-TAT-59/miproxifene); (1RS,2RS)-4,4'-diacetoxy-5,5'-difluoro-(1-ethyl-2-methylene)di-m-phenylenediacetate (acefluranol); 6-hydroxy-2-(p-hydroxyphenyl)-benzo(b)thien-3-yl[2-(1-pyrrolidinyl)-ethoxyphenyl]ketone (LY-117018); and [6-hydroxy-2-(4-hydroxy-phenyl)benzo(b)thien-3-yl]-[4-(2-(1-piperidinyl)-ethoxy)phenyl]methanone (LY-156758).

Still other antiestrogens of the invention include, without limitation: non-steroidal estrogen receptor ligands such as those described in U.S. Pat. Nos. 5,681,835, 5,877,219, 6,207,716, 6,340,774 and 6,599,921, each of which is incorporated herein by reference; steroid derivatives such as those described in U.S. Pat. No. 4,659,516, incorporated herein by reference; 7α-11-aminoalkyl-estratrienes such as those described in WO 98/07740; 11-β-halogen-7α-substituted estratrienes such as those described in WO 99/33855; 17α-alkyl-17β-oxy-estratrienes such as those described in U.S. patent application Ser. No. 10/305,418, incorporated herein by reference; 2-phenyl-1-[4-(2-aminoethoxy)-benzyl]-indoles such as those described in U.S. Pat. No. 7,132,417, incorporated herein by reference; 4-fluoroalkyl-2h-benzopryans such as those described in U.S. Pat. No. 6,844,336, incorporated herein by reference; (4-(2-(2-aza-bicyclo[2.2.1] hept-2-yl)-ethoxy)-phenyl)-(6-hydroxy-2-(4-hydroxy-phenyl)-benzo[b]thiophen-3-yl)-methanone and other benzothiophenes described in WO 95/10513 and U.S. Pat. No. 4,133,814, incorporated herein by reference; 2-phenyl-1-[4-(2-aminoethoxy)-benzyl]-indoles such as those described in U.S. Pat. No. 5,998,402, incorporated herein by reference; 3-[4-(2-Phenyl-Indole-1-ylmethyl)Phenyl]-Acrylamides and other compounds described in U.S. Pat. No. 5,985,910, incorporated herein by reference; 2-phenyl-1-[4-(amino-1-yl-alk-1-ynyl)-benzyl]-1H-indol-5-ols and other compounds described in U.S. Pat. Nos. 5,780,497 and 5,880,137, both of which are incorporated herein by reference; steroids such as those described in U.S. Pat. Nos. 6,455,517, 6,548,491, 6,747,018 and 7,041,839, each of which is incorporated herein by reference; Di-(3'-hydroxyphenyl)-alkane compounds such as those described in U.S. Pat. No. 4,094,994, incorporated herein by reference; phenol derivatives such as those described in U.S. Pat. No. 4,751,240, incorporated herein by reference; 2,3-diaryl-2H-1-benzopyran analogs

US 7,737,185 B2

11

such as those described in Saeed et al., J. Med. Chem., 33:3210-3216 (1990) and Sharma et al., J. Med. Chem. 33:3216-3229 (1990); and benzofuran and triarylfuran analogs such as those described in Durani et al., J. Med. Chem., 32:1700-1707 (1989).

Suitable pharmaceutical compositions or unit dosage form may be in the form of solids, such as tablets or filled capsules or liquids such as solutions, suspensions, emulsions, elixirs or capsules filled with the same, all for oral use. The compositions may also be in the form of sterile injectable solutions or emulsions for parenteral (including subcutaneous) use. Such pharmaceutical compositions and unit dosage forms thereof may comprise ingredients in conventional proportions.

Compositions according to the present invention may be administered by any route of administration including, but not limited to, oral, aural, intravenous, subcutaneous, buccal, transmucosal, intrathecal, intradermal, intracisternal, intramuscular, transdermal, intraperitoneal, epidural, vaginal, rectal, intranasal, sublingual, intra-articular, intra-cerebrospinal and intrasynovial.

Compositions according to the present invention may comprise trans-clomiphene at a dosage between one mg to about 200 mg (although the determination of optimal dosages is with the level of ordinary skill in the art). The composition may comprise trans-clomiphene at a dosage of about 1 mg, 2 mg, 3, mg, 4 mg, 5 mg, 10 mg, 15 mg, 20 mg, 25 mg, 30 mg, 35 mg, 40 mg, 45 mg, 50 mg, 55 mg, 60 mg, 65 mg, 70 mg, 75 mg, 80 mg, 85 mg, 90 mg, 95 mg, 100 mg, 110 mg, 120 mg, 130 mg, 140 mg, 150 mg, 160 mg, 170 mg, 180 mg, 190 mg, 200 mg or there between. The composition may also comprise trans-clomiphene and cis-clomiphene at a ratio of about 71/29, 72/28, 73/27, 74/26, 75/25, 76/24, 77/23, 78/22, 79/21, 80/20, 81/19, 82/18, 83/17, 84/16, 85/15, 86/14, 87/13, 88/12, 89/11, 90/10, 91/9, 92/8, 93/7, 94/6, 95/5, 96/4, 97/3, 98/2, 99/1, 99.5/0.5 or there between. Analogs of the trans- and cis-isomers of clomiphene such as those described in Ernst, et al. supra are also useful in the practice of the present invention.

Dosages are preferably (but not necessarily) administered as part of a dosage regimen designed to give rise to serum testosterone levels that mimic or correspond to the normal secretary total serum testosterone profile described in FIG. 1. For example, according to FIG. 1 a dosage of the preferred composition may be administered in a pharmaceutical formulation that would give rise to peak serum testosterone levels at around 8 a.m. Such pharmaceutical formulations may be in the form of sustained release formulations prepared as described for example in U.S. Pat. No. 6,221,399, Japanese patent 4-312522, Meshali et al, Int. J. Phar. 89:177-181 (1993), Kharenko et al, Intern. Symp. Control Rel. Bioact. Mater. 22:232-233 (1995), WO 95/35093, Dangprasit et al.,

12

Drug. Devel. and Incl. Pharm. 21 (20):2323-2337 (1995); U.S. Pat. Nos. 6,143,353, 6,190,591, 6,096,338, 6,129,933, 6,126,969, 6,248,363 and other sustained release formulations well known in the art.

Compositions of the present invention may also be administered in fast-release formulations, slow-release formulations or mixtures of fast-release and slow-release formulations such as a multi-layer tablet comprising at least one fast-release layer and at least one slow-release layer.

All of the references discussed herein are incorporated by reference in their entirety.

The following Examples are meant to be illustrative of the invention and is not intended to limit the scope of the invention as set out in the appended claims.

EXAMPLE 1

Effects of Clomids on Serum Testosterone and Cholesterol in Male Baboons

Adult, male, Baboons were given 1.5 mg/kg of Clomid, Enclomid (trans-Clomid) or Zuclomid (cis-Clomid) for 12 consecutive days. The samples analyzed were sera taken on the day of first treatment before being given test article (day 0), after 12 days of treatment (day 12) and 7 days after the last treatment (end or wash-out).

1. Effects on Body Weight and Serum LH, FSH, PRL and Testosterone

There were significant increases in total serum testosterone in the group receiving Enclomid. See Table 1. There were no differences among groups in the baseline period or at day 0. There were also no differences among the three groups 7 days after treatment (the washout period). However, Enclomid produced higher levels of testosterone compared to Clomid and Zuclomid on day 6 (p=0.03 and p=0.00002 respectively) and compared to Zuclomid on day 12 (p=0.047). Zuclomid clearly did not raise total serum testosterone to any extent. Compared to the animals receiving Enclomid, the animals receiving Clomid exhibited more variable total testosterone levels on day 6 and later as judged by their coefficients of variations. When we looked at the time course of the effects (FIG. 3), we determined that only Enclomid significantly and statistically raised total serum testosterone on days 6 and 12 compared with either baseline or day 0 values. Moreover, cessation of Enclomid treatment, resulted in a significant drop in the level of total serum testosterone between day 12 and day 18 (washout). This indicates that Enclomid is readily cleared from the circulation consistent with the metabolic clearance seen for Enclomid in humans. Enclomid was clearly better and more consistent than Clomid itself and Zuclomid was ineffective.

TABLE 1

| | | Serum Testosterone Levels (ng/dl) | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| Group | ID | baseline Dec. 3, 2001 | 0 day Dec. 7, 2001 | 6 days Dec. 13, 2001 | 12 days Dec. 20, 2001 | wash-out Dec. 26, 2001 |
| CLO | 7500 | 79.01 | 76.15 | 940.97 | 891.5 | 150.9 |
| | 9012 | 97.55 | 305.24 | 585.92 | 555.6 | 16.3 |
| | 9097 | 158.06 | 102.94 | 151.12 | 318.9 | 143.6 |
| | mean | 111.5 | 161.4 | 559.3 | 588.7 | 203.6 |
| | SD | 41.3 | 125.2 | 395.6 | 287.7 | 97.7 |
| ENCLO | 7223 | 64.57 | 74.96 | 1223.8 | 633.6 | 307.2 |
| | 8021 | 166.86 | 133.59 | 1128.2 | 1466 | 399.2 |
| | 8369 | 170.45 | 106.47 | 1081.1 | 1166 | 271 |

US 7,737,185 B2

13          14

TABLE 1-continued

| | | Serum Testosterone Levels (ng/dl) | | | | |
|---|---|---|---|---|---|---|
| Group | ID | baseline Dec. 3, 2001 | 0 day Dec. 7, 2001 | 6 days Dec. 13, 2001 | 12 days Dec. 20, 2001 | wash-out Dec. 26, 2001 |
| | mean | 134.0 | 105.0 | 1144.4 | 1088.5 | 325.8 |
| | SD | 60.1 | 29.3 | 72.7 | 421.6 | 66.1 |
| ZUCLO | 7438 | 124.84 | 210.4 | 137.51 | 314.5 | 359.7 |
| | 8292 | 104.66 | 67.37 | 169.98 | 406.1 | 860.5 |
| | 10098 | 282.29 | 904.82 | 227.95 | 353.0 | 274.1 |
| | mean | 170.6 | 394.2 | 178.5 | 357.9 | 498.1 |
| | SD | 97.3 | 448.0 | 45.8 | 46.0 | 316.8 |
| | ANOVA | p = 0.61 | p = 0.43 | p = 0.007 | p = 0.57 | p = 0.256 |
| | K-W | p = 0.56 | p = 0.84 | p = 0.051 | p = 0.079 | p = 0.252 |

There were no changes in serum LH or FSH. The ratio of total serum testosterone to LH followed the same pattern as total serum testosterone, suggesting a lack of dependence (data not shown). There was also no change in body weight during the 12 day study. There was a decrease in serum prolactin (PRL) during the study in the group receiving Enclomid, suggesting an effect of antiestrogen that has been described in part (Ben-Jonathan and Hnasko, 2001) and expected on the basis of the fact that as men age, testosterone declines and Prolactin increase (Feldman et al., 2002).

2. Effects on Cholesterol Levels

Treatment with Enclomid tended to decrease serum cholesterol and Zuclomid tended to increase the same parameter. Preliminary analysis indicated that the changes in cholesterol levels were not statistically significant and that the changes were within the normal range. Due to the observed trend for the two isomers to demonstrate opposite effects on cholesterol levels over a short period of time, further analysis was conducted.

Detailed analysis indicated that Enclomid resulted in an 8% decrease in serum cholesterol levels. Conversely, treatment with Zuclomid resulted in a 22% increase in serum cholesterol levels. Treatment with Clomid resulted in a slight increase in serum cholesterol levels. The opposite effect of Enclomid and Zuclomid on serum cholesterol levels is not unexpected given that the isomers have, alternatively, estrogen agonist or antagonist activity. These results indicate that Enclomid may be used for treating patients with high cholesterol levels. These results also indicate that Enclomid may be more benign than Zuclomid with respect to serum cholesterol if used chronically for increasing testosterone levels.

3. Effects on Clinical Chemistry Parameters

The mean values for each parameter did not differ among the three groups for any test parameter at the beginning of the study as determined by ANOVA or by the Kruskal-Wallis test. All groups exhibited normal values at each parameter except for (1) serum sodium; a related calculated parameter, anionic gap, which were low for all nine baboons throughout the trial; (2) serum glucose; and (3) BUN which were high on day 0 for the group which would be treated with Enclomid. On day 12 of treatment and 7 days after treatment (washout), there were no differences among groups for any parameter except anionic gap that showed that the Clomid and Zuclomid groups had lower values than the Enclomid group. The values of serum sodium and anionic gap appear to be anomalies associated with this group of baboons.

There were substantive effects on the red blood cell population with Enclomid and Zuclomid and on hematocrit with Zuclomid. All the compounds lower the mean cell hemoglo-

bin concentration (MCHC) either at day 0 or at the endpoint. With no change in mean cell hemoglobin (MCH) and an increase in the mean cell volume (MCV), the lowering of MCHC is predictable. Although testosterone might be expected to raise hematocrit, only Zuclomid treatment, which did not increase total serum testosterone, demonstrated a statistical difference. Clearly, men in a clinical trial that uses Zuclomid should be monitored for the characteristics of their red blood cell population. Enclomid would be predicted to have less of an effect.

There appears to be a clear effect of 12-day Enclomid treatment on platelets although the values found stayed within the normal range. One thing to consider here is the sexual dimorphism in platelet counts between male and female baboons (279 for males vs. 348 for females). This is likely to be due to hormones. Since the Enclomid group demonstrated increased testosterone, the lowering of the platelet count could be secondary to the change in testosterone in this group. Moreover, treatment with Enclomid pushed the platelet count to its normal male level from a day 0 level that was the high end of the normal range for this group. Enclomid would not necessarily predict a deleterious effect on platelets.

All the Clomids tested had effects on the white blood cell (WBC) population, the most striking was that of Enclomid on raising the counts of lymphocytes and eosinophiles. The effects are not as straightforward as they would seem to be. There appears to be a strong effect of Enclomid on lowering the per cent of granulocytes in the blood. The effects are very strong after the 7-day washout period when the values are decreased below the normal range. (This time course could reflect the relatively long time required to affect change the WBC population.) There is little sexual dimorphism in baboons with respect to the white blood cell populations, so the effects are more likely to be due to the compound itself than changes in testosterone. However, when we look at the calculated count of granulocytes using the WBC count, we find no differences in granulocyte count due to any compound. Concomitantly, it is the lymphocyte story that is the most interesting. Both the count and per cent lymphocytes in the population increase with Enclomid treatment. Whereas the mean values of per cent lymphocytes remain in the normal range, given the trend for an increase in WBC count, the net effect is an increase in lymphocyte count with Enclomid. This eosinophil result is analogous. There is a clear implication for treating men who have low lymphocytes, such as men who are HIV-positive. Since Enclomid is unlikely to lower lymphocytes based on this result, a case could be made for its use in the population of men with AIDS. These individuals are often treated with agents that are intended to raise testosterone due to the wasting effects of disease. Low liver and kidney toxic-

A80

US 7,737,185 B2

**15**

ity and favorable effects on cholesterol and lipids are also highly favored attributes for any medication intended for use HIV-positive men who are already compromised by their disease.

The increase in serum glucose with Clomid or Zuclomid was within the normal range. In the case of Enclomid where the mean serum glucose values were high on day 0, there were no increases with treatment. There was no evidence that Enclomid would have a deleterious effect on blood glucose.

No clearly adverse effects on liver function are apparent as judged by the enzymes AST and ALT. The trend in these values was a decrease with treatment. An increase in the level of enzymes in the serum would indicate liver damage. ALT/SGPT was out of range low at the end of the study for the Clomid group although the differences over the treatment period were not statistically significant. The changes with Enclomid and Zuclomid were within the normal range. AST is depressed in pregnancy; thus the action of an estrogen agonist such as Zuclomid in lowering the marginal AST level could be rationalized. Alkaline phosphatase (ALP) is also found in the liver and is elevated various disease states. The lowering of ALP argues further against hepatic damage. There were no changes in serum albumin, also a liver product. A strong suppression of serum albumin over an extended time period could contribute to free serum steroid hormone levels in humans although a more important role is played by sex hormone binding globulin. As a bottom line, none of the compounds could be linked to liver damage on the basis of the parameters assayed.

Osteoblastic activity and diseases of the bone are accompanied by high serum ALP values. ALP was not elevated following Zuclomid treatment and was decreased in value following Enclomid treatment. The trends would predict a more benign result for the use of Enclomid compared to Zuclomid.

Although BUN and BUN/creatinine were altered during the study in the Clomid and Enclomid groups, the lack of a definitive change in creatinine argues against renal dysfunction. A loss of glomerular filtration capacity would result in an increase in BUN. Decreased BUN occurs in humans due to poor nutrition (not likely in a controlled setting), or high fluid intake (presumably accompanied by edema). Also, despite an increase in total serum testosterone between day 0 and Day 12 with Enclomid, there were no differences between serum creatinine values, arguing against an increase in muscle mass over this short time interval.

Serum sodium levels were lower than reference values for all animals throughout the study. Serum carbon dioxide was higher than reference values on day 12 for the Clomid and Zuclomid groups. Serum anion gap was lower for all animals throughout the study, paralleling the sodium results. Enclomid raised this parameter towards normal values. The electrolyte imbalances detected in the test animals throughout all treatment periods remains elusive but might be part of the same fluid derangement phenomenon suggested by the BUN results.

The foregoing results indicate that Enclomid is more effective than Clomid or Zuclomid at enhancing total serum testosterone. Zuclomid is clearly not effective and that deficiency limits any use of Clomid for hypogonadism, particularly since the Zuclomid component of Clomid would predominate in the circulation over time given its longer half-life.

The strong activity of Enclomid to increase serum testosterone levels lends itself for use in men with low total or free serum testosterone including, without limitation, aging men, men undergoing renal dialysis, men with end-stage pulmonary failure, men on certain narcotics, male AIDS

**16**

patients experiencing muscle loss and/or compromised T4 lymphocyte counts and especially men with COPD.

EXAMPLE 2

Treating Wasting in Patients with COPD

Prior to administration of trans-clomiphene, blood samples are taken from subject individuals and testosterone levels are measured using methodologies described for example in Matsumoto, et al. Clin. Endocrinol. Metab. 56; 720 (1983) (incorporated herein by reference). Sex hormone binding globulin (SHBG), both free and bound to testosterone, may also be measured as described for example in Tenover et al. J. Clin. Endocrinol. Metab. 65:1118 (1987) which describe measurement of SHBG by both a [³H]dihydrotestosterone saturation analysis and by radioimmunoassay. Non-SHBG-bound testosterone levels (bioavailable testosterone) are also measured for example according to Tenover et al. J. Clin. Endocrinol and Metab. 65:1118 (1987). See also Soderguard et al. J. Steroid Biochem 16:801 (1982) incorporated herein by reference.

Patients are given daily dosages of 1.5 mg/kg clomiphene, wherein the ratio of trans-clomiphene to cis-clomiphene is greater than 71/29. Patients are monitored for testosterone levels and increases in muscle mass and/or weight gain such that the dosage amount and dosage frequency may be adjusted to achieve therapeutic levels of testosterone and improvements in muscle mass and/or weight gain in the patient.

EXAMPLE 3

Treating Secondary Hypogonadism in Males with COPD

Prior to administration of trans-clomiphene, blood samples are taken from subject males and testosterone levels are measured using methodologies described for example in Matsumoto, et al. Clin. Endocrinol. Metab. 56; 720 (1983) (incorporated herein by reference). Sex hormone binding globulin (SHBG), both free and bound to testosterone, may also be measured as described for example in Tenover et al. J. Clin. Endocrinol. Metab. 65:1118 (1987) which describe measurement of SHBG by both a [³H] dihydrotestosterone saturation analysis and by radioimmunoassay. Non-SHBG-bound testosterone levels (bioavailable testosterone) are also measured for example according to Tenover et al. J. Clin. Endocrinol and Metab. 65:1118 (1987). See also Soderguard et al. J. Steroid Biochem 16:801 (1982) incorporated herein by reference.

Patients are given daily dosages of 1.5 mg/kg clomiphene, wherein the ratio of trans-clomiphene to cis-clomiphene is greater than 71/29. Patients are monitored for testosterone levels such that the dosage amount and dosage frequency may be adjusted to achieve therapeutic levels of testosterone in the COPD patient.

EXAMPLE 4

Comparison of Androxal™ to Androgel®

A placebo controlled challenge study was conducted at the Advanced Biological Research, Inc. (ABR) Clinical Research Center in Hackensack, N.J. to compare orally administered Androxal™ (trans-clomiphene) to Androgel® (testosterone) in hypogonadal men. Androgel® (Solvay Pharmaceuticals, Inc.) consists of a cream that administers exogenous testosterone in a transdermal matrix.

**17**

The study enrolled 62 hypogonadal men with testosterone levels less than 300 ng/dl (normal 298-1034 ng/dl) that were randomized into 6 different arms, three doses of Androxal™ (12.5 mg, 25 mg, and 50 mg), placebo, and both high and low doses of Androgel®. Half of the men in each of the Androxal™ and placebo arms were randomized into cohorts that underwent in-clinic sessions on days 1 and 14 to determine pharmacokinetic parameters for Androxal™ as well as cyclical changes in testosterone. The placebo and Androxal™ doses were administered in a double blind fashion. The Androgel® cream was administered in an open label fashion. Half of the Androgel® patients underwent in-clinic sessions similar to the other patients in the study. Following the two week drug exposure patients were followed for an additional seven to ten days to determine the status of their testosterone levels.

There were no side effects noted in either the Androxal™ or Androgel® arms of the study that were different than placebo. Furthermore, all doses produced statistically significant changes in testosterone from baseline testosterone levels. The low, mid and high doses of Androxal™ achieved mean increases of 169, 247, and 294 ng/dl respectively, while those of Androgel® 5 G, the lowest approved dose, and Androgel® 10 G, the highest approved dose, produced changes from baseline that were 212 and 363 ng/dl. These values were statistically indistinguishable from those changes achieved with Androxal™. This inability to show differences between Androxal™ and Androgel® appears to result from the highly variable results found when Androgel® is used. For example the 50 mg dose of Androxal™ raised mean total testosterone to 589±172 ng/dl after 15 days, a coefficient of variation (CV) of 29% and similar to the placebo group (36%). On the other hand Androgel® 5 G and 10 G yielded mean total testosterone values 473±289 ng/dl and 608±323 ng/dl, CV's of 61% and 53% respectively.

After 14 days of Androxal™ therapy all doses were associated with a total testosterone diurnal pattern similar to the placebo group, i.e. a morning peak, a mid-day trough and a rise overnight. Without being bound by theory, this pattern may be due to the mode of action of Androxal™, which appears to be mediated through effects on the hypothalamic-pituitary axis. The diurnal pattern for men on Androgel® was nearly flat. However, spikes in total testosterone for Androgel® were associated with dosing and often exceeded the normal high level of 1,034 ng/dl. Certain individuals on Androgel® 10 G were able to achieve peak levels of total testosterone of over 2500 ng/dl.

Treatment with Androxal™ produced a statistically significant increase in the serum levels of LH in the hypogonadal male subjects (FIG. 5). As in the case of total serum testosterone there was an unexpected continuation in the level of serum LH in the follow-up period (i.e., 7-10 days after cessation of daily oral treatment) where those levels remained high for the three doses of Androxal™. By comparison, treatment with AndroGel® initially decreased LH and after cessation there was an apparent rebound towards pre-treatment levels.

Treatment with Androxal™ also produced a statistically significant increase in the serum levels of FSH in the hypogonadal male subjects (FIG. 6). The pattern of increasing FSH is similar to that seen in the case of LH, that is, all doses of Androxal™ boosts serum FSH which remains high during the follow-up period whereas AndroGel® suppresses the level of serum FSH and cessation of treatment allows serum FSH to rebound towards concentrations more similar to pre-treatment levels.

The effect on serum dihydroxytestosterone (DHT) levels were also measured. Men on Androxal™ experienced a favor-

**18**

able shift in their DHT to total testosterone. For example men on the 50 mg dose of Androxal™ experienced a DHT/TT ratio of 0.83 as compared to the placebo group ratio of 1.07. By contrast the DHT/TT ratio for either of the Androgel® groups was >1.5. The results indicate that men on Androgel® were gaining DHT faster than total testosterone. Thus the normal levels of DHT was disrupted relative to testosterone in men on Androgel® therapy.

Results of clinical chemistry parameters also indicated, unexpectedly, that men on Androxal™ experienced a non-dose dependent reduction in triglycerides. The reduction in triglycerides averaged a decrease of 19.1% after two weeks of therapy. This compared to a 5.9% reduction for the placebo group and increases of 0.3% and 22% for the Androgel® 5 G and 10 G respectively.

Based on this study we infer a number of potential advantages for Androxal™ as a potential therapy. First, Androxal™ appears to raise total testosterone into the normal range in a highly consistent manner without abnormally high spikes in serum testosterone. In addition, the use of trans-clomiphene to treat men that suffer secondary hypogonadism offers a new approach that potentially could offset one of the major side effects of exogenous therapies such as Androgel®. Exogenous therapies provide negative feedback thereby shutting down FSH and LH production. FSH is an essential reproductive hormone and in the male stimulates spermatogenesis. Long term exposure to exogenous testosterone, as a result of its effects on FSH production, causes a reduction in sperm synthesis, leading to the potential for transient infertility due to low sperm counts and therefore a resulting shrinkage of the testis, since the volume of the testis is related to the level of spermatogenesis within the seminiferous tubules. The increase in FSH levels also indicates that Androxal™ may be used to treat infertility in males, including hypogonadal males. Secondly, Androxal™ appears to improve the DHT/TT ratio, a potentially important consideration from the standpoint of prostate cancer. Thirdly, the maintenance of a normal diurnal pattern improves testosterone levels in a more natural fashion. Finally, the tendency to lower triglycerides may be an advantage to many men.

We claim:

**1**. A method for treating wasting in a hypogonadal male, comprising administering to the male a composition consisting essentially of trans-clomiphene or pharmaceutically acceptable salts thereof and optionally one or more pharmaceutically acceptable diluents, adjuvants, carriers or excipients in an effective amount to treat said wasting in the hypogonadal male.

**2**. The method of claim **1**, wherein the composition is administered in a dosage of 1-200 mg of trans-clomiphene per day.

**3**. The method of claim **2**, wherein the composition is administered in a dosage of 50 mg of trans-clomiphene per day.

**4**. The method of claim **1**, wherein the composition is administered in a dosage of 1.5 mg/kg of trans-clomiphene per day.

**5**. The method of claim **1**, wherein the composition consists essentially of 12.5 mg of trans-clomiphene or a pharmaceutically effective salt thereof.

**6**. The method of claim **1**, wherein the composition is a capsule.

**7**. The method of claim **1**, wherein the composition is a capsule.

\* \* \* \* \*

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.         : 7,737,185 B2                                    Page 1 of 2
APPLICATION NO. : 11/750190
DATED                  : June 15, 2010
INVENTOR(S)       : Joseph S. Podolski et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

Delete the title page and substitute therefore with the attached title page showing the corrected number of claims in patent.

IN THE CLAIMS

At column 18, lines 61 and 62, please delete claim 7 in its entirety.

Signed and Sealed this
Eighth Day of April, 2014

*Michelle K. Lee*

Michelle K. Lee
*Deputy Director of the United States Patent and Trademark Office*

A82.1

**CERTIFICATE OF CORRECTION (continued)**                                       Page 2 of 2

(12) **United States Patent**                      (10) **Patent No.:**    **US 7,737,185 B2**
    Podolski et al.                                (45) **Date of Patent:**    **Jun. 15, 2010**

(54) **METHODS AND COMPOSITIONS WITH**
    ***TRANS*-CLOMIPHENE**

(75) Inventors: **Joseph S. Podolski**, The Woodlands, TX
    (US); **Ronald Wiehle**, Houston, TX
    (US)

(73) Assignee: **Repros Therapeutics Inc.**, The
    Woodlands, TX (US)

(*) Notice:    Subject to any disclaimer, the term of this
    patent is extended or adjusted under 35
    U.S.C. 154(b) by 253 days.

(21) Appl. No.: 11/750,190

(22) Filed:    **May 17, 2007**

(65)            **Prior Publication Data**
    US 2007/0249726 A1    Oct. 25, 2007

            **Related U.S. Application Data**

(63) Continuation-in-part of application No. 10/427,768,
    filed on Apr. 30, 2003, now Pat. No. 7,368,480, which
    is a continuation-in-part of application No. PCT/
    US02/21524, filed on Jul. 9, 2002.

(60) Provisional application No. 60/304,313, filed on Jul. 9,
    2001.

(51) **Int. Cl.**
    *A61K 31/135*    (2006.01)
    *A61P 11/00*    (2006.01)

(52) **U.S. Cl.** ............................................ 514/651

(58) **Field of Classification Search** ...................... None
    See application file for complete search history.

(56)            **References Cited**

            U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,061,733 | A | 12/1977 | Gunjikar |
| 4,820,736 | A | 4/1989 | Jensen et al. |
| 4,894,373 | A | 1/1990 | Young |
| 5,728,688 | A | 3/1998 | Labrie |
| 5,861,389 | A | 1/1999 | Radlmaier |
| 6,017,964 | A | 1/2000 | MacLean et al. |
| 6,096,338 | A | 8/2000 | Lacy |
| 6,126,969 | A | 10/2000 | Shah |
| 6,129,933 | A | 10/2000 | Oshlack |
| 6,143,353 | A | 11/2000 | Oshlack |
| 6,190,591 | B1 | 2/2001 | Van Lengerich |
| 6,221,399 | B1 | 4/2001 | Rolfes |
| 6,248,363 | B1 | 6/2001 | Patel |
| 6,291,505 | B1 | 9/2001 | Huebner et al. |
| 6,342,250 | B1 | 1/2002 | Masters |
| 6,391,920 | B1 | 5/2002 | Fisch |
| 6,583,129 | B1 | 6/2003 | Mazer et al. |
| 6,600,010 | B2 | 7/2003 | Mao et al. |
| 6,638,528 | B1 | 10/2003 | Kanios |
| 6,645,974 | B2 | 11/2003 | Hutchinson et al. |
| 6,653,297 | B1 | 11/2003 | Hodgen |
| 6,685,957 | B1 | 2/2004 | Bezemer et al. |
| 6,743,448 | B2 | 6/2004 | Kryger |
| 7,105,679 | B2 | 9/2006 | Kanojia et al. |
| 2002/0120912 | A1 | 8/2002 | Fisch |
| 2002/0183296 | A1 | 12/2002 | Dudley et al. |

| | | | |
|---|---|---|---|
| 2004/0097597 | A1 | 5/2004 | Podolski et al. |
| 2004/0171697 | A1 | 9/2004 | Podolski et al. |
| 2004/0220154 | A1 | 11/2004 | Kryger |
| 2004/0241224 | A1 | 12/2004 | Podolski et al. |
| 2006/0269611 | A1 | 11/2006 | Steiner et al. |

            FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| AU | 2001261684 | 12/2001 |
| EP | 0206021 A | 8/1988 |
| EP | 0430388 A2 | 6/1991 |
| EP | 0888775 A2 | 7/1999 |
| EP | 1829534 A1 | 3/2006 |
| JP | 4-312522 | 11/1992 |
| WO | WO 95/35093 | 12/1995 |
| WO | WO 01/34117 A1 | 5/2001 |
| WO | WO 01/91744 A1 | 12/2001 |
| WO | WO 03/005954 A2 | 1/2003 |
| WO | WO 03/005954 A3 | 1/2003 |
| WO | WO 03/026568 A2 | 4/2003 |
| WO | WO 03/072092 | 9/2003 |
| WO | WO 2006/019916 | 2/2006 |
| WO | WO 2006/084153 | 8/2006 |
| WO | WO 2006/102232 | 9/2006 |
| WO | WO 2007/019165 | 2/2007 |
| WO | WO 2009/051908 | 4/2009 |

            OTHER PUBLICATIONS

Laghi et al. (Am J Respir Crit Care, Med vol. 171, pp. 598-605, 2005).*
Debigare et al. (Am. J. Respir. Crit. Care Med., vol. 165, No. 9, 2001, pp. 1712-1717).*
Casaburi et al. (Am J Respir Crit Care Med. vol. 170, pp. 870-878, 2004).*
Banner A. S. (Lancet, vol. 354, Aug. 7, 1999, pp. 440-441).*
Vippagunta (Adv. Drug Del. Rev., 2001, vol. 48, 2001. pp. 3-26.*
ACCE Clinical Practice Guidelines for the Evaluation and Treatment of Hypogonadism in Adult Male Patients (1996).

                (Continued)

*Primary Examiner*—Brian-Yong S Kwon
(74) *Attorney, Agent, or Firm*—Howrey LLP

(57)            **ABSTRACT**

The present invention relates to the use of compositions comprising trans-clomiphene for treating wasting, especially a loss of muscle mass. The invention is also directed to methods for treating wasting in a patient with chronic obstructive pulmonary disorder. The present invention is also directed to methods for treating hypogonadism in males with chronic obstructive pulmonary disorder.

            **6 Claims, 6 Drawing Sheets**

A82.2



US007759360B2

(12) **United States Patent**          (10) **Patent No.:**     **US 7,759,360 B2**
Podolski                                (45) **Date of Patent:**   ***Jul. 20, 2010***

(54) **METHODS AND MATERIALS FOR THE TREATMENT OF TESTOSTERONE DEFICIENCY IN MEN**

(75) Inventor: **Joseph S Podolski**, The Woodlands, TX (US)

(73) Assignee: **Repros Therapeutics Inc.**, The Woodlands, TX (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 1081 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **10/483,458**

(22) PCT Filed: **Jul. 9, 2002**

(86) PCT No.: **PCT/US02/21524**

§ 371 (c)(1),
(2), (4) Date: **Jul. 2, 2004**

(87) PCT Pub. No.: **WO03/005954**

PCT Pub. Date: **Jan. 23, 2003**

(65)          **Prior Publication Data**

US 2004/0241224 A1      Dec. 2, 2004

**Related U.S. Application Data**

(60) Provisional application No. 60/304,313, filed on Jul. 9, 2001.

(51) **Int. Cl.**
  *A61K 31/4743*     (2006.01)
  *A61K 9/20*        (2006.01)
(52) **U.S. Cl.** ...................................... **514/301**; 424/465
(58) **Field of Classification Search** ................. 514/651, 514/301; 424/465
  See application file for complete search history.

(56)          **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,061,733 A | 12/1977 | Gunjikar | |
| 4,820,736 A | 4/1989 | Jensen et al. | |
| 4,894,373 A | 1/1990 | Young | |
| 5,728,688 A | 3/1998 | Labrie | |
| 5,861,389 A | 1/1999 | Radlmaier | |
| 6,017,964 A | 1/2000 | MacLean et al. | |
| 6,096,338 A | 8/2000 | Lacy | |
| 6,126,969 A | 10/2000 | Shah | |
| 6,129,933 A | 10/2000 | Oshlack | |
| 6,143,353 A | 11/2000 | Oshlack | |
| 6,190,591 B1 | 2/2001 | Van Lengerich | |
| 6,221,399 B1 | 4/2001 | Rolfes | |
| 6,248,363 B1 | 6/2001 | Patel | |
| 6,291,505 B1 | 9/2001 | Huebner et al. | |
| 6,342,250 B1 | 1/2002 | Masters | |
| 6,391,920 B1 | 5/2002 | Fisch | |
| 6,583,129 B1 | 6/2003 | Mazer et al. | |

| | | | |
|---|---|---|---|
| 6,600,010 B2 | 7/2003 | Mao et al. | |
| 6,638,528 B1 | 10/2003 | Kanios | |
| 6,645,974 B2 | 11/2003 | Hutchinson et al. | |
| 6,653,297 B1 | 11/2003 | Hodgen | |
| 6,685,957 B1 | 2/2004 | Bezemer et al. | |
| 6,743,448 B2 | 6/2004 | Kryger | |
| 7,105,679 B2 | 9/2006 | Kanojia et al. | |
| 2002/0120012 A1 | 8/2002 | Fisch | |
| 2002/0183296 A1* | 12/2002 | Dudley et al. ................ 514/177 |
| 2004/0097597 A1 | 5/2004 | Podolski et al. | |
| 2004/0171697 A1 | 9/2004 | Podolski et al. | |
| 2004/0220154 A1 | 11/2004 | Kryger | |
| 2004/0241224 A1 | 12/2004 | Podolski et al. | |
| 2006/0269611 A1 | 11/2006 | Steiner et al. | |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| AU | 200261684 B2 | 12/2001 | |
| EP | 0206021 B1 | 8/1988 | |
| EP | 0430388 A2 | 6/1991 | |
| EP | 0888775 A2 | 7/1999 | |
| EP | 1829534 A1 | 3/2006 | |
| JP | 4-312522 | 11/1992 | |
| WO | WO 95/35093 | 12/1995 | |
| WO | WO 01/34117 A1 | 5/2001 | |
| WO | WO 01/91744 A1 | 12/2001 | |
| WO | 03/005954 A3 | 1/2003 | |
| WO | WO 03/005954 A2 | 1/2003 | |
| WO | WO 03/005954 A3 | 1/2003 | |
| WO | WO 03/026568 A2 | 4/2003 | |
| WO | WO 03/072092 | 9/2003 | |
| WO | 2006/019916 A1 | 2/2006 | |
| WO | 2006/084153 A2 | 8/2006 | |
| WO | 2006/102232 A2 | 9/2006 | |
| WO | 2007/019165 A1 | 2/2007 | |
| WO | 2009/051908 A1 | 4/2009 | |

OTHER PUBLICATIONS

Grinenko et al., Khimiko-farmatsevticheskii Zhurnal, vol. 23, No. 1, pp. 123-126, Jan. 1989.*

Vippagunta (Adv. Drug Del. Rev., 2001, vol. 48, 2001, pp. 3-26.*

Clinical Endocrinology & Metabolism, 1995, vol. 80, pp. 3546-3552.*

Ben-Jonathan, N., et al., "Dopamine as a Prolactin (PRL) Inhibitor," Endocr. Rev. 22(6), pp. 724-63 (2001).

Breznik, R., et al., "Effectiveness of Antiestrogens in Infertile Men,"Arch. Androl., vol. 31(1), pp. 43-48 (1993).

Check, J., et al., "Empirical Therapy of the Male with Clomiphene in Couples with Unexplained Infertility"Int. Journal Fertil., vol. 34(2), pp. 120-122 (1989).

(Continued)

*Primary Examiner*—Brian-Yong S Kwon

(74) *Attorney, Agent, or Firm*—Howrey LLP

(57)          **ABSTRACT**

The present invention relates to the use of compositions comprising trans-clomiphene for treating men with hypogonadism. The invention is also directed to methods for treating males with hypogonadism.

**7 Claims, 3 Drawing Sheets**

## US 7,759,360 B2
Page 2

### OTHER PUBLICATIONS

Cooper, A., et al., "The Effects of Clomiphene in Impotence A Clinical and Endocrine Study," British Journal of Psychiatry, vol. 120, pp. 327-330 (1972).

Cunningham, G., et al., "Testosterone Replacement Therapy and Sleep-Related Erections in Hypogonadal Men," J. Clin. Endocrinol. Metab., vol. 70, No. 3, pp. 792-797 (1990).

Dangprasit, P., et al., "Development of Diclofenac Sodium Controlled Release Solid Dispersions by Spray Drying Using Optimization Strategy I. Powder Formulation," Drug. Devel. And Industrial Pharm. 21(20), pp. 2323-2337 (1995).

Davidson, J., et al., "Effects of Androgen on Sexual Behavior in Hypogonadal Men," J. Clin. Endocrinol. Metab., vol. 48, No. 6, pp. 955-958 (1979).

Ernst, S., et al., "Stereochemistry of Geometric Isomers of Clomiphene: A Correction of the Literature and a Reexamination of Structure-Activity Relationships," J. Pharmaceut. Sci., vol. 65, pp. 148-150 (1976).

Feldman, H., et al., "Age Trends in the Level of Serum Testosterone and Other Hormones in Middle-Aged Men: Longitudinal Results form the Massachusetts Male Aging Study," J Clin Endocrinol Metab. 87(2), pp. 589-598 (2002).

Fuse, H., et al., "Changes in Seminal Plasma Transferring Concentration Following Administration of Clomiphene Citrate," Archives of Andrology, vol. 31, pp. 139-145 (1993).

Guay, A., et al., "Effect of Raising Endogenous Testosterone Levels in Impotent Men with Secondary Hypogonadism: Double Blind Placebo-Controlled Trial with Clomiphene Citrate," Journal of Clinical Endocrinology and Metabolism, vol. 80, No. 12, pp. 3546-3552 (1995).

Guay, A., et al., "Possible Hypothalamic Impotence," Urology, vol. 38, No. 4, pp. 317-322 (1991).

Guay A., et al., "Results of Double Blinded Treatment With Clomiphene Citrate in Patients With Hypogoadotropic Hypogonadism," Annual Meeting of the Endocrine Society, Abstract No. 386, (Jun. 1993).

Hirshkowitz, M., et al., "Androgen and Sleep-Related Erections," J. Psychosomatic Research, vol. 42, No. 6, pp. 541-546 (1997).

Homonnai, Z., et al., "Clomiphene Citrate Treatment in Oligozoospermia: Comparison Between Two Regimens of Low-Dose Treatment," Fertility and Sterility., vol. 60, No. 5, pp. 801-804 (1988).

Jarow, J., "Nonsurgical Treatment of Male Infertility: Empiric Therapy," Therapy, Chapter 23, pp. 410-422, (date of Publication Not Available).

Kharenko, A., et al., "Controlled Release From Oral Formulations Based on Interpolymeric Polymethacrylic Acid—Polyethylene Glycol Complex," Proceed. Intern. Symp. Control Rel. Bioact. Mater., vol. 22, pp. 232-233 (1995).

Matsumoto, A., et al., "Human Chorionic Gonadotropin and Testicular Function: Stimulation of Testosterone, Testosterone Precursors, and Sperm Production Despite High Estradiol Levels," Journal of Clinical Endocrinol. and Metab. vol. 56, No. 4, pp. 720-728 (1983).

Merck Index, 13th Ed., Entry 2410, p. 417 (2001).

Meshali, M., et al., "Effect of Interpolymer Complex Formation of Chitosan With Pectin or Acaxia on the Release Behaviour of Chlorpromazine HC1" Int. J. Phar., vol. 89, pp. 177-181 (1993).

Morales, A., et al., "Andropause: A Misnomer for a True Clinical Entity," J. Urol., vol. 163, No. 3, pp. 705-712 (Mar. 2000) Abstract.

Purvis, K., et al., "Stability of Sperm Characteristics in Men with Disturbances in Sperm Quality," Int. Journal Androl., 12, pp. 171-178 (1989).

Soderguard, R., et al., "Calculation of Free and Bound Fractions of Testosterone and Estradiol-17β to Human Plasma Proteins at Body Temperature," J. Steroid Biochem, vol. 16, pp. 801-810 (1982).

Sternbach, et al., "Age-associated Testosterone Decline in Men: Clinical Issues for Psychiatry," Am. J. Psychiatry, vol. 155, No. 10, pp. 1310-1318 (1998) Abstract.

Suzuki, et al., "Endocrine Environment of Benign Prostatic Hyperplasia: Prostate Size and Volume are Correlated with Serum Estrogen Concentration," Scand. J. Urol. Nephrol., vol. 29, No. 1, pp. 65-68 (1995) Abstract.

Tenover, J., et al., "Serum Bioactive and Immunoreactive Follicle-stimulating Hormone Levels and the Response to Clomiphene in Healthy Young and Elderly Men," Journal Clinical Endocrinol. And Metab., vol. 64, No. 6, pp. 1103-1108 (1987).

Tenover, J., et al., "The Effects of Aging in Normal Men on Bioavailable Testosterone and Luteinizing Hormone Secretion: Response to Clomiphene Citrate," Journal Clinical Endocrinol. Metab. , vol. 65, No. 6, pp. 1118-1126 (1987).

U.S. Pharmacopeia, United States Phamacopeia, 26th Ed., pp. 484-485 (2003).

Chakraborty, P. et al., "Effects of Long-Term Treatment With Estradiol or Clomiphene Citrate on Bone Maintenace, and Pituitary and Uterine Weights in Ovariectomized Rats," J. Steroid Biochem. Molec. Biol., vol. 40, No. 4-6, pp. 725-729 (1991).

Fitzpatrick, S., et al., "Effect of Estrogen Agonists and Antagonists on Induction of Progesterone Receptor in a Rat Hypothalamic Cell Line," Endocrinology, vol. 140, No. 9, pp. 3928-3937 (1999).

Haskell, S., "Selective Estrogen Receptor Modulators," Southern Medical Journal, vol. 96, No. 5, pp. 469-476 (2003).

Jimenez, M., et al., "Clomiphene Prevents Cancellous Bone Loss from Tibia of Ovariectomized Rats," vol. 138, No. 5, pp. 1794-1800 (1997).

Turner, R., et al., "Differential Responses of Estrogen Target Tissues in Rats Including Bone to Clomiphene, Enclomiphene, and Zuclomiphene," vol. 139, No. 9, pp. 3712-3720 (1998).

Young, R., et al., "A Short-Term Comparison of the Effects of Clomiphene Citrate and Conjugated Equine Estrogen in Menopausal/Castrate Women," Int. J. Fertil., vol. 36, No. 3, pp. 167-171 (1991).

Young, R., et al., "Qualitative Differences in Estrogenic/Antiestrogenic Effects of Clomiphene and Zuclomiphene," Int. J. Fertil., vol. 36, No. 5, pp. 291-295 (1991).

Medical Information of Henan Province, "Report on 42 Cases of Treating Male Sterility with Clomiphene," vol. 2, No. 2 (Feb. 2001) (Translation).

Anonymous: "Zonagen Presents Data for Androxal in the Treatment of Hypogonadal Men and Data for Progenta as a Potential New Approach in the Treatment of Breast Cancer," News Release, The Healthcare Sales & Marketing Network, XP-002352050, Sep. 2, 2 2004.

Jiann, B., et al., "Effect of Clomiphene on Ca$^{2+}$ Movement in Human Prostate Cancer Cells," Life Sciences, vol. 70, No. 26, pp. 3167-3178 (May 2002).

PCT International Search Report of PCT/US2005/02500 dated Nov. 24, 2005.

PCT Written Opinion of PCT/US02/21524 dated Nov. 25, 2005.

Shida, K., et al., "Medical Treatment of Neoplasm with Steroids and Antisteroids," Chemical Abstracts Service, XP-002352053, May 12, 1984.

Singh, S., et al., "Changes in Fructose & Citric Acid in Accessory Glands of Reproduction of Rats Following Long-Term Treatment With Isomers of Clomiphene Citrate," Indian Journal of Experimental Biology, vol. 11, pp. 23-26 (Jan. 1973).

Wiehle, R.D., et al., Androxal™ (oral enclomiphene citrate) Raises Free and Total Serum Testosterone in Hypogonadal Men: Comparison with Androgel 1%® Fertility and Sterility, vol. 82. pp. 2004-2009. (2004).

Chang, C-F, et al., "Stimulation of Ovulation in Ayu, Plecoglossus-Altivelis, by Treatment with Antiestrogens and Luteinizing Hormone-Releasing Hormone Analog," Aquaculture, vol. 101, Nos. 3-4, pp. 329-336 (1992).

PCT Written Opinion of PCT/US06/30053 dated Dec. 22, 2006.

Petak, S., et al., American Association of Clinical Endocrinologists Medical Guidelines for Clinical Zpractice for the Evaulationand Treatment of Hypogonadism in Adult Male Patients, Endocrine Practice, vol. 8, pp. 439-456 (2002).

Ronnberg, "The Effect of Clomiphene Treatment on Different Sperm Parameters in Men with Idiopathic Oligozoospermia," Andrologia, vol. 12, No. 1, pp. 261-265 (1980).

US 7,759,360 B2

Page 3

Schultheiss, D., et al., "Testosterone Therapy in the Ageing Male: What About the Prostate?" Andrologia, vol. 36, No. 6, pp. 357-365 (2004).

Schweikert, et al., "Effects of Estrogen Deprivation on Human Benign Prostatic Hyperplasia," Steroid Biochem Mol Biol., vol. 44, No. 4-6, pp. 573-576 (1993).

Written Opinion of Singapore Patent Applc. 2007-05640-1 dated Aug. 13, 2008.

Stahl, F., et al., "Effects of Tamoxifen on the Levels of luteinizing Hormone (LH), Follicle Stimulating Hormone FSH), Prolactin (PRL), 17 beta-oestradiol (E2), and free dihydrotestosterone (DHT) in blood of patients with Benign Prostatic Hyperplasia," US National Library of Medicine, Bethesda, MD, US, vol. 82, No. 1, pp. 21-28 (1983).

Sterochemistry of Geometric Isomers of Clomiphene: A Correction of the Literature and A Reexamination of Structure-Activity Relationships, Journal of Pharmaceutical Science, vol. 65, No., pp. 184-150 (176) XP009056304.

Stedman's Medical Dictionary, William and Wilking, pp. 1312, 1439 & 1798-1799 (1995).

Tenover, J., et al., J Clin. Endocrine. Metabol., vol. 75, pp. 1092-1098 (1992).

Tenover, J., et al., "Male Hormone Replacement Therapy Including Andropause," Endocrinology and Metabolism Clinics of North America, W.B. Saunders Company, Philadelphia, US, Dec. 1998, vol. 27, No. 4, pp. 969-987 XP008019800.

U.S. Appl. No. 10/427,768 Examiner's Interview Summary Record dated Nov. 19, 2007.

U.S. Appl. No. 10/427,768 Final office action dated Apr. 6, 2006.

U.S. Appl. No. 10/427,768 Non-final office action dated May 29, 2007.

U.S. Appl. No. 10/427,768 Non-final office action dated Oct. 12, 2005.

U.S. Appl. No. 10/427,768 Notice of Allowance and Examiner's Amendment dated Dec. 27, 2007.

U.S. Appl. No. 10/427,768 Restriction Requirement dated May 23, 2005

U.S. Appl. No. 10/712,546 Non-final office action dated Mar. 15, 2006.

U.S. Appl. No. 10/712,546 Notice of Allowance dated Sep. 29, 2006.

U.S. Appl. No. 10/712,546 Restriction Requirement dated Nov. 10, 2005.

U.S. Appl. No. 11/570,190 Restriction Requirement dated Mar. 27, 2009.

U.S. Appl. No. 90/008,024 Non-final office action dated Nov. 1, 2006.

U.S. Appl. No. 90/008,024 Examiner Interview Summary Record dated Dec. 13, 2006.

U.S. Appl. No. 90/008,024 Non-final office action dated Jan. 29, 2007.

U.S. Appl. No. 90/008,024 Final office action dated Jun. 22, 2007.

U.S. Appl. No. 90/008,024 Examiner Interview Summary Record dated Jul. 25, 2007.

U.S. Appl. No. 90/008,024 Final office action dated Nov. 16, 2007.

U.S. Appl. No. 90/008,024 Advisory Action dated Feb. 1, 2008.

U.S. Appl. No. 90/008,024 Advisory Action dated Mar. 5, 2008.

U.S. Appl. No. 90/008,024 Examiner's Answer dated Jun. 12, 2008.

U.S. Appl. No. 90/006,921 Non-final office action dated Sep. 9, 2004.

U.S. Appl. No. 90/006,921 Examiner's Interview Summary dated Oct. 20, 2004.

U.S. Appl. No. 90/006,921 Final office action dated Feb. 23, 2005.

U.S. Appl. No. 90/006,921 Petition Decision dated May 25, 2005.

U.S. Appl. No. 90/006,921 Non-final office action dated Jun. 27, 2005.

ACCE Clinical Practice Guidelines for the Evaluation and Treatment of Hypogonadism in Adult Male Patients (1996).

Agarwal, et al., "Male Sexual Dysfunction After Stroke," J Assoc. Physicians India, vol. 37, No. 8, pp. 505-507 (1989).

Barg, P., et al., "Male Factor: Clinical Evaluation of the Semen Analysis," Infert. Reprod. Med. Clin. North Amer., vol. 2, pp. 333-340 (1991).

Bartsch, G., "The Effect of Antiestrogen, Antiandrogen, and the Prolactin Inhibitor 2 Bromo-'alpha!-ergocriptine on the Stromal Tissue of Human Benign Prostatic Hyperplasia. Correlation of Sterological Data and Plasma Hormones," Database Embase; Elsevier Science Publishers, Amsterdam, NL, 1981, vol. 18, No. 4, pp. 308-312.

Bhasin, S., et al., J. Clin Endocrin, Metabol., vol. 91, pp. 1995-2010 (2006).

Brody, J., "Sperm Found Especially Vulnerable to Environment," The New York Times, Mar. 10, 1981.

Broulik, P.D., "Tamoxifen Prevents Bone Loss in Castrated Male Mice," Hormone and Metabolic Research, Thieme-Stratton, Stuttgart, DE, vol. 32, No. 5, pp. 181-184 (2000) XP009041862.

Burghardt, et al., "Gap Junction Modulation in Rat Uterus. III. Structure-Activity Relationships of Estrogen Receptor-Binding Ligands on Myometrial and Serosal Cells," Biol. Reprod. vol. 36, No. 3, pp. 741-751 (1977).

Drew, A., "Letter: Possible Teratogenic Effect of Clomiphene," Developmental Medicine and Child Neurology, vol. 16, No. 2, pp. 276 (1974).

Editions Du Vidal Ed—Editions Du Vidal: Vidal 1997; Dictionnaire Vidal 1997, Paris, FR, p. 1161 XP002150196.

Elanjian, Sona I., "Clomiphene for Male Infertility," Journal of Pharmacy Technology, vol. 12, No. 3, pp. 102-104 (1996).

Eil, "Ketoconazole Binds to the Human Androgen Receptor," Horm Metab Res., vol. 24, No. 8, pp. 367-370 (1992).

EP Supplementary Search Report of EP 02748104 dated Jun. 24, 2005.

EP Supplementary Search Report of EP 06720243 dated Aug. 6, 2008.

EP Supplementary Search Report of EP 06738985 dated Aug. 15, 2008.

EP Supplementary Search Report of EP 06800648 dated Jul. 21, 2008.

Epstein, "Clomiphene Treatment in Oligospermic Infertile Males," Fertility and Sterility, vol. 28, No. 7, pp. 741-745 (1977).

Excerpt on www.medscape.com from Drug Ther. Perspect., vol. 10, pp. 1-5 (1997).

Garg, Abhimanyu, "Medical progress: Acquired and Inherited Lipodystrophies," New England Journal of Medicine, vol. 35, No. 12, pp. 1231-1232 (2004).

Glasier, A., et al., "A Comparison of the Effects on Follicular Development Between Clomiphene Citrate its Two Separate Isomers and Spontaneous Cycles," Human Reproduction, vol. 4, No. 3, pp. 252-256 (1989).

Guay, A., et al., Internetatl. J. Ompot. Res., vol. 15, pp. 156-165 (2003).

Guzick, D., et al., "Sperm Morphology, Motility and Concentration in Fertile and Infertile Men," N. Engl. J. Med., vol. 345, pp. 1388-1393 (2001).

Hanus, M. et al. "Antiestrogens (Tamoxifen) in the Alternative Therapy of Benign Prostatic Hyperplasial," US National Library of Medicine, Bethesda, MD, Database Medline, vol. 72, No. 7, pp. 316-318 (1993).

Herzog, A. G., "Reproductive Endocrine Considerations and Hormonal Therapy for Men with Epilepsy," Epilepsia, Raven Press Ltd., New York, US (1991), vol. 32, No. Suppl. 6, pp. S34-S37.

International Preliminary Examination Report of PCT/US02/21524 dated Mar. 3, 2006.

International Preliminary Report on Patentability of PCT/US05/02500 dated Jan. 16, 2007.

International Preliminary Report on Patentability of PCT/US06/003882 dated Aug. 7, 2007.

International Preliminary Report on Patentability of PCT/US06/030053 dated Feb. 5, 2008.

International Preliminary Report on Patentability of PCT/US06/10022 dated Sep. 25, 2007.

International Search Report of PCT/US08/057433 dated Dec. 19, 2008.

International Search Report of PCT/US02/21524 dated Jun. 18, 2003.

International Search Report of PCT/US06/003882 dated Aug. 14, 2006.

International Search Report of PCT/US06/10022 dated Jan. 10, 2007.

A85

## US 7,759,360 B2
### Page 4

International Search Report of PCT/US06/30053 dated Dec. 22, 2006.

Jones, T. Hugh., "Testosterone Associations with Erectile Dysfunction, Diabetes, and the Metabolic Syndrome," European Urology Supplements, vol. 6, pp. 847-857 (2007).

Kadioglu, et al., Treatment of Idiopathic and Postvaricocelectomy Oligozoospermia with Oral Tamoxifen Citrate, BJU Int., vol. 83, No. 6, pp. 646-648 (1994).

Ke, H. Zhu, et al., "Lasofoxifene (CP-336,156), A Selective Estrogen Receptor Modulator, Prevents Bone Loss Induced by Aging and Orchidectomy in the Adult Rat," Endocrinology, vol. 141, No. 4, pp. 1338-1344 (2000) XP001170303.

Kidd, S., et al., "Effects of male age on semen quality and fertility: A review of the literature," Fertility and Sterility, vol. 75, pp. 237-248 (2001).

Kotoulas, et al., "Tamoxifen Treatment in Male Infertility. I. Effect on spermatozoa," Fertil. Steril., vol. 61, No. 5, pp. 911-914 (1994).

Lewis, B., et al., "Medical Implication of the Biological Clock," JAMA, vol. 296, pp. 2369-2371 (2006).

Lim, V., et al., "Restoration of Plasma Testosterone Levels in Uremic Men with Clomiphene Citrate," Journal of Clinical Endocrinology and Metabolism, New York, US vol. 43, No. 6, pp. 1370-1377 (1976) XP 009041861.

Lund, et al., "Testosterone and Andropause: The Feasibility of Testosterone Replacement Therapy in Elderly Men," Pharmacotherapy, vol. 19, No. 8, pp. 951-956 (1999).

Macleod, J., et al., J. Urology, vol. 66, pp. 436-449 (1951).

McKinlay, et al., "The Questionable Physiologic and Epidemiologic Basis for a Male Climacteric Syndrome: Preliminary Results from the Massachusetts Male Aging Study," Maturitas, vol. 11, No. 2, pp. 103-115 (1989).

Parini, et al., "Importance of Estrogen Receptors in Hepatic LDL Receptor Regulation," Ateriosclerosis, Thrombosis, and Vascular Biology, vol. 17, pp. 1800-1805 (1997).

PCT Written Opinion of PCT/US05/02500 dated Sep. 14, 2006.

PCT Written Opinion of PCT/US06/003882 dated Aug. 4, 2007.

PCT Written Opinion of PCT/US06/030053 dated Feb. 5, 2008.

PCT Written Opinion of PCT/US06/10022 dated Jan. 10, 2007.

Elanjian, Sona I., "Clomiphene for Male Infertility," Journal of Pharmacy Technology, vol. 12, No. 3, pp. 102-104 (1996).

Epstein, "Clomiphene Treatment in Oligospermic Infertile Males," Fertility and Sterility, vol. 28, No. 7, pp. 741-745 (1977).

Garg, Abhimanyu, "Medical progress: Acquired and Inherited Lipodystrophies," New England Journal of Medicine, vol. 35, No. 12, pp. 1231-1232 (2004).

Hayashi, Norio, et al., Hinyokika Kiyo (Acta Urologica Japonica), vol. 34, No. 5, pp. 847-850 (1988) with English translation.

Schultheiss, D., et al., "Testosterone Therapy in the Ageing Male: What About the Prostate?" Andrologia, vol. 36, No. 6, pp. 357-365 (2004).

Shirai, Takashi, et al., Saishin-Igaku (Latest Medical Science), vol. 45, No. 11, pp. 2250-2254 (1990) with English translation.

Sterochemistry of Geometric Isomers of Clomiphene: A Correction of the Literature and a Reexamination of Structure-Activity Relationships, Journal of Pharmaceutical Science, vol. 65, No., pp. 184-150 (176) XP009056304 .

Takihara, Hiroshi, Jin to Toseki (Kidney and Dialysis) vol. 41, Special Edition, pp. 759-761 (1996) with English translation.

Weissenberg, R., et al., "The Effect of Clomiphene Citrate and is Zu or En isomers on the Reproductive System of the Immatuyre Male Rate," Andrologia, vol. 24, pp. 161-165 (19992).

Written Opinion of Singapore Patent Applc. 2007-05640-1 dated Jul. 9, 2008.

U.S. Appl. No. 11/750,190 Non-final office action dated Aug. 11, 2009.

U.S. Appl. No. 11/750,190 Notice of Allowance dated Jan. 8, 2010.

U.S. Appl. No. 11/571,150 Restriction Requirement dated Aug. 31, 2009.

U.S. Appl. No. 11/571,150 Non-final office action dated Oct. 14, 2009.

U.S. Appl. No. 11/997,858 Restriction Requirement dated Aug. 28, 2009.

U.S. Appl. No. 11/815,542 Restriction Requirement dated Aug. 31, 2009.

U.S. Appl. No. 11/815,542 Non-final office action dated Oct. 15, 2009.

Banner, A., et al., "Emerging Role of Corticosteroids in Chronic Obstructive Pulmonary Disease," The Lancet, vol. 354, pp. 440-441 (Aug. 7, 1999).

Casaburi, R., et al., "Effects of Testosterone and Resistance Training in Men with Chronic Obstructive Pulmonary Disease," American Journal of Respiratory and Critical Care Medicine, vol. 170, pp. 870-878 (2004).

Debigare, R., et al., "Peripheral Muscle Wasting in Chronic Obstructive Pulmonary Disease," American Journal of Respiratory and Critical Care Medicine, vol. 164, pp. 1712-1717 (2001).

International Search Report of PCT/US09/063621 dated Dec. 28, 2009.

Laghi, F., et al., "Respiratory and Skeletal Muscles in Hypogonadal Men with Chronic Obstructive Pulmonary Disease," American Journal of Respiratory and Critical Care Medicine, vol. 171, pp. 598-605 (2005).

PCT Written Opinion of PCT/US08/075433 dated Dec. 19, 2008.

PCT Written Opinion of PCT/US09/063621 dated Dec. 28, 2009.

Shanis, et al., Arch. Androl., vol. 21, pp. 109 (1991).

Sokel, Fertil and Steril, vol. 49, pp. 865 (1988).

Steiner, et al., "Antiestrogens and Selective Estrogen Receptor Modulators Reduce Prostte Cancer Risk," World J Urol., vol. 21, pp. 31-36 (2003).

* cited by examiner

**FIG. 1**

**Normal Secretory Total Serum Testosterone Profiles in Healthy Young and Older Men**



**FIG. 2**



$(C_2H_5)_2NCH_2CH_2O$ — [structure] — $C_6H_8O_7$

FIG. 3



US 7,759,360 B2

**1**

## METHODS AND MATERIALS FOR THE TREATMENT OF TESTOSTERONE DEFICIENCY IN MEN

This application claims the benefit, under 35 U.S.C. §119 (e), of U.S. Provisional Patent Application No. 60/304,313, filed on Jul. 9, 2001.

### FIELD OF THE INVENTION

The present invention relates to the compositions and methods for increasing testosterone levels. More specifically, the present invention relates to a composition comprising clomiphene enriched for trans-clomiphene. The present invention also relates to the use of a composition comprising clomiphene enriched for trans-clomiphene reagents for increasing testosterone levels.

### BACKGROUND

Testosterone is the primary male androgen, playing a vital role in overall male health. Testosterone is essential to the development and maintenance of specific reproductive tissues (testes, prostate, epididymis, seminal vesicle, and penis) and male secondary sex characteristics. It plays a key role in libido and erectile function and is necessary for the initiation and maintenance of spermatogenesis. Testosterone also has important functions not related to reproductive tissues. For example, it positively affects body composition by increasing nitrogen retention, which supports lean body mass, muscle size and strength. If also acts on bone to stimulate bone formation.

Testosterone secretion is the end product of a series of hormonal processes. Gonadotropin-releasing hormone (GnRH), which is secreted in the hypothalamus, controls the pulsatile secretion of luteinizing hormone (LH) and follicle stimulating hormone (FSH), which are secreted by the anterior pituitary. LH, in turn, regulates the production and secretion of testosterone in the Leydig cells of the testes, while FSH assists in inducing spermatogenesis.

Testosterone is most often measured as "total testosterone." This measurement includes testosterone that is bound to sex hormone-binding globulin (SHBG) (~44%) and is therefore not bioavailable and testosterone which either is free (~2%) or loosely bound to other proteins (non-SHBG-bound) (~54%).

Results from a WHO study indicate that testosterone is normally secreted in a circadian rhythm, with higher levels in the morning and nadir levels occurring around 8 to 10 p.m. See FIG. **1**. This variation in testosterone secretion throughout the day becomes much less pronounced in older men (mean age equals 71 years). The importance of this rhythm is not known at this time.

Samples were obtained from both young and elderly patients every 10 minutes for 24 hours via an indwelling cannula. According to Tenover (1987) the mean 24 hr total serum testosterone levels in healthy young men (age range 22 yrs.-35 yrs. mean 27.3 yrs) was 4.9±0.3 (±SEM) mg/ml (17.0 nmol/L) while older men (age range 65 yrs-84 yrs. mean 70.7 yrs.) had a significantly lower mean 24 hrs. total serum testosterone level of 4.1±0.4 mg/ml. (P<0.5; 14.2 nmol/L).

Total serum testosterone levels obtained from single random samples were also significantly lower in older men (4.0±0.2 mg/ml [13.9 n nmol/L]) as compared to 4.8±0.2 mg/ml [16.6 nmol/L] in healthy young men.

Testosterone deficiency can result from underlying disease or genetic disorders and is also frequently a complication of

**2**

aging. For example, primary hypogonadism results from primary testicular failure. In this situation, testosterone levels are low and levels of pituitary gonadotropins (LH and FSH) are elevated. Secondary hypogonadism is due to inadequate secretion of the pituitary gonadotropins. In addition to a low testosterone level, LH and FSH levels are low or low-normal. Some of the sequelae of adult testosterone deficiency include a wide variety of symptoms including: loss of libido, erectile dysfunction, oligospermia or azoospermia, absence or regression of secondary sexual characteristics, progressive decrease in muscle mass, fatigue, depressed mood and increased risk of osteoporosis.

Several forms of testosterone therapy exists in the United States today. Recently, transdermal preparations have gained favor in the market. However, a scrotal testosterone patch results in supraphysiologic levels of 5α-dihydrotestosterone (DHT) due to the high concentration of 5α-reductase in scrotal skin. It is not known whether these elevated DHT levels have any long-term health consequences. Nonscrotal systems are considered more convenient and most patients achieve average serum concentrations within the normal range and have normal levels of DHT. Oral testosterone therapy is not recommended because doses required for replacement therapy are associated with significant risk of hepatotoxicity.

### SUMMARY

The present invention is directed to compositions useful for increasing testosterone levels in male mammals and for ameliorating or preventing the sequelae of low testosterone levels. In one of its aspects the invention is directed to compositions having active ingredients comprising 0% or 29% weight/weight of (cis, -Z-, trans-clomiphene) (hereinafter "cis-clomiphene") and 100% to 71% w/w (trans-, -E-, cis-clomiphene) (hereinafter "trans-clomiphene") or pharmaceutically acceptable salts thereof. Among the preferred compositions of the present invention which contain both cis-clomiphene and trans-clomiphene are compositions wherein the ratio of trans-clomiphene and cis-clomiphene is greater than 71/29. A more preferred composition according to the present invention comprises about 100% w/w of active ingredients of trans-clomiphene or a pharmaceutically acceptable salt thereof. All compositions of the present invention may further comprise suitable pharmaceutical excipients diluents, carriers, and the like. Analogs of cis-clomiphene and trans-clomiphene are also contemplated for use in all aspects of the present invention.

The present invention is also directed to methods for increasing serum testosterone levels in hypogonadal male mammals (and for ameliorating or preventing the sequelae of low testosterone levels), the method comprising administering to a subject male an effective amount of a composition according to the present invention, the compositions having active ingredients comprising 0% to 29% weight/weight of cis-clomiphene and 100% to 71% w/w trans-clomiphene including any of their pharmaceutically acceptable salts thereof. Among the preferred methods are those in which the administered compositions contain both isomers wherein the ratio of trans-clomiphene to cis-clomiphene is greater than 71/29. A more preferred method comprises administering to the male a composition comprising about 100% w/w of trans-clomiphene.

US 7,759,360 B2

**3**

### BRIEF DESCRIPTION OF THE DRAWING

FIG. **1** is a graphic representative of the normal secretory total serum testosterone profiles in healthy men (young and old).

FIG. **2** shows the chemical structure of clomiphene citrate.

FIG. **3** is a graphic demonstration of the time course of serum testosterone levels with Clomid, Enclomid and Zuclomid.

### DETAILED DESCRIPTION

The present invention provides methods and compositions useful for increasing testosterone levels in male mammals and for ameliorating or preventing the sequelae of low testosterone levels including but not limited to those described above.

Clomiphene (FIG. **2**) is an antiestrogen related to tamoxifen that blocks the normal estrogen feedback on the hypothalamus and subsequent negative feedback on the pituitary. This leads to increases in luteinizing hormone (LH) and follicle stimulating hormone (FSH). In men, these increased levels of gonadotropins stimulate the Leydig cells of the testes and result in the production of higher testosterone levels. Clomiphene citrate has the following structure:

Ernst et al., J. Pharmaceut. Sci. 65:148 (1976), have shown that clomiphene is a mixture of two geometric isomers which they refer to as cis,-Z-, clomiphene (cis-clomiphene or zuclomiphene) and trans-,E-, clomiphene, (trans-clomiphene or enclomiphene). According to Ernst, et al. trans-clomiphene HCI has a melting point of 149° C.-150.5° C., while cis-clomiphene HCI has a melting point of 156.5° C.-158° C.

Ernst et al. have also noted that (the trans-isomer) is anti-estrogenic (AE) while the cis-isomer is the more potent and more estrogenic form and has also been reported to have anti-estrogenic activity. The authors attribute the effect of the drug on ovulatory activity to both forms stating that the mixture is more effective than trans-clomiphene alone. The trans-isomer aids ovulation at the level of the hypothalamus. The estrogenic isomer cis-clomiphene contributes to enhanced ovulation elsewhere in the physiologic pathway leading to ovulation. The isomers are also reported to have different in vivo half-life. Furthermore the cis form has been reported to leave residual blood levels for in excess of one month following a single dose.

Vandekerckhove, et al. (Cochrane Database Syst Rev 2000; (2):CD000151 (2000)) noted that ten studies involving 738 men have suggested that anti-estrogens appear to have a beneficial effect on endocrinal outcomes, i.e. testosterone, but there is not enough evidence to evaluate fertility effects. Nevertheless should clomiphene administration enhance testosterone levels then one could easily conclude that the drug should positively impact the side effects of testosterone deprivation as long as the testes still retain the ability to respond to gonadotropin stimulation.

Clomiphene is currently approved as a mixture of both cis- and trans-isomers, the cis-isomer being present as about 30% to 50% (Merck Manual) for fertility enhancement in the anovulatory patient. Clomiphene improves ovulation by initiating a series of endocrine events culminating in a preovulatory gonadotropin surge and subsequent follicular rupture. The drug is recommended to be administered for 5 days at a dose of up to 100 mg daily. Clomiphene has also been associated with numerous side effects including: blurred vision, abdominal discomfort, gynecomastia, testicular tumors, vasomotor flushes, nausea, and headaches. Furthermore, other studies suggest that clomiphene possesses both genotoxic and tumor

**4**

enhancement effects. The net outcome of these observations is that clomiphene in its current format, having between 30% and 50% of the cis isomer, would be unacceptable for chronic therapy in men for the treatment of testosterone deficiency.

Clomiphene has also been used for therapeutic intervention in men with low testosterone levels. Tenover et al., J. Clin. Endocrinol. Metab. 64:1103, (1987) and Tenover et al., J. Clin. Endocrinol. Metab. 64:1118 (1987) found increased in FSH, LH in both young and old men after treatment with clomiphene. They also found increases in free and total testosterone in men with young men showing significant increases

Studies were also conducted to determine whether or not clomiphene could be used to improve fertility in men by improving semen quality. Homonnai et al. Fertil. and Steril 50:801 (1988) saw increases in sperm concentration and count but others have not. (See e.g., Sokel, et al., Fertil. and Steril. 49:865 (1988); Check, et al., Int. J. Fertil. 34:120 (1989); Purvis, et al., Int. J. Androl 21:109 (1989); and Breznik, Arch. Androl. 21:109 (1993).) One group saw a deterioration in the percentage of normal sperm with long-term treatment. Shamis, et al., Arch. Androl 21:109 (1991). A WHO study showed no changes in semen quality or fertility after 6 months of treatment (Anonymous Androl. 15:299 (1992).) A meta-analysis seems to confirm that testosterone levels go up in men with poor quality sperm but not fertility. (Vanderkerckhove, et al., 2000). Studies have also suggested that long term treatment with clomiphene does not seem to have a drastic deleterious effect on health, although it did show that treatment resulted in poorer sperm quality after 4 months. Studies have kept men on clomiphene for as long as 18 months and at levels of 25 mg per day or 100 mg every other day.

In 1991, Guay et al (Urology 38:377 (1991)) suggested that clomiphene could treat sexual dysfunction in men. Their hypothesis seems to be that sexual function follows testosterone levels. This was supported by early studies showing positive influence of androgens and sexual function, Davidson, et al., J. Clin. Endocrinol. Metab. 48:955 (1979), and studies that rated sleep-related erections as a strong response to T, Cunningham, et al., J. Clin. Endocrinol. Metab. 70:792 (1990). However, in 1995, Guay et al. (Gray, et al., J. Clin. Endocrinol. Metab. 80:3546 (1995)) published a study in which they saw increase in LH, FSH, and testosterone after 2 months of clomiphene but no effects on erectile dysfunction. There might be some advantage for young men and specific groups of older men, but it seems that just raising the testosterone level is not enough. Effects of testosterone on sleep-related erections may have been taken too seriously (Herskowitz, et al., J. Psychosomat. Res. 42:541 (1997)).

According to the present invention, a composition comprising of one isomer preferably trans-clomiphene or a predefined blend of the isomers of clomiphene as described below differing from the normally produced mixture are used to enhance testosterone levels while reducing the side effects of the drug. Thus, the present invention provides an oral therapy for increasing testosterone levels, which lacks or has diminished side effects connected with the existing clomiphene formulations.

In one embodiment of the present invention, a patient who has a need or desire to increase their serum testosterone levels are administered one or more dosages of an effective amount of composition comprising trans-clomiphene at a dosage between 1 mg to about 200 mg (although the determination of optimal dosages is within the level of ordinary skill in the art). Cis-clomiphene may also be present in the composition so long as the ratio of trans-clomiphene to cis-clomiphene is

US 7,759,360 B2

5

greater than 71/29. Analogs of the trans- and cis- isomers of clomiphene such as those described in Ernst el al., supra are also useful in the practice of the present invention.

Dosages are preferably (but not necessarily) administered as part of a dosage regimen designed to give rise to serum testosterone levels that mimic or correspond to the normal secretary total serum testosterone profile described in FIG. 1. For example, according to FIG. 1 a dosage of the preferred composition may be administered in a pharmaceutical formulation that would give rise to peak serum testosterone levels at around 8 a.m. Such pharmaceutical formulations may be in the form of sustained release formulations prepared as described for example in U.S. Pat. No. 6,221,399, Japanese patent 4-312522, Meshali et al, Int. J. Phar. 89:177-181 (1993), Kharenko et al, Intern. Symp. Control Rel. Bioact. Mater. 22:232-233 (1995), WO 95/35093, Dangprasit et al, Drug. Devel. and Incl. Pharm. 21 (20):2323-2337 (1995); U.S. Pat. Nos. 6,143,353, 6,190,591, 6,096,338, 6,129,933, 6,126,969, 6,248,363 and other sustained release formulations well known in the art.

Suitable pharmaceutical compositions or unit dosage form may be in the form of solids, such as tablets or filled capsules or liquids such as solutions suspensions, emulsions, elixirs or capsules filled with the same, all for oral use. The compositions may also be in the form of sterile injectable solutions or emulsions for parenteral (including subcutaneous) use. Such pharmaceutical compositions and unit dosage forms thereof may comprise ingredients in conventional proportions.

Compositions according to the present invention may also be administered by the intravenous, subcutaneous, buccal, transmucosal, intrathecal, intradermal, intracisternal or other routes of administration. After administration of the composition serum testosterone levels may be measured as described above and dosages may be altered to achieve a sufficient increase in the serum testosterone levels to achieve the desired physiological results associated with normal testosterone described above.

6

All of the references discussed herein are incorporated by reference in their entirety.

The following Example is meant to be illustrative of the invention and is not intended to limit the scope of the invention as set out in the appended claims.

EXAMPLE 1

Effects of Clomids on Serum Testosterone in Male Baboons

Adult, male, Baboons were given 1.5 mg/kg of Clomid, Enclomid (trans-Clomid) or Zuclomid (cis-Clomid) for 12 consecutive days. The samples analyzed were sera taken on the day of first treatment before being given test article (day 0), after 12 days of treatment (day 12) and 7 days after the last treatment (end or wash-out).

1. Effects on Body Weight and Serum LH, FSH, PRL and Testosterone

There were significant increases in total serum testosterone in the group receiving Enclomid. See Table 1. There were no differences among groups in the baseline period or at day 0. There were also no differences among the three groups 7 days after treatment (the washout period). However, Enclomid produced higher levels of testosterone compared to Clomid and Zuclomid on day 6 ($p=0.03$ and $p=0.00002$ respectively) and compared to Zuclomid on day 12 ($p=0.047$). Zuclomid clearly did not raise serum testosterone to any extent. Compared to the animals receiving Enclomid, the animals receiving Clomid exhibited more variable total testosterone levels on day 6 and later as judged by their coefficients of variations. When we looked at the time course of the effects (FIG. 3), we determined that only Enclomid significantly and statistically raised total serum testosterone on days 6 and 12 compared with either baseline or day 0 values. Moreover, cessation of Enclomid treatment, resulted in a significant drop in the level of total serum testosterone between day 12 and day 18 (washout). This indicates that Enclomid is readily cleared from the circulation consistent with the metabolic clearance seen for Enclomid in humans. Enclomid was clearly better and more consistent than Clomid itself and Zuclomid was ineffective.

TABLE 1

| | | Serum Testosterone Levels (ng/dl) | | | | |
|---|---|---|---|---|---|---|
| Group | ID | baseline Dec. 3, 2001 | 0 day Dec. 7, 2001 | 6 days Dec. 13, 2001 | 12 days Dec. 20, 2001 | wash-out Dec. 26, 2001 |
| CLO | 7500 | 79.01 | 76.15 | 940.97 | 891.5 | 150.9 |
| | 9012 | 97.55 | 305.24 | 585.92 | 555.6 | 316.3 |
| | 9097 | 158.06 | 102.94 | 151.12 | 318.9 | 143.6 |
| | mean | 111.5 | 161.4 | 559.3 | 588.7 | 203.6 |
| | SD | 41.3 | 125.2 | 395.6 | 287.7 | 97.7 |
| ENCLO | 7223 | 64.57 | 74.96 | 1223.8 | 633.6 | 307.2 |
| | 8021 | 166.86 | 133.59 | 1128.2 | 1466 | 399.2 |
| | 8369 | 170.45 | 106.47 | 1081.1 | 1166 | 271 |
| | mean | 134.0 | 105.0 | 1144.4 | 1088.5 | 325.8 |
| | SD | 60.1 | 29.3 | 72.7 | 421.6 | 66.1 |
| ZUCLO | 7438 | 124.84 | 210.4 | 137.51 | 314.5 | 359.7 |
| | 8292 | 104.66 | 67.37 | 169.98 | 406.1 | 860.5 |
| | 10098 | 282.29 | 904.82 | 227.95 | 353.0 | 274.1 |
| | mean | 170.6 | 394.2 | 178.5 | 357.9 | 498.1 |
| | SD | 97.3 | 448.0 | 45.8 | 46.0 | 316.8 |
| | ANOVA | $p=0.61$ | $p=0.43$ | $p=0.007$ | $p=0.57$ | $p=0.256$ |
| | K-W | $p=0.56$ | $p=0.84$ | $p=0.051$ | $p=0.079$ | $p=0.252$ |

A92

US 7,759,360 B2

7

There were no changes in serum LH or FSH. The ratio of total serum testosterone to LH followed the same pattern as total serum testosterone, suggesting a lack of dependence (data not shown). There was also no change in body weight during the 12 day study. There was a decrease in serum prolactin (PRL) during the study in the group receiving Enclomid, suggesting an effect of antiestrogen that has been described in part (Ben-Jonathan and Hnasko, 2001) and expected on the basis of the fact that as men age, testosterone declines and Prolactin increase (Feldman et al., 2002).

2. Effects on Clinical Chemistry Parameters

The mean values for each parameter did not differ among the three groups for any test parameter at the beginning of the study as determined by ANOVA or by the Kruskal-Wallis test. All groups exhibited normal values at each parameter except for (1) serum sodium; a related calculated parameter, anionic gap, which were low for all nine baboons throughout the trial; (2) serum glucose; and (3) BUN which were high on day 0 for the group which would be treated with Enclomid. On day 12 of treatment and 7 days after treatment (washout), there were no differences among groups for any parameter except anionic gap that showed that the Clomid and Zuclomid groups had lower values than the Enclomid group. The values of serum sodium and anionic gap appear to be anomalies associated with this group of baboons.

There were substantive effects on the red blood cell population with Enclomid and Zuclomid and on hematocrit with Zuclomid. All the compounds lower the mean cell hemoglobin concentration (MCHC) either at day 0 or at the endpoint. With no change in mean cell hemoglobin (MCH) and an increase in the mean cell volume (MCV), the lowering of MCHC is predictable. Although testosterone might be expected to raise hematocrit, only Zuclomid treatment, which did not increase total serum testosterone, demonstrated a statistical difference. Clearly, men in a clinical trial that uses Zuclomid should be monitored for the characteristics of their red blood cell population. Enclomid would be predicted to have less of an effect.

There appears to be a clear effect of 12-day Enclomid treatment on platelets although the values found stayed within the normal range. One thing to consider here is the sexual dimorphism in platelet counts between male and female baboons (279 for males vs. 348 for females). This is likely to be due to hormones. Since the Enclomid group demonstrated increased testosterone, the lowering of the platelet count could be secondary to the change in testosterone in this group. Moreover, treatment with Enclomid pushed the platelet count to its normal male level from a day 0 level that was the high end of the normal range for this group. Enclomid would not necessarily predict a deleterious effect on platelets.

All the Clomids tested had effects on the white blood cell (WBC) population, the most striking was that of Enclomid on raising the counts of lymphocytes and eosinophiles. The effects are not as straightforward as they would seem to be. There appears to be a strong effect of Enclound on lowering the percent of granulocytes in the blood. The effects are very strong after the 7-day washout period when the values are decreased below the normal range. (This time course could reflect the relatively long time required to affect change the WBC population.) There is little sexual dimorphism in baboons with respect to the white blood cell populations, so the effects are more likely to be due to the compound itself than changes in testosterone. However, when we look at the calculated count of granulocytes using the WBC count, we find no differences in granulocyte count due to any compound. Concomitantly, it is the lymphocyte story that is the

8

most interesting. Both the count and percent lymphocytes in the population increase with Enclomid treatment. Whereas the mean values of percent lymphocytes remain in the normal range, given the trend for an increase in WBC count, the net effect is an increase in lymphocyte count with Enclomid. This eosinophil result is analogous. There is a clear implication for treating men who have low lymphocytes, such as men who are HIV-positive. Since Enclomid is unlikely to lower lymphocytes based on this result, a case could be made for its use in the population of men with AIDS. These individuals are often treated with agents that are intended to raise testosterone due to the wasting effects of disease. Low liver and kidney toxicity and favorable effects on cholesterol and lipids are also highly favored attributes for any medication intended for use HIV-positive men who are already compromised by their disease.

The increase in serum glucose with Clomid or Zuclomid was within the normal range. In the case of Enclomid where the mean serum glucose values were high on day 0, there were no increases with treatment. There was no evidence that Enclomid would have a deleterious effect on blood glucose.

No clearly adverse effects on liver function are apparent as judged by the enzymes AST and ALT. The trend in these values was a decrease with treatment. An increase in the level of enzymes in the serum would indicate liver damage. ALT/SGPT was out of range low at the end of the study for the Clomid group although the differences over the treatment period were not statistically significant. The changes with Enclomid and Zuclomid were within the normal range. AST is depressed in pregnancy; thus the action of an estrogen agonist such as Zuclomid in lowering the marginal AST level could be rationalized. Alkaline phosphatase (ALP) is also found in the liver and is elevated various disease states. The lowering of ALP argues further against hepatic damage. There were no changes in serum albumin, also a liver product. A strong suppression of serum albumin over an extended time period could contribute to free serum steroid hormone levels in humans although a more important role is played by sex hormone binding globulin. As a bottom line, none of the compounds could be linked to liver damage on the basis of the parameters assayed.

Osteoblastic activity and diseases of the bone are accompanied by high serum ALP values. ALP was not elevated following Zuclomid treatment and was decreased in value following Enclomid treatment. The trends would predict a more benign result for the use of Enclomid compared to Zuclomid.

Although BUN and BUN/creatinine were altered during the study in the Clomid and Enclomid groups, the lack of a definitive change in creatinine argues against renal dysfunction. A loss of glomerular filtration capacity would result in an increase in BUN. Decreased BUN occurs in humans due to poor nutrition (not likely in a controlled setting), or high fluid intake (presumably accompanied by edema). Also, despite an increase in total serum testosterone between day 0 and Day 12 with Enclomid, there were no differences between serum creatinine values, arguing against an increase in muscle mass over this short time interval.

Serum sodium levels were lower than reference values for all animals throughout the study. Serum carbon dioxide was higher than reference values on day 12 for the Clomid and Zuclomid groups. Serum anion gap was lower for all animals throughout the study, paralleling the sodium results. Enclomid raised this parameter towards normal values. The electrolyte imbalances detected in the test animals throughout all

US 7,759,360 B2

9 | 10

treatment periods remains elusive but might be part of the same fluid derangement phenomenon suggested by the BUN results.

Treatment with Enclomid tended to decrease serum cholesterol and Zuclomid tended to increase the same parameter although neither change reached statistical significance. Those changes were within the normal range although the trend for the two isomers to demonstrate opposite effects over a short period of time merits the further monitoring and might not be unexpected given that the isomers have, alternatively, estrogen agonist or antagonist activity. Enclomid might be expected to be more benign than Zuclomid with respect to serum cholesterol if used chronically.

The foregoing results indicate that Enclomid is more effective than Clomid or Zuclomid at enhancing total serum testosterone. Zuclomid is clearly not effective and that deficiency limits any use of Clomid for hypogonadism, particularly since the Zuclomid component of Clomid would predominate in the circulation over time given its longer half-life.

Enclomid appeared to be relatively benign in all aspects when compared to Zuclomid and, often, even Clomid. This is particularly true when consideration is given to the trend of Enclomid to lower cholesterol, and liver enzymes as opposed to Zuclomid's trend to raise the same parameters. The surprising trend for Enclomid to raise the lymphocyte count may be useful for men with AIDS if it can be shown the CD4+ subpopulation of lymphocytes is not lowered or is enhanced.

EXAMPLE 2

Method for Increasing Testosterone Level in Men Using Trans-clomiphene and Mixtures of Trans-clomiphene and Cis-clomiphene at Ratios Greater Than 71/29.

Prior to administration of trans-clomiphene, blood samples are taken from subject males and testosterone levels are measured using methodologies described for example in Matsumoto, et al. Clin. Endocrinol. Metab. 56; 720 (1983) (incorporated herein by reference). Sex hormone binding globulin (SHBG), both free and bound to testosterone, may also be measured as described for example in Tenover et al. J. Clin.

Endocrinol. Metab. 65:1118 (1987) which describe measurement of SHBG by both a [$^3$H] dihydrotestosterone saturation analysis and by radioimmunoassay. Non-SHBG-bound testosterone levels (bioavailable testosterone) are also measured for example according to Tenover et al. J. Clin. Endocrinol and Metab. 65:1118 (1987). See also Soderguard et al. J. Steroid Biochem 16:801 (1982) incorporated herein by reference.

Patients are given daily dosages of 1.5 mg/kg clomiphene, wherein the ratio of trans-clomiphene to cis-clomiphene is greater than 71/29. Patients are monitored for testosterone levels such that the dosage amount and dosage frequency may be adjusted to achieve therapeutic levels of testosterone in the patient.

I claim:

1. A method for increasing serum levels of testosterone in a human male with secondary hypogonadism, the method comprising administering to said male an effective amount of a composition consisting essentially of trans-clomiphene or pharmaceutically acceptable salts thereof and optionally one or more pharmaceutically acceptable diluents, adjuvants, carriers or excipients.

2. The method of claim 1, wherein the trans-clomiphene is in a dosage of 1-200 mg per day.

3. The method of claim 2, wherein the trans-clomiphene is in a dosage of 60 mg per day.

4. The method of claim 1, wherein the trans-clomiphene is administered in a dosage of 1.5 mg/kg per day.

5. The method of claim 1, wherein the composition consists essentially of 12.5 mg of trans-clomiphene or a pharmaceutically effective salt thereof.

6. The method of claim 1, wherein the composition is in the form of a filled capsule for oral use.

7. A method for treating secondary hypogonadism in a human male, the method comprising administering to a human male in need thereof, an effective amount of a composition consisting essentially of trans-clomiphene or pharmaceutically acceptable salts thereof and optionally one or more pharmaceutically acceptable diluents, adjuvants, carriers or excipients.

*   *   *   *   *

Form 30

**FORM 30. Certificate of Service**

# UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

# CERTIFICATE OF SERVICE

I certify that I served a copy on counsel of record on | May 20, 2015 |
by:

☐ US mail
☐ Fax
☐ Hand
☒ Electronic Means
   (by email or CM/ECF)

| Elliot H. Scherker | | /s/ Elliot H. Scherker |

Name of Counsel                            Signature of Counsel

Law Firm | Greenberg Traurig, P.A. |

Address | 333 Southeast Second Avenue, Suite 4400 |

City, State, ZIP | Miami, Florida 33131 |

Telephone Number | 305-579-0500 |

FAX Number | 305-579-0717 |

E-mail Address | scherkere@gtlaw.com |

NOTE: For attorneys filing documents electronically, the name of the filer under whose log-in and password a document is submitted must be preceded by an "/s/" and typed in the space where the signature would otherwise appear. Graphic and other electronic signatures are discouraged.

**FORM 19.   Certificate of Compliance With Rule 32(a)**

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.     This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) or Federal Rule of Appellate Procedure 28.1(e).

☑     The brief contains [        *13,880*        ] words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii), or

☐     The brief uses a monospaced typeface and contains [                    ] lines of text, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) or Federal Rule of Appellate Procedure 28.1(e) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

☑     The brief has been prepared in a proportionally spaced typeface using [                *Microsoft Word, 2010*                ] in [                *Times New Roman, Size 14*                ], or

☐     The brief has been prepared in a monospaced typeface using [                                ] with [ [                                ].

/s/ Elliot H. Scherker
_____
(Signature of Attorney)

Elliot H. Scherker
_____
(Name of Attorney)

Attorney for Defendant-Appellant Harry Fisch
_____
(State whether representing appellant, appellee, etc.)

May 20, 2015
_____
(Date)